UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:08-CV-00069-TBR

ELIZABETH A. CLEMONS, DAVID R.                          Plaintiffs
KHALIEL, and LARRY W. TAYLOR, on
behalf of themselves and all other similarly
situated individuals.

v.

NORTON HEALTHCARE, INC. RETIREMENT                     Defendant
PLAN.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiffs' Motion for Summary Judgment.
(Docket No. 143.)  Defendant has responded, (Docket No. 148), and Plaintiffs have
replied. (Docket No. 167).  This matter is now fully briefed and ripe for adjudication.
For the following reasons, the Court will **GRANT in part** and **DENY in part** (to the
extent it is inconsistent with this opinion) Plaintiffs' Motion for Summary Judgment.
(Docket No. 143.)  The Court **ORDERS** Defendant to recalculate Plaintiffs' Monthly
Retirement Income and corresponding lump sums, consistent with the below holdings.
Furthermore, the Court **ORDERS** Defendant to ensure the recalculated lump sums are
at least actuarially equivalent to the Monthly Retirement Income, appropriately
accounting for the increasing monthly income (cost of living adjustment) and sixty (60)
months certain of the Monthly Retirement Income.  The recalculations should be done
within 45 days and submitted to the Court for approval.   If Plaintiffs have any
objections with these recalculations, they must respond within 14 days.

Defendant has also moved for Summary Judgment and for Oral Argument. (Docket No. 145.) Plaintiffs have responded, (Docket No. 154), and Defendant has replied. (Docket No. 164.) For the following reasons, the Court will **DENY** Defendant's Motion for Summary Judgment to the extent it is inconsistent with this opinion. The Court will also **DENY** their request for oral argument. Plaintiffs' complaint is not dismissed.

## BACKGROUND

This is an Employee Retirement Income Security Act ("ERISA") pension dispute brought by a class of early retirees who elected to draw lump sum distributions.[1] The pension plan at issue is a defined benefit pension plan sponsored by Norton Healthcare, Inc. Retirement Plan ("Defendant") with the express purpose of providing retirement benefits to employees. The Plan was established in 1991 when the Company merged two predecessor plans: the Methodist Evangelical Hospital Plan (the "MEH Plan") and the NKC Hospitals, Inc. Plan (the "NKC Plan"). It is funded exclusively by contributions from the Company and maintained in accordance with a written plan document, beginning with the first plan document effective January 1, 1991. (Docket No. 143-3.)

Subsequent to the 1991 plan, the Plan document has been amended. These subsequent amendments were reflected in restated Plan documents. Each restatement of the Plan document incorporates all intervening amendments since the last Plan document. One such restated Plan document was effective January 1, 1997. (Docket No. 143-5, 1997 Plan Document.) There are several amendments that occurred in both

---

[1] Employee Retirement Income Security Act, 29 U.S.C. §1001-1461.

January and May of 2004, which predated Plaintiffs retirement. (Docket No. 143-11; 143-12.)

By its terms, the Plan provides for an early retirement to any employee who accrues ten years of service and attains age 55:

> 2.22(a) The term "Early Retirement Date" shall mean, in the case of each Member who has been credited with at least (10) years of Service and whose Attained Age is at least fifty-five (55), the later of:
>> (1) the date such Member shall leave the employ of the Employer in accordance with Section 4.05 hereof, or
>>
>> (2) the date the Member directs in writing shall be his Early Retirement Date.
>> * * *
> 4.05(a) Upon written application, a Member whose Attained Age is at least fifty-five (55) and who has been credited with ten (10) or more years of Service may retire as of an Early Retirement Date.

(Docket No. 143-5.)

Plaintiffs are participants in the Defendant Plan (and its predecessors and successors) who claim that Defendant underpaid their retirement benefits. The Court previously certified Plaintiffs' claims as a class action. (Docket No. 66.) The Court defined the class as follows:

> All participants in Norton Health, Inc. Retirement Plan, its predecessors and successors, whose contractual lump-sum pension benefits:
>
> (a) Did not include the value of the basic form of benefit – an "increasing monthly retirement income" (annual cost-of-living adjustment) – when election of such basic form would have yielded the highest value for the participant; and/or
>
> (b) Did not include the value of the "alternative" lump-sum benefit where the basic form of benefit is multiplied by 212, when election of such alternative benefit would have yielded the highest value for the participant; and/or

(c) Did not include the value of the early retirement subsidy.

(Docket No. 66, Page 12-13.)

In their Second Amended Complaint, Plaintiffs' challenge the calculation of their benefits on three separate bases:

> First, they allege Defendant failed to include the value of the **"increasing monthly income" ("cost-of-living")** in the calculation of participant lump sum benefits and in the calculation of participant "cash balance" starting balances.

> Second, they allege Defendant failed to include the **value of early retirement subsidies** in the calculation of participant lump sum benefits and in the calculation of participant "cash balance" starting balances.

> Third, they allege Defendant failed to calculate participant **lump sum benefits according to the contractual formula**.

(Docket No. 42, Second Amended Complaint.)  Specifically, Plaintiffs allege the following deficiencies by the Defendant with respect to these steps.

> (1) The Plan failed to accurately determine the form of benefit payable to Class members by incorrectly characterizing their accrued benefit as a <u>non-increasing</u> benefit.  Plaintiffs contend this characterization is directly contrary to the express terms of the plan.

> (2) The Plan further compounded the error of characterization of the accrued benefit by failing to include the value of the <u>five-year certain benefit</u> (60 months), as well as the <u>"increasing" benefit</u> when calculating the Actuarial Equivalent lump sum benefit.

> (3) The Plan failed to provide the 212 Lump Sum minimum benefit, whereby the step two benefit is multiplied by 212 to arrive at the lump sum minimum benefit.

> (4) For early retirees on or after January, 1, 2004, the Plan improperly reduced their lump sum benefit for <u>early commencement</u> contrary to the amended plan document.

The Plaintiffs request the Court to enter summary judgment in their favor as to the following:

(1) The accrued benefit is an increasing monthly income and continuing for sixty months certain. The accrued benefit for Mr. David Khaliel is $2,849.13. The accrued benefit is the Basic Form of benefit.

(2) The Early Retirement Benefit is fully subsidized. For Class members terminating on or after January 1, 2004, their benefits are not to be reduced for early commencement. Their lump sum benefits are to be calculated based upon their Basic Form of benefit. For Mr. Khaliel, his Early Retirement Benefit would be calculated based upon his accrued Basic Form of benefit ($2,849.13).

(3) The lump sum benefit, based on the Basic Form of benefit, shall be the greater of:

(a) an amount equal to the Actuarial Equivalent of the Basic Form, inclusive of the increasing and five-year certain benefit; or

(b) an amount equal to the Basic Form times 212, said amount then divided by one minus the appropriate reduction factor.

The Plaintiffs also request that the Court order the Defendant to perform the requisite recalculation of Class member's benefits in accordance with the findings within 45 days, so the Class can verify the amounts. Defendants contest all these assertions and request the opposite be ordered, essentially affirming their determination of Name Plaintiffs' lump sums.

Name Plaintiff David R. Khaliel was employed by the Defendant from November 18, 1974, to January 9, 2005. When he retired effective March 1, 2005, he elected to receive his accrued plan benefit in lump sum. Mr. Khaliel received a lump sum and submitted a claim by letter July 11, 2007, challenging Defendant's benefit calculations. The Defendant never responded to this claim for benefits. This lawsuit was filed on January 30, 2008. (Docket No. 1, Complaint.)

**STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

**DISCUSSION**

<u>STANDARD OF REVIEW FOR DEFENDANT'S BENEFIT DECISIONS</u>

As an initial matter, it is necessary to determine the standard of review that will be applied to Defendant's decision(s) to deny Plaintiffs benefits they claim are due under the plan. Name Plaintiff Khaliel received a lump sum payment and subsequently, by letter dated July 11, 2007, submitted a claim challenging the Plan's benefit calculations. The Defendant never responded to Mr. Khaliel's letter, prompting the filing of this lawsuit.[2] The Court has already ruled on the exhaustion issue and again agrees with Plaintiffs that the exhaustion requirements under ERISA were excused because further exhaustion would be futile.[3]

We review the plan administrator's denial of benefits *de novo,* unless the benefit plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Morrison v. Marsh & McLennan Companies, Inc.,* 439 F.3d 295, 300 (6th Cir. 2006). In this case, the benefit Plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan. Notably, the Plaintiffs' do not dispute that the Plan affords this discretion.[4] 6.06 of the plan provides for this discretion:

> 6.06 Powers and Authority
>
> (a) Each Committee shall have all powers and discretion necessary or helpful for carrying out its responsibilities, and the decisions or

---

[2] The Court is assuming that Plaintiffs are correct in stating Defendant failed to respond to Mr. Kahliel's letter because the Court was not directed to, nor did it find on its own, any contention by the Defendant that it did respond to the letter.

[3] The Court has already ruled on this matter previously, so further discussion is not required.

[4] "Whereas the plan documents appear to have language providing discretion to the plan administrator, the Class asserts that the applicable standard of review should be *de novo.*" (Docket No. 143-1, Page 14.)

actions of such Committee in good faith in respect of any matter hereunder shall be conclusive and binding upon all parties concerned.

(b) Without limiting the generality of the foregoing, the Retirement Committee shall be the Plan Administrator and shall have the power and discretion:

(1) to make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan.

(2) to construe all terms, provisions, conditions and limitations of the Plan.

(3) to determine all questions arising out of or in connection with the provisions of the Plan or its administration in any and all cases in which the Retirement Committee deems such a determination advisable.

(Docket No. 143-5, Page 57-58.)

Where an ERISA plan gives the plan administrator such discretionary authority, as is the case here, we review under an "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989). Review under the arbitrary and capricious standard is the least demanding form of judicial review of an administrative action; it requires only an explanation based on substantial evidence that results from a deliberate and principled reasoning process. *See Killian v. Healthsource Provident Adm'rs Inc.,* 152 F.3d 514, 520 (6th Cir. 1998). The Court must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants. *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) (citation omitted).[5] Thus, if an interpretation of the plan provisions is "reasonable," it must be upheld. *Morrison*, 439 F.3d at 300; *Firestone,* 489 U.S. at 111.

---

[5] However, relatedly, the Court notes that if the Plan's language is susceptible of more than one interpretation the "rule of *contra proferentum*" applies and any ambiguities are construed against the drafting parties. *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000).

The issue of reasonableness is a question of law.  *Waxman v. Luna,* 881 F.2d 237, 240 (6th Cir. 1989).

However, there is arguably a principle of contract interpretation that would temper the deference given to the administrator: "to the extent the Plan's language is susceptible of more than one interpretation, we will apply the 'rule of *contra proferentum*' and construe any ambiguities against . . . the 'drafting parties.'"  *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000) (noting arbitrary and capricious deferential review is tempered by the principle of "*contra profentum*" which construes any ambiguities against the drafting parties) (emphasis added).  At first glance, these two principles seem to be at odds with one another.  However, they can be reconciled by noting that arbitrary and capricious review isn't as deferential when it comes to ambiguities in plan language asserted against a drafting party, such as Defendant here.  Of course, plan administrators still are afforded the normal deferential arbitrary and capricious review when it comes to determinations apart from plan language, such as whether an employee is disabled or not.[6]  But as to construing plan provisions themselves, ambiguities are construed *against* the drafting party.[7]

The Court notes that the principle of *contra profenentum* in the context of a Plan administrator's decision is not a well established principle:

---

[6] Often times these determinations could be referred to as "fact determinations" (such as determining whether an employee is disabled or not).  While it technically does involve interpreting "plan language," it also involves making factual determinations separate from the plan language.  The Court recognizes it is a fine line, but it is a line nonetheless.

[7] The Court notes that this was a tough question which the applicable precedent, as discussed below, appears to be inconsistent on.  The Court believes this is the best way to reconcile this difficult issue created by arguably inconsistent precedent.  However, as will be discussed, the resolution of this issue had no bearing on the Court's ultimate conclusion in this case.

First, they point to cases from this Circuit that they claim have reduced the deference given to an administrator's decision through the use of state principles of contract interpretation. "[T]o the extent that the Plan's language is susceptible of more than one interpretation, we will apply the 'rule of contra proferentum' and construe any ambiguities against" the drafting party. *University Hospitals of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846-47 (6th Cir. 2000) (quoting *Perez v.. Aetna Life Ins. Co.,* 150 F.3d 550, 557 n. 7 (6th Cir. 1998) (en banc)); *see also Copeland Oaks v. Haupt,* 209 F.3d 811, 813 (6th Cir. 2000). We do not believe that through these statements this Circuit has established a rule of interpretation that would completely contradict the deference paid to an administrator's decision.

As the parenthetical notes, the court in *University Hospitals* attributes the application of the rule of interpretation to the *Perez* court. When we examine *Perez,* we see that the court was not talking about applying the principal to "temper" the arbitrary and capricious standard. Rather, the *Perez* court was interpreting the provision that was alleged to grant that discretion-the principal issue in the case. *See Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 557 & n. 7 (6th Cir. 1998) (en banc). It was in that context that the court said it was *possible* to apply the state rule of interpretation. *See id.* ("Because the only reasonable interpretation of the Plan concludes that *it vests discretion* in Aetna to make benefit determinations, Perez's *contra proferentum* argument lacks merit.") (emphasis added).

The *Perez* court cites a footnote in an earlier case, *Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 895 n. 6 (6th Cir. 1996), when describing how "[t]he rule of *contra proferentum* provides that ambiguous contract provisions in ERISA-governed insurance contracts should be construed against the drafting party." *Perez,* 150 F.3d at 557 n. 7. But that language does not hold that the *Perez* court was suggesting that the rule of interpretation is to be used in ERISA cases when the standard of review is arbitrary and capricious. And indeed when one reads *Schachner* one realizes that the *Perez* court was likely just citing it for descriptive purposes rather than suggesting that it was the rule in this Circuit. For *Schachner* does nothing more than state in a footnote that the court need not address the issue of whether the rule of interpretation applies in ERISA cases. "Since we hold that the phrase [in the Plan] is not ambiguous, however, we need not consider" the arguments regarding the applicability of *contra proferentum. Schachner,* 77 F.3d at 895 n. 6. Indeed, the court does not even purport to be reviewing the administrator's decision; rather, it makes clear it is

applying a de novo standard of review to the contract. *See id.* at 893.

*University Hospitals,* while it states (citing *Perez* (*Id.* at 846)) it will construe any ambiguities against the drafter when applying the "arbitrary and capricious" standard, makes no further reference to that principle in its analysis and holding that the Plan administrator's construction of the Plan was arbitrary and capricious and that the only reasonable construction of the Plan was that asserted by the plaintiff.

*Copeland Oaks* was a suit by a benefit Plan to require the employee and his daughter who had suffered injuries to sign a subrogation agreement before it, the Plan, paid any of the daughter's medical expenses. Plaintiff's daughter's claim against a third party had been settled for $100,000 plus $5,000 medical expenses for the parents. This Circuit had adopted the so-called "make whole" rule of federal common law. That requires an insured to be made whole before an insurer can enforce its rights to subrogation. *Copeland Oaks* attempted to rely on the language of the Plan and the arbitrary and capricious standard for its conclusion that the Plan had opted out of the default make-whole rule. The court held, however, that it was arbitrary and capricious in the absence of language rejecting the make-whole rule with clarity and specificity as ultimately determined by the reviewing court not to apply the default since the language of the Plan failed to establish its priority over any partial recovery.

Thus, none of the cases cited indicate how the arbitrary and capricious standard is affected by applying the state law rule that contracts are construed against the drafter. We note that this Circuit, in *McMahan v. New England Mutual Life Ins. Co.,* 888 F.2d 426 (6th Cir. 1989), held that the plaintiff's state law claim for breach of contract-and, therefore, Kentucky's rule of interpreting ambiguous provisions against the drafter-was preempted by ERISA. 'We think it clear that subjecting an ERISA fiduciary to the vagaries of state contract law regarding its benefits decisions would create the very real prospect that the fiduciary's administrative scheme would be subject to conflicting requirements in various states.... Accordingly, we reject plaintiffs' first argument and hold that the state law claim in this case was within reach of the pre-emption clause.' *Id.* at 429.

However, since there are two bases on which the Plan administrator relied in denying coverage and there is no ambiguity as to one, we need not decide the effect to give to the dicta in the cited cases.

*Mitchell v. Dialysis Clinic, Inc.*, 18 F. App'x 349, 353-54 (6th Cir. 2001); *see also Smiljanich v. Gen. Motors Corp.*, 182 F. App'x 480, 486 n. 2 (6th Cir. 2006); *see generally Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 82 (6th Cir. 2009) (stating in dicta that the application of *contra proferentum* should be limited to cases in which an administrator's decision is reviewed de novo).

Although the principle in *University Hospitals* was arguably dicta and at least two unpublished Sixth Circuit cases have, in dicta, renounced the principle, the Court finds the principle is sound and there is a slightly more precedent in favor of adopting it.[8]  First, *University Hospitals* is a published Sixth Circuit case, while all the cases arguing against the principle are unpublished cases.  Second, the Court believes the principle is a sound one.  Admittedly, the unpublished cases make sound points on why the Sixth Circuit might have read their previous cases too broadly in establishing the principle and why there are legitimate concerns with applying <u>all</u> state contract law to ERISA governed contracts.  However, the substantive arguments against the *application* of the principle itself (as opposed to the *establishment* of the principle through prior precedent), in this Court's opinion, are overbroad and do not outweigh the merit of applying the principle and following <u>published</u> Sixth Circuit precedent.   Applying

---

[8] The Court notes that the Sixth Circuit has provided some continued support for the principle of *contra proferentum* in this context in <u>published</u> cases:

> Osborne contends that the policy language should be construed against its drafter Hartford. *See University Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 846-47 (6th Cir. 2000) (applying *contra proferentum* to ERISA contract). We apply the doctrine of *contra proferentum,* however, only if the contract term is ambiguous. *See Perez v. Aetna Life Ins.,* 150 F.3d 550, 557 n. 7 (6th Cir. 1998) (en banc).
>
> This case does not involve the interpretation of ambiguous contractual language that should be construed against the drafter of the contract. The dispute before us is not over the meaning of "own occupation," which defines the term "Total Disability," but over the methodology Hartford used to determine Osborne's occupation. Even if the doctrine of *contra proferentum* applies in interpreting ERISA plans, the doctrine does not apply here.

*Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 300 (6th Cir. 2006).

*contra proferentum* doesn't necessarily mean that, as a result, <u>all</u> state contract law will be applicable. Therefore, its individual application wouldn't necessarily subject an "ERISA fiduciary to the vagaries of state contract law" or "create the very real prospect that the fiduciary's administrative scheme would be subject to conflicting requirements in various states."[9] *Mitchell v. Dialysis Clinic, Inc.*, 18 F. App'x 349, 354 (6th Cir. 2001).

As to the merit of the application of the principle itself, the principle of *contra proferentum* is sound. To the extent drafters do make ambiguous contracts, they should have those contracts construed against them. The Court can think of no significant reason why this basic and equitable contract principle should not apply in the context of ERISA contracts.

In any event, whether or not this Court finds the principle of *contra profentum* applies won't actually impact the Court's analysis because the below holdings are not based on construing any ambiguities against the Defendant, but rather, it is based on a plain reading of the document (the Court did not find any ambiguities). Despite Defendant's initial qualification for deferential arbitrary and capricious review (based on the Plan documents affording Defendant discretion), Plaintiffs make several arguments for why deferential review is not applicable or, at the very least, should be tempered. The Court will deal with each in turn.

---

[9] Hypothetically, even if the some states applied the principle of *contra proferentum* while others did not, the Court seriously doubts that drafters of plans in those states which did not apply the principle would, as a result, go out and intentionally create ambiguous plan documents. It seems to the Court that creating unambiguous contracts is a general principle that should be followed regardless of state law on the issue. While in some contexts the application of state law to ERISA governed contracts may necessarily subject an "ERISA fiduciary to the vagaries of state contract law," the Court doesn't believe the application of the principle of *contra profentum* would do that given that drafters wouldn't prefer to create ambiguous contracts in the first place (in fact they presumably would prefer to create unambiguous ones). *Mitchell v. Dialysis Clinic, Inc.*, 18 F. App'x 349, 354 (6th Cir. 2001).

I.  <u>Deferential review is not without limitations and/or does not apply to a plan administrator's decision that is contrary to the plan terms</u>

Plaintiffs' assert that under the arbitrary and capricious standard the administrator's decision must be rational in light of the plan's provisions.  Essentially, the decision must be reasonable and the Court cannot simply "rubber stamp" the plan administrator's decision.  *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).  The Court agrees, and, if review under the arbitrary and capricious standard is applied, must determine if the decision is rationale.

The Employee Retirement Income Security Act ("ERISA") requires a plan administrator to discharge his duties with respect to the plan "in accordance with the documents and instruments governing the plan."  ERISA §404(a)(1)(D); 29 U.S.C. §1104(a)(1)(D).  "In interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language, as it would be construed by an ordinary person."  *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 934 (6th Cir. 2000).  Where no ambiguity exists as to the meaning of plan provisions, the plan administrator must apply the plan provisions as written.  *Univ. Hospitals*, 202 F.3d at 850.  Therefore, the Court agrees with Plaintiffs that if the Defendant's interpretation of the plan is contrary to the plain meaning of the language, as it would be construed by an ordinary person, then the typical deferential review is not applicable.

II.  <u>Plaintiffs' Assertion of an Inherent Conflict of Interest Tempering Any Deference</u>

Plaintiffs assert that review of a benefit denial is tempered when the plan administrator has a conflict of interest.  *Univ. Hospitals*, 202 F.3d at 846.  Defendant

funds the Plan and its Board of Directors appoints the members of the Retirement Committee to administer the Plan. The Court acknowledges that this is "one factor" a Court must consider when evaluating a Defendant's decision to deny benefits under ERISA. *Schwalm*, 626 F.3d at 311. Such a conflict is a "red flag" that may trigger a somewhat more searching review, but the arbitrary and capricious standard remains in place. *Id.*

However, it is unclear whether the conflict of interest factor is applicable to this particular situation, and, if it is, it is less of a "red flag" than is typically seen. The Supreme Court's commentary on this factor is helpful:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). The Defendant points out that the initial (and what turned out to be the "final") benefit calculations were performed by an independent organization, Mercer.[10] Plaintiffs did not suggest there were any circumstances suggesting a higher likelihood the "conflict" affected the benefits decision (including a history of biased claims administration). Therefore, if a conflict of interest does exist, it is a less significant conflict than is typical because Mercer acts as an independent "intermediary" making an initial determination before the Defendant

---

[10] There appears to have been separate independent organizations for each Name Plaintiff (Khaliel and Taylor). However, there is no indication there were any meaningful differences between these two entities, so there is no need to distinguish between the two of them.

makes the final determination.[11]   However, because the Defendant still continues to make a final determination/actually administers the plan, the situation is not completely devoid of any conflict of interest.  *See generally Shvartsman v. Johnson & Johnson*, 2012 U.S. Dist. LEXIS 80328, 24-25 (D.N.J. June 11, 2012) ("However, a conflict of interest is not present if an employer funds a benefit plan, but an independent third party is paid to administer the plan.").[12]   As such, if the Court performs review under the arbitrary and capricious standard, it will take into account that a minimal conflict of interest exists.

III.   Plaintiffs' Argument that Defendant has Waived Any Deference By Failing to Exercise Any Discretion

Deferential review can be waived where a plan administrator does not make a benefits decision, as there is nothing for a court to defer.  *See Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009).  While not clear from the briefs, the Court interprets Plaintiffs' argument as two separate arguments for why Defendant failed to exercise discretion.

First, Plaintiffs argue that since Defendant never responded to Mr. Khaliel's letter inquiring as to why his lump sum wasn't more, they failed to exercise their discretion.  However, as to this first argument, Plaintiffs misapply the general principle that deferential review can be waived when a plan administrator does not make a benefits decision.  While Plaintiffs are correct in stating that Defendant failed to respond to Mr. Khaliel's letters inquiring as to why his lump sum was not more, they are incorrect in concluding the mere lack of response was a failure by Defendant to

---

[11] The Court notes that in this instance Mercer's initial determination was "adopted" by the Defendant.  If the Defendant had departed from Mercer's initial determination, the conflict of interest factor may have weighed more in favor of a heightened review.

[12] The Court notes that in this case, as opposed to *Shvartsman*, an independent third party does not "administer" the plan, but instead makes an initial determination.  The Defendant still has the "final call."

exercise his discretion.[13]  To the contrary, at that point Defendant had already exercised its discretion by awarding a lump sum it believed complied with plan terms.  Implicit in that award is the fact that Defendant believed, in its discretion, that the lump sum was the correct amount based on its interpretation of the plan.

Plaintiffs' second argument is a closer call.  Plaintiffs argue that since Mercer was the one making the initial determination and calculation, as opposed to Defendant, that is essentially a failure to exercise discretion by the Defendant.  There is support for Plaintiffs' second argument in an unpublished Sixth Circuit Case:

> In fact, the parties do not dispute the fact that the LTD Plan grants discretionary authority. Instead, plaintiff argues that despite this grant of authority, the arbitrary and capricious standard cannot apply because the plan administrators did not exercise their discretion with regard to plaintiff's claim. Defendants never offered plaintiff an interpretation of the plan explaining their denial of his claim for benefits. The Third Circuit has held that, "[t]he deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and where the trustee has in fact interpreted the instrument*." *Moench v. Robertson,* 62 F.3d 553, 567 (3d Cir. 1995) (citing *Trustees of Central States, Southeast and Southwest Areas Health and Welfare Fund v. State Farm Mut. Auto Ins. Co.,* 17 F.3d 1081, 1083 (7th Cir. 1994)). In *Moench,* the court held that despite language in the plan granting discretionary authority, the arbitrary and capricious standard did not apply because there was no evidence that the Plan administrative committee construed the plan at all-rather, the evidence showed that a distinct entity, not granted authority in the plan language, offered the Plan interpretation in question. *Id.* Plaintiff analogizes to the present case, arguing that defendants did not render an interpretation of Plan language but instead simply told plaintiff that his time to appeal had expired.
>
> The district court rejected plaintiff's argument, emphasizing that *Moench* is distinguishable from the present case. The district court explained that "[p]laintiff mischaracterizes the holding in *Moench.*

---

[13] The Court is assuming that Plaintiffs are correct in stating Defendant failed to respond to Mr. Khaliel's letter because the Court was not directed to, nor did it find on its own, any contention by the Defendant that it did respond to Plaintiffs' letter.

> That court refused to apply a deferential standard of review because entities *other than the trustee* had interpreted the plan, not because of complete lack of interpretation."

> Despite the district court's conclusion, plaintiff's argument has merit. If in fact a plan administrator never offers an interpretation of plan language, then there is nothing to which the court can defer. Although the LTD Plan document clearly grants discretionary authority to defendants, defendants never provided an interpretation of the Plan to plaintiff in response to his claim that he continued to be enrolled in the Plan. As a result, we cannot apply a deferential standard of review. We will review defendants denial of plaintiff's claim for benefits de novo. As this case is before us on a motion for summary judgment, we must determine if there is any genuine issue of material fact whether defendants' decision to deny benefits was improper.

*Thompson v. J.C. Penney Co., Inc.*, 00-3504, 2001 WL 1301751 (6th Cir. Aug. 7, 2001). However, *Thompson* is distinguishable from the present case.[14] In *Thompson*, Plaintiff filed an application for disability benefits with the LTD Plan. *Id.* at 2. The "Defendants never provided a formal acceptance or denial of plaintiff's application for disability benefits." *Id.* It is in that sense that the defendant never offered an "interpretation" of the Plan—it never provided a formal acceptance or denial.

In this case, the formal denial of benefits was the award of a lump sum, a lump sum that was less than the amount Plaintiffs claim they are entitled. This lump sum award provided an "interpretation" of the plan sufficient to satisfy *Thompson*. If, on the other hand, Defendant had completely failed to respond to or acknowledge Mr. Khaliel, for example by not awarding a lump sum at all and not communicating its rejection, then *Thompson* would be applicable to provide for review of Plaintiffs' claims for benefits *de novo*.

---

[14] Because this is a close call, the Court notes that *Thompson* was an unpublished Sixth Circuit case. Therefore, it is not binding on the Court. In any event, there is more recent and published Sixth Circuit precedent available to guide the Court, as discussed below.

Furthermore, Plaintiffs' second argument is at odds with a more recent, *published* Sixth Circuit case:

> But this contention, even if it were properly before us, lacks any support in the caselaw. Zurich's retention of outside counsel to assist it in its claim determination would in fact seem to demonstrate that it took the process seriously and attempted to ensure that its decision had a strong legal basis. The Kovaches have not demonstrated that Zurich's retention of Maguire amounted to the sort of improper delegation of authority that would require us to apply a de novo standard of review to Zurich's decision. We will thus proceed to examine Zurich's denial of the Kovaches' claim under the arbitrary-and-capricious standard.

*Kovach v. Zurich Am. Ins. Co.,* 587 F.3d 323, 329 (6th Cir. 2009). There is no indication that Defendant's retention of an independent organization to make benefits calculations amount to the sort of improper delegation of authority mentioned in *Zurich* as requiring application of a *de novo* standard of review. *Id.* As discussed above, Mercer only made the "initial" determination, and Defendant made the "final" determination. (Docket No. 148, Page 7.) Therefore, Defendant still exercised its discretion and did not waive the right to deferential review.

Consistent with the above holdings, the Court will review Defendant's denial of benefits under an arbitrary and capricious standard, taking into account the minimal conflict of interest that exists because Defendant still administers the plan and makes the "final" determination (although in this case it adopted the independent organization's "initial" calculation).

<u>SUBSTANTIVE ARGUMENTS CONCERNING PLAN PROVISIONS</u>

I.    <u>Introduction</u>

As an initial matter, the Court is applying the 1997 Plan Document and the 2004 amendments (from both January and May).[15]   (Docket No. 143-5; 143-10; 143-11.) This was the Plan Document in effect when the Name Plaintiffs retired.[16]   The 2008 Plan Document was not in effect at that time.  Both parties appear to agree there are no substantive differences in the 2008 Plan Document, but for clarity and consistency all references will be to the 1997 Plan Document with the 2004 amendments.[17]

In responding to the parties' motions for summary judgment, the Court will only be deciding the proper way to interpret the Plan document.  Essentially, the Court will be specifying exactly what provisions apply and resolving any disagreements between the parties on interpretations of those provisions.  However, the Court will not be performing any of the calculations required by these provisions.  Those calculations are left for the parties to perform, consistent with the Court's instructions.

---

[15] The Court notes that both parties referenced different plan documents.  This made it extremely difficult for the Court to decipher the parties' arguments.  For any filings going forward, the Court requests the parties reference the proper plan document: the 1997 plan document with the 2004 amendments.

[16] Defendant has consistently argued that Plaintiff should not be permitted to rely on the 2008 Plan Document because the 1997 Plan Document was originally pled.  The Court has already ruled on this matter, but notes that it only considered the 1997 Plan Document and the 2004 Amendments.  However, to the extent the Defendant would also argue against reliance on the 2004 Amendments (the Court assumes it would for the same reasons it argued against the 2008 Plan Document), the Court feels the Defendant is being disingenuous.  The 2004 Amendments were part of the record and produced during discovery. Furthermore, it is clear they were in effect when Name Plaintiff Khaliel retired.  Plaintiffs (who filed their motion for summary judgment first) indicated their arguments were based in large part on these amendments and also indicated the theory of their case through their expert, who also relied on these amendments.

[17] The Court notes there is at least one area where there *could* be a substantive difference between the Plan with the 2004 Amendments and the 2008 Plan (this area deals with how the Plan would be interpreted based on the incorporation of provisions done for purposes of determining Accrued Benefits).  From 2004 to 2008 the bottom paragraph in 4.03(a)(3) was moved to its own separate section of 4.03(c).  If provisions incorporating specifically 4.03(a)(3) were not updated to reflect this change, then an argument could be made that the paragraph in 4.03(c) would no longer be applicable.  However, the Court need not decide this issue because it is not before it and the parties did not raise it.

II.    Determination of Monthly Retirement Income

Plaintiffs argue that on January 1, 2004, the early retirement benefit became fully subsidized (retirees no longer had their benefits reduced for early retirement). Essentially, they argue that a participant's early retirement benefit would no longer be reduced for early commencement, while Defendant disagrees.[18]   The Court will address both parties' positions by examining the contractual provisions they reference in support of their respective arguments.[19]

*Prior* to January 1, 2004, a Member's Monthly Retirement Income ("MRI") on his Early Retirement Date was subject to the provisions of 4.05(b).[20]   In 4.05(b), there was (and still is) a reduction formula based on the number of months a retiree retired early: "reduced by one one hundred and eightieth (1/180) for each of the first sixty (60) months and one three hundred and sixtieth (1/360) for each of the next sixty (60) months by which the Member's Early Retirement Date precedes his Normal Retirement Date."  4.05(b)(1), (2), and (3).

However, in January 2004, the Plan was amended and the phrase "Effective prior to January 1, 2004," was inserted at the beginning of 4.05(b).  (Docket No. 143-10.)  Accordingly, 4.05(b) by its own terms no longer applied after January 1, 2004, for

---

[18] Defendants assert that there are two "parallel" benefit options available for determination of the Monthly Retirement Income: a Cash Balance Benefit (created in 2004) and a Defined Benefit (which was frozen in 2004, but retirees retained the possibility of receiving if it was greater than the Cash Balance benefit). Defendant appears to argue that distributions from the Cash Balance Account were exempted from Early Retirement reducers, while distributions from the former Defined Benefit were not.  While a logical assertion on its face, the Court struggles to see how a plain reading of the Plain document permits this interpretation. As will be discussed below, a plain reading of the Plan document provides for the opposite: the Defined Benefit is also exempt from the Early Retirement reducers (at least after the 2004 amendments). Furthermore, to the extent the plan document ambiguous, it is construed *against* the drafter.  *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000).

[19] The Court notes that Defendant has argued that 4.05 operates to reduce for early retirement.  (Docket No. 145-2, Page 7-8.)  However, this reference to 4.05 is the pre-2004 version of 4.05.  Additionally, as will be discussed below, any argument that 4.05 continues to reduce for early retirement as to the Defined Benefit is incorrect based on a plain reading of the Plan provisions.

[20] The Court notes that Section 4.05, which includes both 4.05(b) and 4.05(d), is labeled "Early Retirement."

determining an early retiree's MRI. By the same and additional amendments in 2004, 4.05(d) was created and was "Effective only for a Member who terminates employment on or after January 1, 2004, . . ." (Docket No. 143-10, 143-11.) 4.05(d) provided for the determination of Monthly Retirement Income for a Member who opted to retire early *on or after* January 1, 2004.[21] Unlike 4.05(b),[22] 4.05(d) does not have any reference to a reduction for Early Retirement. Name Plaintiff Khaliel terminated his employment with Defendant on January 9, 2005, and commenced his benefits under the plan effective March 1, 2005. (Docket No. 143, Page 7.)

It should be noted that <u>all</u> the provisions applying prior to January 1, 2004, didn't suddenly become obsolete/superfluous because of these amendments.[23] Throughout the Plan there are references to a retiree's "Accrued Benefit" as of December 31, 2003. These references ultimately will require a retiree to receive the "greater of" two benefit calculations:

> 4.05(d) Effective only for a Member who terminates employment on or after January 1, 2004, upon such Member's retirement, the Member shall be entitled to a **Monthly Retirement Income** equal to the benefit described under Subsection <u>4.03(b)</u>, determined as of the Member's Early Retirement Date, subject to Subsections (a) and (c) above; provided **<u>in no case shall such Monthly Retirement Income be less than the Member's Accrued Benefit as of December 31, 2003</u>**.
>
> * * *

---

[21] The Court notes this is logical. The 2004 Amendments made 4.05(b) only apply prior to January 1, 2004, while at the same time creating 4.05(d) which applied on or after January 1, 2004.

[22] The Court reiterates that by amendment 4.05(b) no longer applied on or after January 1, 2004.

[23] Admittedly, as will be shown, the provisions reducing distributions prior to January 1, 2004, for Early Retirement do become obsolete/superfluous (in that since it is after January 1, 2004, these provisions will likely never apply to a retiree absent some unusual circumstances). While this is a seemingly odd result (and accordingly one the Court was hesitant to make), it is what is demanded by a plain reading of the plan document. Presumably, at least standing here today, Defendant would argue it was their intention for the Early Retirement Reducers of 4.05(b) to continue to apply to the Defined Benefit for retirees on or after January 1, 2004. However, the Plan's language does not in any way warrant that interpretation. Furthermore, to the extent the plan document ambiguous, it is construed *against* the drafter. *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000).

4.03(b) Effective January 1, 2004, the amount of the Member's **Monthly Retirement Income** under the **basic form** described in Section **4.02(a)** and payable at the Members' Normal Retirement Date shall be determined as set forth in paragraphs (1) and (2) hereof, if applicable; provided, **in no case shall such monthly retirement be less than the Member's Accrued Benefit as of December 31, 2003**.

* * *

2.01 Accrued Benefit

(a) Effective prior to January 1, 2004, the term **"Accrued Benefit"** as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:

(1) The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(1) or

(2) The greater of the amount in paragraph (A) or (B):

(A) The Member's **projected Monthly Retirement Income at his Normal Retirement Date** under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, . . .

(B) The **Member's Monthly Retirement Income** under Section 4.03(a)(2)(B) or (3)(B). (emphasis added.)

The parties' references to a "Traditional/Defined Benefit"[24] (for benefits accrued as of December 31, 2003, and were "frozen" at that point) and "Cash Balance"[25] (benefits accrued based on the formula used on or after January 1, 2004) reflect these two distinct benefit calculations/values. These provisions establish the accrued traditional/defined benefit for each participant who had one as of December 31, 2003, as a *minimum* benefit for each respective participant.[26] The parties appear to agree that the Defined Benefit (the Accrued Benefit as of December 31, 2003) produced the largest

---

[24] Plaintiffs appears to refer to this as the "TRAC Benefit" (although Plaintiff neglects to account for the bottom paragraph of 4.03(a)(3) in making this reference as discussed below). The language itself is not important. What is important is to recognize that there are two, separate benefit calculations.

[25] Plaintiffs appeared to allege that Name Plaintiff Khaliel's Cash Balance Benefit would be $1,811.17 per month. (Docket No. 146-16, Page 13, Number 45.)

[26] The Defendant has stated that the benefit available under the Cash Balance is less than that for the Defined Benefit. (*See* Docket 145-1, Number 15.) Plaintiffs appear to agree.

benefit.[27]  Therefore, the Court's discussion of Plan provisions will be in the context of determining Plaintiff's Monthly Retirement Income under the "Traditional/Defined Benefit" formula.

    a.  Amount of Defined Benefit (Monthly Retirement Income)

    Before resolving the parties' areas of disagreement as to the *treatment* of the Defined Benefit (the Accrued Benefit as of December 31, 2003), the Court will resolve disagreement concerning the correct *amount* for the Defined Benefit.  Although the parties aren't entirely clear on their disagreement concerning this issue, the Court has deciphered there is disagreement as to the calculation of the *amount* of the Defined Benefit.[28]  The Court need not replicate this calculation to tell the parties' the proper amount (nor would it be capable of doing so).  Since this disagreement hinges on whether or not the bottom paragraph in 4.03(a)(3) is applicable (beginning with "[s]uch monthly amount shall be converted to. . ."), the Court need only instruct whether or not that bottom paragraph is applicable.  For the reasons below, the Court will hold that this paragraph **is applicable** to the determination of the Plaintiffs' MRI under 4.03(a)(3).

> 4.03(a)(3)   For a member with an NKC Accrued Benefit, the greater of (A) or (B)
>
> (A) one and two-thirds percent (1-2/3%) of the Member's Average Monthly Earnings, such amount multiplied by the Member's years of Credited Service, minus the lesser of (i) and (ii):
>
> > (i) six hundred twenty five thousandths percent (0.625%) of the Member's three year average of Monthly Earnings (not to exceed the taxable wage base) up to his Covered

---

[27]  The Court believes the parties are in agreement that, even with application of 4.03(a)(3)'s bottom paragraph, the Defined Benefit produces a larger amount than the Cash Balance Benefit.

[28]  *See* Docket No. 148-5, Exhibit C, Page 21 (appearing to assert application of 4.03(a)(3) results in an MRI of 2,288.78 rather than 2,849.13); Docket No. 165, Page 27 (asserting the same).  On the other hand, Plaintiffs appear to assert the amount of the Defined Benefit MRI is $2,849.13.

Compensation, multiplied by the Member's years of Credited Service to a maximum of thirty (30);

(ii) eight hundred thirty-three thousandths percent (0.833%) of the lesser of the Member's Average Monthly Earnings, three (3) year average of Monthly Earnings (not to exceed the taxable wage base) or Covered Compensation, multiplied by the Member's years of Credited Service to a maximum of thirty (30).

(B) the NKC Accrued Benefit.

Such monthly amount shall be **converted to a single sum** on the basis of the interest rate or rates which would be used as of the first day of the Plan Year in which the benefit determination occurs by the Pension Benefit Guaranty Corporation for determining the present value of a Member's lump sum distribution on plan termination [in no event, however, will a Pension Benefit Guaranty Corporation immediate rate in excess of nine percent (9%), and the deferred rates related thereto, be used] and the 1984 Unisex Pension Mortality Table set back (3) years of age, and the **resulting amount divided by 212**; provided, effective January 1, 2000, the amount resulting from such conversion shall be no less than the amount which results from a conversion based upon the interest rate for 30-year Treasury securities for the second month prior to the beginning of the applicable Plan Year and the mortality table prescribed by the Secretary of the Treasury and **resulting amount divided by 212**. (emphasis added.)

§4.05(d) directs a reader to §4.03(b) for determination of MRI (with the Accrued Benefit minimum requirement). §4.03(b) also has an Accrued Benefit (Defined Benefit) minimum requirement. § 2.01, the provision applicable for determination of the Accrued Benefit, ultimately directs the Court to § 4.03(a)(3)(A). Because it results in a greater MRI than the Cash Balance Benefit, § 4.03(a)(3) continues to provide the Court with the formula to define Named Plaintiff Khaliel's MRI, even after the applicable 2004 Plan Amendments. § 4.03(a)(3)'s bottom paragraph contain

instructions for converting a monthly amount into a "single sum" (as opposed to a lump sum), ultimately resulting in division by 212.

It is important to recognize, in interpreting 4.03(a)(3), that "single sum" is distinct from "lump sum." The term "lump sum" is used throughout the plan to refer to the actual conversion to a lump sum. The fact that the Plan specifically uses "single sum" makes it obvious it is distinct from a "lump sum." Keeping this distinction in mind, the Court finds the "single sum" reference is merely part of a lengthy calculation for ultimately determining Plaintiffs' MRI.[29] It is also important to recognize this bottom paragraph is not indented. This precludes any argument that it applies only to 4.03(a)(3)(B) and not (a)(3)(A) because the fact that the paragraph is not indented indicates it was intended to apply to *both* (A) and (B). As a result, the Court holds that the bottom paragraph of 4.03(a)(3) applies in determining Plaintiffs' Monthly Retirement Income (in the Defined Benefit calculation).

Accordingly, the Court **ORDERS** 4.03(a)(3)'s bottom paragraph (beginning with "[s]uch monthly amount shall be . . .") is applicable in determining Plaintiffs' Monthly Retirement Income.[30]

b. <u>Resolving Disagreement on Treatment of the Defined Benefit With Respect to Early Retirement</u>

The parties appear to agree that the Defined Benefit (the Accrued Benefit as of December 31, 2003) produced the largest benefit.[31] However, the parties disagree on

---

[29] This is important because had this been instructions to convert a lump sum, the Court would find it inapplicable because the incorporation of 4.03(a)(3) is *only* for purposes of determining the MRI in this context.

[30] It appears the same result would occur under 4.03(a)(2).

[31] The Court believes the parties are in agreement that, even with application of 4.03(a)(3)'s bottom paragraph, the Defined Benefit produces a larger amount than the Cash Balance Benefit.

(1) whether this number (either as a monthly amount or upon conversion to a lump sum) should be reduced for early retirement; (2) whether this number represents an *increasing* monthly income (as opposed to non-increasing, which would have to be reduced to reflect an increasing monthly income); and (3) whether the lump sum conversion was done correctly (specifically whether it took into account the 60 months certain aspect of the MRI and whether, if applicable, it was adjusted for the increasing monthly income).

While Defendant appears to argue there is a difference in treatment regarding calculation of a lump sum depending on which type of benefit is being used (Defined Benefit or Cash Balance), the Court has found the Plan document does not textually support this assertion. The actual calculation of the *lump sum* is the same regardless of which type of benefit (Defined or Cash) one uses for determination of the MRI for a retiree *on or after January 1, 2004*. Similarly, the operation of § 4.05 (labeled Early Retirement) is the same for retirees *on or after January 1, 2004*, regardless of which type of benefit is used for the determination of the MRI—there is no reduction for Early Retirement as a result of 4.05.[32]

In order to demonstrate why the calculation of the MRI and/or resulting lump need not be reduced for Early Retirement, the Court will note some of the provisions required for the calculation of the Defined Benefit to provide context important to interpreting the Plan document. The primary takeaway from this demonstration is that, despite Defendant's contentions otherwise, a reading of the Plan document does not result in a reduction for Early Retirement.

As already mentioned, the starting point is 4.05(d):

---

[32] The Court reiterates that for a retiree on or after January 1, 2004, 4.05(d) applies.

> 4.05(d) **Effective only for a Member who terminates employment on or after January 1, 2004**, upon such Member's retirement on the Member's Early Retirement Date, the Member shall be entitled to a Monthly Retirement Income equal to the benefit described under Subsection 4.03(b), determined as of the Member's Early Retirement Date, subject to Subsections (a) and (c) above; provided **in no case shall such Monthly Retirement Income be less than the Member's Accrued Benefit as of December 31, 2003**. (emphasis added)

Keeping in mind that 4.05(d) references a "Member's Accrued Benefit as of December 31, 2003" for the minimum amount required for a Member's *Monthly Retirement Income*, 2.01(a) prescribes exactly what *calculation* is required to determine this precise minimum, Accrued Benefit (the accrued benefit as of December 31, 2003):

> 2.01 Accrued Benefit
> (a) Effective prior to January 1, 2004, the term **"Accrued Benefit"** as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:
>
> > (1) The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(1) or
> >
> > (2) The greater of the amount in paragraph (A) or (B):
> >
> > > (A) The Member's **projected Monthly Retirement Income at his *Normal* Retirement Date** under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, . . .
> > >
> > > (B) The Member's Monthly Retirement Income under Section 4.03(a)(2)(B) or (3)(B). (emphasis added.)

As should be apparent from a reading of 2.01 and 4.05(d), the reference to the Accrued Benefit (as of December 31, 2003) is a reference *only* for purposes of determining a Member's *Monthly Retirement Income*. There is no indication that this should impact the determination of their *lump sum*. Although 2.01 ultimately directs a determination of a Member's *Monthly Retirement Income* to be done under 4.03(a), the

determination of a Member's *lump sum* is still a separate calculation. Essentially, the reference and operation of 4.03(a) in this context is <u>only</u> for the purposes of determining a Member's Monthly Retirement Income. Understanding that the "incorporation" of 4.03(a) in this context is *solely* for determination of the MRI is the key for understanding why Defendant's argument that the MRI continues to be reduced for Early Retirement is unavailing.

There are two reasons that the reference and operation of 4.03 (by way of 2.01) is only for purposes of determining a Member's Monthly Retirement Income ("MRI") is significant. First, there is no indication the MRI determination requires an application of the Early Retirement reductions in 4.05(b) that applied prior to January 1, 2004. The "incorporation" of 4.03(a) through 4.05 and 2.01 is *only* for the purpose of determining a Member's *Monthly Retirement Income*, not for applying the pre-2004 Early Retirement reducers in 4.05(b).[33] If the actual intention of the Defendant was to continue to apply to Early Retirement reducers in 4.05(b) on or after January 1, 2004, to the Accrued Benefit as of December 31, 2003 (the Defined Benefit), that intention is not made apparent from a reading of the Plan.[34] On the contrary, there is no reference to 4.05(b), or even 4.05 in general, in Section 2.01 which establishes exactly what the Accrued Benefit "mean[s]."[35] 2.01(a). While it may have been logical to reduce the

---

[33] The Court further notes that 4.03(a)(3)(A), which the parties appear to agree is the applicable provision, is stated under 2.01(a)(2)(A) to be used for purposes of determining a Member's projected MRI at his **Normal** Retirement Date, which provides more evidence that the pre-2004 Early Retirement reducers under 4.05(b) should not apply to a determination of the MRI.

[34] Furthermore, as already mentioned, to the extent the Plan's language is susceptible of more than one interpretation, we will apply the "'rule of *contra proferentum*' and construe any ambiguities against . . . the 'drafting parties.'" *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000)

[35] Defendant is correct that standing alone 4.05(b)(3) would operate to reduce Plaintiffs' Monthly Retirement Income under the Plan for Early Retirement. However, the amendments made 4.05(b) no longer applicable to retirees on or after January 1, 2004.

MRI for Early Retirement, that intention is not made apparent from a plain reading of the Plan.

Accordingly, consistent with the above holdings, the Court **ORDERS** the Defendant to not reduce the Plaintiffs' Monthly Retirement Income for Early Retirement in recalculating the benefits due under the Plan.[36]

    c.   <u>Resolving Disagreement on Treatment of Defined Benefit as to Increasing Monthly Income (Cost of Living Adjustment) and Sixty Months Certain Assertions</u>

As stated above, the parties disagree (1) whether this MRI represents an *increasing* monthly income (as opposed to non-increasing, which would have to be reduced to reflect an increasing monthly income); (2) whether the MRI is for sixty (60) months certain; and (3) whether the lump sum conversion was done correctly (specifically whether it took into account the 60 months certain aspect of the MRI and whether, if applicable, it was adjusted for the increasing monthly income). For the foregoing reasons, the Court holds the MRI is an *increasing* monthly income and is for sixty (60) months certain, which should be reflected in the conversion to a lump sum.[37] Reading the previously discussed 4.05(b), 4.03(b), 2.01, and 4.02(a) in conjunction with 4.02(b)(6) requires this result:

> 4.05(d) Effective only for a Member who terminates employment on or after January 1, 2004, upon such Member's retirement on the <u>Member's Early Retirement Date</u>, the Member shall be entitled to a <u>Monthly Retirement Income</u> **equal to the benefit described**

---

[36] The Court notes, as discussed below, that Defendant's argument that in the alternative/additionally 4.05(b)(5) reduces Plaintiffs' MRI for Early Retirement is also wrong because of the 2004 Amendments. 4.05(b)(5) applies only to "the Monthly Retirement Income described in paragraphs (1), (2), (3) and (4) above . . .". Those paragraphs no longer apply after the 2004 Amendments because 4.05(b) begins with the qualifier "[e]ffective prior to January 1, 2004, . . ." Therefore, 4.05(b)(5) is not applicable. The Court will further expand on why 4.05(b)(5) is inapplicable below in III. Conversion to a Lump Sum and Early Retirement Impact.

[37] As will be discussed below, the Court finds unavailing Defendant's arguments that this MRI was a non-increasing annuity and needed to be "reduced" in order to represent an increasing annuity.

**under Subsection 4.03(b)**, determined as of the Member's Early Retirement Date, subject to Subsections (a) and (c) above; provided in no case shall such  Monthly Retirement Income be less than the Member's Accrued Benefit as of December 31, 2003.

* * *

4.03(b) Effective January 1, 2004, the amount of the Member's Monthly Retirement Income **under the basic form described in Section 4.02(a)** and payable at the Members' Normal Retirement Date shall be determined as set forth in paragraphs (1) and (2) hereof, if applicable; provided, in no case shall such monthly retirement be less than the Member's Accrued Benefit as of December 31, 2003.

* * *

2.01 Accrued Benefit

(a) Effective prior to January 1, 2004, the term **"Accrued Benefit"** as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:

(1) The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(1) or

(2) The greater of the amount in paragraph (A) or (B):

(A) The Member's **projected Monthly Retirement Income at his Normal Retirement Date** under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, . . .

(B)  The Member's Monthly Retirement Income under Section 4.03(a)(2)(B) or (3)(B).

* * *

4.03(a) Effective prior to January 1, 2004, when a Member lives to his Normal Retirement Date, he shall be entitled to retire and to receive a Monthly Retirement Income in an amount certified to the Trustee by the Retirement Committee.  The amount of the Member's Monthly Retirement Income **under the basic form described in 4.02(a)** and payable at his Normal Retirement Date shall be equal to the largest of the amounts provided . . .

* * *

4.02(a) Basic Form:  The basic form of Retirement Benefit (to which the formula indicated in **Section 4.03 applies**) shall be an **increasing monthly income** commencing on the Member's Disability, **Early**, Normal, or Late Retirement Date or on the date specified in Section 5.01 and **continuing for sixty (60) months**

**certain** and for his lifetime thereafter. The monthly income shall be increased, on each January 1 following the date the . . .

* * *

4.02(b)(6) A lump sum payment payable at the Member's Disability, Early, Normal, or Late Retirement Date or the date specified in Section 5.01, and calculated by multiplying the **increasing** Monthly Retirement Income determined under the applicable Section by 212, and, **if the Monthly Retirement Income is due to <u>Early Retirement</u> or Disability Retirement, dividing by one (1) minus the appropriate reduction factor under Section 4.05(b)(5),** Section 4.06(a)(5) or Section 5.01(c)(5), **as applicable.** (emphasis added.)

While not a model of clarity, there are several indications in these provisions that lead to the conclusion that the MRI (the accrued benefit as of December 31, 2003) is increasing and for sixty months certain. First, the basic form of retirement benefit in 4.02(a) is stated to be "increasing" and for "sixty (60) months certain." There is no indication in 4.05(d) (which deals with a Member's Early Retirement on or after January 1, 2004), 4.03(b) (applicable provision for determining the amount of the MRI), 2.01(a) (Accrued Benefit as of December 31, 2003), 4.03(a) (provision sent to by 2.01 for actual determination of the Accrued Benefit), or 4.02(a) that the basic form is not the proper form in the situation where a Member retires early on or after January 1, 2004, and is availing himself of the Accrued Benefit as of December 31, 2003. In fact, there are indications that it is indeed the proper form in all of these provisions.

4.02(a) explicitly indicates that the basic form is the benefit to which the formula indicated in 4.03 applies (which it does in this context both for determination of the amount of the MRI, 4.03(b), and, by incorporation through 2.01, 4.03(a)). 4.03(b), which is applicable for the determination of the amount of the MRI, explicitly states the MRI shall be in "the basic form described in Section 4.02(a)." 4.02(a) also specifically

references Early Retirement. 2.01(a)(2)(A) states "projected Monthly Retirement Income at his **Normal** Retirement Date," which indicates that, regardless of whether or not the Member has retired early, he or she is entitled to the MRI that would be available at his Normal Retirement Date. 4.03(a), which 2.01 uses for the actual determination of the Accrued Benefit, states the amount of the MRI is "under the basic form described in 4.02(a)."

Furthermore, 4.02(b)(6) references "increasing Monthly Retirement income" with respect to the lump sum. Defendant argues that the accrued benefit is a non-increasing benefit that must be first "converted" (reduced) into an increasing annuity. The Court finds no support for this assertion in the Plan language. To the contrary, as shown above, the Court finds a plain reading of the Plan terms requires that this benefit be increasing as specified in 4.02(a).

Accordingly, the Court **ORDERS** that Defendant treat the Plaintiffs' Monthly Retirement Income as an increasing monthly income for sixty (60) months certain in recalculating the Plaintiffs' benefits due under the Plan. Having determined the Monthly Retirement Income is both increasing and for sixty months certain, the Court will now address the parties' arguments concerning the conversion of this Monthly Retirement Income to a lump sum. As will become clear below, Defendant's argument that the conversion to a lump sum resulted in a reduction for Early Retirement is unavailing.[38]

---

[38] Nor would it be logically consistent with the rest of the Plan taking into account the Court's above holdings because, as the Court held above, the Monthly Retirement Income individually is to not be reduced for Early Retirement.

III.     Conversion to a Lump Sum and Early Retirement Impact

Both parties appear to agree that 4.02(b)(6) is applicable to convert the "increasing Monthly Retirement Income" to a lump sum.[39]  The parties' disagreement concerns whether 4.02(b)(6) operates to reduce this lump sum for Early Retirement.

> 4.02(b)(6) A lump sum payment payable at the Member's Disability, Early, Normal, or Late Retirement Date or the date specified in Section 5.01, and calculated by multiplying the increasing Monthly Retirement Income determined under the applicable Section by 212, and, **if the Monthly Retirement Income is due to <u>Early Retirement</u> or Disability Retirement, dividing by one (1) minus the appropriate reduction factor under Section 4.05(b)(5), Section 4.06(a)(5) or Section 5.01(c)(5), <u>as applicable</u>.**
>
> * * *
>
> 4.05(b)(5) **Anything herein to the contrary notwithstanding**, the <u>**Monthly Retirement Income** described in paragraphs (1), (2), (3) and (4)</u> above be reduced or further reduced by one three hundredths (1/300) for each month by which the Member's Early Retirement Date precedes his Normal Retirement Date (emphasis added).

4.02(b)(6) essentially instructs a reader to multiply the determined, increasing MRI by 212 and then, if the MRI is due to Early Retirement, to divide by one (1) minus the appropriate reduction factor under 4.05(b)(5) **as applicable**.  Defendant has consistently argued that application of 4.02(b)(6) results in a reduction for Early Retirement, but has never actually expanded on or explained how their interpretation of that provision results in such a reduction.  In fact, upon reviewing Defendant's briefing, the Court believes it has argued for different, inconsistent interpretations of 4.02(b)(6), one which

---

[39] Plaintiffs have alleged the multiplication by 212 is the "minimum lump sum" benefit. (*See, e.g.,* Docket No. 143, Page 25-26.)  Implicit in this statement is that Plaintiffs believe the other option for determining the lump sum (the Actuarial Equivalent of the MRI) can be, at least in some instances, greater than the lump sum derived from the multiplication by 212.  The Court merely notes that, as will be discussed below, to the extent the application of 4.02(b)(6) is less than what the Actuarial Equivalent of the MRI would be, then Plaintiffs would be entitled to an Actuarial Equivalent lump sum.

would actually *increase* the Plaintiffs' lump sum for Early Retirement.[40] Because Defendant was not entirely clear on how exactly it interpreted 4.02(b)(6) and 4.05(b)(5) to result in a reduced lump sum because of Early Retirement, the Court will analyze some of the arguments for a reduction for Early Retirement which Defendant has made with respect to these provisions.

Despite Defendant's contentions otherwise, application of 4.02(b)(6) does not result, through its reference to 4.05(b)(5), in a literal application of Section 4.05(b)(5) in its entirety in this context. That would be illogical and not consistent with the plain reading of the text. A division by one (1) always results in getting the same number with which one started.[41] So that language, specifically placed in the plan document, would be rendered superfluous. If that odd reading is what the drafters intended, then they presumably would have separated off the division by one from the "minus the appropriate reduction factor."[42] Furthermore, as will be discussed below, language in both 4.02(b)(6) ("as applicable") and 4.05(b)(5) precludes application of 4.05(b)(5) for retirees on or after January 1, 2004.

To the extent Defendant is arguing for application of 4.05(b)(5) on its own right (aside from any incorporation through 4.02(b)(6)), the Court notes that such application would not be appropriate. The first line of 4.05(b)(5) states its application only applies to "the Monthly Retirement Income described in paragraphs (1), (2), (3), and (4)." As

---

[40] *See* Docket No. 145-1, Number 64: "212 / (1-(32/300)) = 237.313." Admittedly, this appears to be in the context of having already applied 4.05(b)(5), which the Court will hold is not applicable in this situation. That change—that 4.05(b)(5) is no longer applicable—would presumably cause the Defendant to argue that this interpretation would no longer be appropriate.

[41] For example, 1000 / 1 = 1000. It would make very little sense for this to be the reading of 4.02(b)(6), as the division by one (1) would essentially be superfluous/meaningless.

[42] Even a period or comma would potentially have made this interpretation more reasonable, although the Court still doubts it would be determinative.

discussed, due to the 2004 Amendments, 4.05(b)(1)-(4) does not determine a retiree's (on or after January 1, 2004) Monthly Retirement Income. Therefore, 4.05(b)(5) standing alone would not apply to a determination of Plaintiffs' benefits.

Plaintiffs' assert that application of 4.02(b)(6) and 4.05(b)(5) only results in a multiplication of 212, arguing that the ending "as applicable" language in 4.02(b)(6) and "the Monthly Retirement Income described in paragraphs (1), (2), (3), and (4)" language in 4.05(b)(5) precludes any possible reduction of benefits due to Early Retirement on the basis of 4.05(b)(5).[43]  (*See* Docket No. 154, Plaintiffs' Response to Defendant's Motion for Summary Judgment, Page 25 n. 25.)  There is merit to Plaintiffs' argument since a reduction under 4.05(b)(5) would not be "applicable" since: (1) Plaintiffs' Monthly Retirement Income was not determined under  4.05(b)(1)-(4); and (2) all indications are a reduction for Early Retirement is not appropriate given the language in 4.05(b)(5) and that the determination of a retiree's MRI (before conversion to a lump sum) did not result in a reduction Early Retirement.[44]

Therefore, the Court agrees with Plaintiff that application of 4.02(b)(6) for a conversion to a lump sum will not result in a reduction of benefits for Early Retirement.[45]  Furthermore, as already mentioned, to the extent the Plan's language is

---

[43] Plaintiffs also argue the language in 4.05(d) making the determination subject to (a) and (c), but not (b), precludes the application of 4.05(b)(5).  This argument has merit as to the application of 4.05(b)(5) on its own right.  However, as to application of 4.05(b)(5) through incorporation by 4.02(b)(6), this argument is without merit.  This language is all with respect to the "Monthly Retirement Income" determination.  It does not have anything to do with the lump sum determination.  Choosing to take a lump sum is what "exposes" a retiree to 4.02(b)(6), which subsequently incorporates 4.05(b)(5).  In any event, as discussed below, the Court holds that 4.05(b)(5) is not made applicable through 4.02(b)(6).

[44] While not determinative, the Court notes that it would be an odd result for the Plan to be read in a way that doesn't reduce a retiree's MRI for Early Retirement, but does reduce their lump sums for Early Retirement.

[45] The Court notes that Plaintiffs have merely asked the Court to find that 4.02(b)(6) does not result in a reduction of benefits for Early Retirement (essentially asking the Court to find it only results in a

susceptible of more than one interpretation, we will apply the "rule of *contra proferentum* and construe any ambiguities against . . . the drafting parties." *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000). Accordingly, the Court **ORDERS** that application of 4.02(b)(6) for determination of Plaintiffs' lump sums does not result in a reduction for Early Retirement.

## IV.     Actuarial Equivalent Lump Sum

It appears Plaintiffs believe 4.02(b)(6)'s application only results in a "minimum" lump sum and that the actuarial equivalent lump sum will actually be a larger amount (and therefore is the lump sum they will wish to take).[46]   The Plan and ERISA require that a participant's lump sum benefit be the "actuarial equivalent" of the MRI.   *See* 5.01(e).[47]   5.01(e) states "a terminated Member may elect to receive his benefits in Actuarially Equivalent alternate form."   A lump sum is an alternate form.   Had Defendant intended the actuarially equivalent calculation to be based on a non-increasing annuity (or any form other than the basic form), 5.01(e) would have been the section that it would have been logical to place that qualifier.   2.02 doesn't eliminate the assumption of actuarial equivalency based on an increasing monthly income and sixty (60) months certain.   Therefore, an "actuarial equivalent" lump sum will need to account for an increasing monthly benefit for sixty (60) months certain.

---

multiplication by 212).  Plaintiffs have not asked for any other interpretations of this provision and have only refuted Defendant's contentions that it results in a reduction for Early Retirement.
[46] If Plaintiffs' contention is true, then it would appear the Court's holding as to 4.02(b)(6) would not impact the lump sum Plaintiffs ultimately receive (as they will always take the actuarial equivalent amount).
[47] The Court notes that 5.01(e) is actually qualified by "subject to the provisions of Section 4.02," but ERISA actually requires that the lump sum be actuarially equivalent, so that possible qualification does not matter.  In any event, there is nothing within 4.02 that could be interpreted as completely negating any presumption from the rest of the plan provisions that a lump sum should be the actuarially equivalent of the increasing and sixty (60) months certain monthly retirement income.

Plaintiffs allege the Defendant incorrectly determined their lump sum benefit by failing to adjust for the value of a sixty (60) months certain benefit. Plaintiffs allege this adjustment is done by multiplying the Monthly Retirement Income ("MRI") by 1.015. (Docket No. 143, Page 11.) It appears Defendant has admitted this is the proper way to make such an adjustment. (Docket No. 143-7, NOR 485; 143-15, No. 47.) Plaintiffs also allege that Defendant failed to take into account the increasing nature of the MRI when determining the lump sum. Defendant appears to allege that multiplying by 212 is the appropriate way of reflecting for the increasing benefit, as well as accounting for the five year certain aspect. (Docket No. 145, Page 14-15; Docket No. 154, Page 27.)

Plaintiffs appear to disagree that the 212 factor is the appropriate way to determine the actuarial equivalent lump sum. (Docket No. 154, Page 26-28.) Specifically, Plaintiffs allege "the Plan must still calculate the actuarial equivalent by using the interest rates in effect as of the calculation date and by using the participant's actual age at retirement." In essence, Plaintiffs argue that the 212 lump sum is the _minimum_ benefit provided by the Plan--even if 4.02(b)(6) (the provision of the plan applicable for determination of the lump sum) is properly applied, they are still entitled to the "actuarial equivalent" of the MRI, which includes proper adjustment for the sixty months certain benefit and increasing nature of the MRI.

The Court holds that Plaintiff is entitled to a lump sum that at least is actuarially equivalent to the increasing and sixty (60) months certain Monthly Retirement Income. To the extent application of 4.02(b)(6) does not provide an actuarially equivalent lump sum, then Defendant will need to provide them with an alternative lump sum that is the

actuarial equivalent of the MRI. The Court **ORDERS** Defendant to provide the actuarial equivalent lump sum, if necessary, when performing the recalculation. As part of that calculation, Defendant should be prepared to demonstrate why the lump sum is at least actuarially equivalent to an increasing monthly income and sixty months (60) certain.[48]

V.    Note on Standard

The Court believes all of its holdings are based on a plain reading of the Plan document. However, as held above, to the extent any of the relevant provisions are ambiguous, they would be construed *against* the drafter and in favor of the Plaintiffs. *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000) (noting arbitrary and capricious deferential review is tempered by the principle of "*contra profentum*" which construes any ambiguities against the drafting parties). Accordingly, to the extent any of the Plan provisions turned out to be ambiguous, they would in any event be construed against the Defendant. *Id.*

MISCELLANEOUS ARGUMENTS

I.    Plaintiffs' Summary Plan Description Argument Concerning Early Retirement Reductions

The Court finds Plaintiffs' argument that the Summary Plan Description ("SPD") eliminated reduction for Early Retirement without a legal basis. Plaintiffs request the Court to look at the SPD from January 2004:

---

[48] The Court is aware some of the parties' experts arguably have given their opinion on whether the lump sum is actuarially equivalent. However, those opinions were made prior to the Court's holdings regarding the impact of Early Retirement on the MRI and conversion to lump sum, the increasing nature of the MRI, and the sixty (60) months certain nature of the MRI.

**Early Retirement**
For plan members who terminate employment on or after January 1, 2004, if you terminate employment prior to normal retirement age (age 65), your benefit will consist of the vested portion of **your retirement account**, with no reduction for early termination (emphasis added).

(Docket No. 143-8, Page 5.)  Defendant disagrees with Plaintiffs' contention that Early Retirement reducers were altogether eliminated from lump sum distribution calculations by the Plan.  In support, Defendant also points to the 2004 SPD, specifically some of the bolded descriptions:

**Retirement Account** – You have a retirement account in your name.  Benefit credits are added to your account each year, and your account is credited with interest based on competitive rates.

**Benefit Credits** – At the end of each year, Norton Healthcare credits your account with a benefit account for that year.  This benefit credit equals a percentage of your total cash compensation for each calendar year in which you completed 1,000 or more hours of service.  The benefit credit percentage that applies to you will vary from year to year, depending on the number of years you have been employed at Norton Healthcare.

**Interest** – Your account not only grows through annual benefit credits, it receives a competitive rate of interest, too.

(Docket No. 143-8, Page 1.)  Based on this language, Defendant argues that the SPD language identified by Plaintiffs only eliminates the Early Retirement reductions for Cash Balance distributions: relying on the "your retirement account" language.  (Docket No. 148, Page 11.)  Defendant argues this language is unique pension verbiage for reference to Cash Balance benefit distributions.

The Court is inclined to agree with Defendant's interpretation that the "retirement account" definition in the 2004 Summary Plan Description only purports to eliminate Early Retirement reductions for Cash Balance distributions.  However, the

Court does not need to decide this issue definitively because SPD language is not legally binding:

> [h]owever, we cannot agree that the terms of statutorily required plan summaries (or summaries of plan modifications) necessarily may be enforced (under § 502(a)(1)(B)) as the terms of the plan itself . . . information *about* the plan provided by those disclosures is not itself *part of* the plan.

> Finally, we find it difficult to reconcile the Solicitor General's interpretation with the basic summary plan description objective: clear, simple communication. See §§ 2(a), 102(a), 29 U.S.C. § 1001(a), 1022(a) (2006 ed.). To make the language of a plan summary legally binding could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers.

> For these reasons taken together we conclude that the summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B). We also conclude that the District Court could not find authority in that section to reform CIGNA's plan as written.

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877-78 (2011).[49]   Since *Amara,* the Sixth Circuit has observed that Summary Plan Descriptions are not "legally binding, nor parts of the benefit plans themselves." *Engleson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 620 (6th Cir. 2013).   Therefore, regardless of how the Court would interpret the SPD,

---

[49] The Supreme Court has recently reaffirmed this precedent, but in what the Court can best describe as a "unique" situation departed from it:

> We have made clear that the statements in a summary plan description 'communicat[e] with beneficiaries *about* the plan, but ... do not themselves constitute the *terms* of the plan.' *CIGNA Corp. v. Amara,* 131 S.Ct. 1866, 1878 (2011). Nonetheless, the parties litigated this case, and both lower courts decided it, based solely on the language quoted above. See 663 F.3d 671, 673 (C.A.3 2011); App. to Pet. for Cert. 26a. Only in this Court, in response to a request from the Solicitor General, did the plan itself come to light. See Letter from Matthew W.H. Wessler to William K. Suter, Clerk of Court (Nov. 19, 2012) (available in Clerk of Court's case file). That is too late to affect what happens here: Because everyone in this case has treated the language from the summary description as though it came from the plan, we do so as well.

*US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1543, n. 1 (2013).

its provisions would not be legally binding in the face of contrary plan provisions. The actual plan provisions, not the SPD, are what controls for the determination of whether there is a reduction for early retirement.

## II.    Larry Taylor Dilemma

Defendant argues that Plaintiffs have "abandoned" Name Plaintiff Larry Taylor. (Docket No. 145, Page 14; 148, Page 11-12.) Plaintiffs' appear to accept that Taylor may not be entitled to an early retirement benefit, but reassert that his lump sum failed to include the value of a 5-year certain and life annuity. Given the seemingly unique circumstances surrounding Taylor,[50] and the parties' notable lack of pleading on this issue, the Court is unable to make a definitive holding on this issue. However, to the extent the plan language applicable to Taylor is substantively the same as the 1997 Plan and 2004 amendments, the Court's holdings are applicable to any benefit determination.

## III.    2008 Plan Document

Plaintiffs point out the 2008 Plan governs the claims of those members of the Class who terminated their employment with the Company after September 12, 2008. (Docket No. 154, Page 29.) Plaintiffs allege the 2008 Plan is substantively the same as the 1997 Plan with the 2004 Amendments (the Plan that was briefed and before the Court). It is unclear whether Defendants disagree. To the extent the Plan provisions are

---

[50] It appears that "Mr. Taylor left employment in 1988," but took his lump sum distribution in 2006. (Docket No. 154, Page 33.) Plaintiffs reference the "1985 Plan" in a citation, but the Court has been unable to locate it. *Id.* Therefore, the Court is unable to make a definitive judgment one way or another as to Mr. Taylor. However, as the Court holds above, to the extent the plan language is substantively the same with respect to the 1997 Plan with the 2004 amendments, the Court's holdings are applicable.

substantively the same, the Court's holdings also apply to Class members who terminated their employment with the Company after September 12, 2008.[51]

## IV.    Form 5500

The Defendant emphasized that there was no reported increase in liability on their 2004 Form 5500. To the extent the Court's above reading of the plan document does result in a more "subsidized" early retirement, the Court admits this is an odd situation.[52] However, just as there was no legal significance to the Summary Plan Description, there is no legal significance to the Form 5500. The Court is interpreting the Plan document, not the Form 5500. While the Defendant may not have necessarily meant to subsidize early retirement, a plain reading of the Plan document results in that outcome. The Court is bound to interpret the Plan document, not decipher what Defendant's actual intentions were or were not.

## CONCLUSION

The Court has found the review of this matter challenging. The Court has attempted to apply the applicable standards of review and apply the plain meaning of the Plan as applicable. Needless to say this was easier said than done. The Court was faced with merging of two plans into one document, which were subsequently amended on numerous occasions, but included prior provisions. At times it was like traversing a matrix. The parties attempted to be helpful, but the complexity of documents and

---

[51] The Court notes there is at least one area where there *could* be a substantive difference between the Plan with the 2004 Amendments and the 2008 Plan (this area deals with how the Plan would be interpreted based on the incorporation of provisions for purposes of determining Accrued Benefits). From 2004 to 2008 the bottom paragraph in 4.03(a)(3) was moved to its own separate section of 4.03(c). If provisions incorporating specifically 4.03(a)(3) were not updated to reflect this change, then an argument could be made that the paragraph in 4.03(c) would no longer be applicable. However, the Court need not decide this issue because it is not before it and the parties did not raise it.

[52] Even if it is an "odd" situation, however, it would not be unheard of for a Defendant to (1) wrongfully interpret their plan document; and/or (2) to have misstated their liabilities.

piecemeal nature of those documents made the task daunting for all concerned.

Nevertheless, after several drafts this opinion represents an attempt to interpret the plain meaning of the text where available and reach a reasoned conclusion.

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED as follows:

(1) **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (Docket No. 143), is **GRANTED in part** and **DENIED in part** (to the extent it is inconsistent with this opinion).

(2) **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment, (Docket No. 145), is **DENIED** to the extent it is inconsistent with this opinion. Plaintiffs' complaint will not be dismissed.

(3) **IT IS HEREBY ORDERED**, consistent with the above holdings, that Defendant **RECALCULATE** Plaintiffs' Monthly Retirement Income and corresponding lump sums. Furthermore, Defendant should ensure the recalculated lump sums are at least actuarially equivalent to the Monthly Retirement Income, appropriately accounting for the increasing monthly income (cost of living adjustment) and sixty (60) months certain of the Monthly Retirement Income.

(4) **IT IS HEREBY ORDERED** the recalculations should be done within 45 days and submitted to the Court for approval. If Plaintiffs have any objections with these recalculations, they must respond within 14 days.

IT IS SO ORDERED.

Date:

cc:     Counsel