**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:08-CV-00069-TBR**


ELIZABETH A. CLEMONS, *et al.*                                                    Plaintiffs

v.

NORTON HEALTHCARE, INC. RETIREMENT PLAN                              Defendant


**MEMORANDUM OPINION**

On March 18, 2015, this Court ordered Defendant Norton Healthcare, Inc. Retirement Plan ("Norton") to provide its opening brief concerning the damages formula it believes should be applied to the Plaintiffs, a class of early retirees who elected to receive lump sum distributions ("the Class"). (Docket No. 244 at 1.) The Court also ordered the Class to submit a Response and Norton to Reply to the Class's Response. (Docket No. 244 at 1.) Lastly, the Court ordered both parties to submit briefing to the Court regarding the provision of data by Norton to the Class. (Docket No. 244 at 2.) The parties submitted all required briefing to the Court. (*See* Docket Nos. 245, 246, 247, 248, 249, 250, 251.)

Subsequently, the Class filed a Motion to Strike Norton's Reply concerning the damages formula. (Docket No. 252 at 1.) In the alternative, the Class requested leave to file a surreply. (Docket No. 252.) The Defendant Norton has responded, (Docket No. 253.), and the Class has replied, (Docket No. 254.) Fully briefed, this matter is ripe for adjudication. The Court has considered the Class's Surreply in forming this opinion. Therefore, the Court with DENY the Class's Motion to Strike and GRANT its request to file a surreply.

1

**Background**

The Court has discussed the general facts of this case in prior opinions but will repeat them as necessary to resolve the current controversy. (*See* Docket No. 217) This case involves an Employee Retirement Income Security Act ("ERISA") pension dispute brought by a class of early retirees who elected to draw lump sum distributions.[1] The pension plan at issue is a defined benefit pension plan sponsored by Norton with the express purpose of providing retirement benefits to employees. By its terms, the Plan provides for an early retirement to any employee who accrues ten years of service and attains age 55. The Class's members are participants in the Norton's Plan (and its predecessors and successors) who claim that Norton underpaid their retirement benefits. The Court previously certified Plaintiffs' claims as a class action. (Docket No. 66.) The Court defined the class as follows:

> All participants in Norton Healthcare, Inc. Retirement Plan, its predecessors and successors, whose contractual lump-sum pension benefits:
>
> (a) Did not include the value of the basic form of benefit – an "increasing monthly retirement income" (annual cost-of-living adjustment) – when election of such basic form would have yielded the highest value for the participant; and/or
>
> (b) Did not include the value of the "alternative" lump-sum benefit where the basic form of benefit is multiplied by 212, when election of such alternative benefit would have yielded the highest value for the participant; and/or
>
> (c) Did not include the value of the early retirement subsidy.

(Docket No. 66 at 12-13.)

On October 31, 2013, this Court granted in part the Class's Motion for Summary Judgment and denied Norton's Motion for Summary Judgment. (Docket No. 217 at 44.) The Court found that the Class Members' Monthly Retirement Income ("MRI") is an increasing

---

[1] Employee Retirement Income Security Act, 29 U.S.C. §1001-1461.

monthly income for sixty (60) months certain. (Docket No. 217 at 33.) Additionally, the Court concluded that application of the Plan's Section 4.02(b)(6) for the determination of the Class members' lump sums does not result in a reduction of benefits for Early Retirement. (Docket No. 217 at 36-37.) As a result of the Court's aforementioned findings, the Court ordered Norton to "recalculate Plaintiffs' Monthly Retirement Income and corresponding lump sums" and to "ensure the recalculated lump sums are at least actuarially equivalent to the Monthly Retirement Income, appropriately accounting for the increasing monthly income (cost of living adjustment) and sixty (60) months certain of the Monthly Retirement Income." (Docket No. 217 at 44.)

Following the Court's Order, the parties were unable to agree as to (I) the formula used to calculate the Class's Monthly Retirement Income and corresponding lump sum, (II) who among the Plan's participants qualifies as a member of the class, (III) whether or not the Class members are entitled to pre-judgment interest, and (IV) what data Norton must provide to the Class. The Court will address each of the aforementioned issues below.

**Discussion**

**I.      Calculation of Class Members' Monthly Retirement Income and Corresponding Lump Sum**

The Court will address (A) Norton's proposed formula and (B) the Class's proposed formula. Following an analysis of the parties' proposed formulas and their disagreements with each respective formula, the Court will provide its conclusion.

**A.      Norton's Proposed Formula**

In its Damages Memorandum, Norton proposes the following formula:

| | |
|---|---|
| Full Years of Credited Service to Separation = | A |
| Credited Service at Normal Retirement Date = | B |
| Average Monthly Earnings = | C |

| | |
|---|---|
| Final Average Earnings = | D |
| Covered Compensation = | E |
| Monthly Retirement Income @ Normal Retirement Date (TRAC ((C* 0.0167*B)-(0.00625*(lesser of D or E)*(lesser of B or 30)))*(A/B) = | F |
| The annuity value at current age based on PBGC interest (taken from January 1 of the plan year of the annuity starting date) and UP84(-3) mortality table = | G |
| MRI after application of bottom paragraph of §4.03(a)(3) 2nd ¶: F*G/212 = | H |
| Lump Sum using 212 Factor: H*212 = | I |

(Docket No. 245 at 5-6 (footnotes omitted).) Norton states that application of the aforementioned formula "to randomly sampled Class members results in substantial enhancements to lump sum distributions." (Docket No. 245 at 6.)

Additionally, Norton discusses the Internal Revenue Code's requirement that "[i]n order to be a 'qualified' tax-exempt pension plan, . . . a defined benefit pension plan must allow for minimum interest rates and minimum mortality tables when converting an Accrued Benefit to a distribution in the form of a lump sum." (Docket No. 245 at 4-5 (citing 26 U.S.C. § 417(e)(3)(A).) According to Norton, the 30-year Treasury securities rate is the applicable interest rate and the 1994 GAR table is the applicable mortality table. (Docket No. 245 at 5 (citing 26 C.F.R. § 1.417(e)-(1)(d)(1)-(4); Rev. Rul. 2001-62).) Norton states that "[t]he present value of the accrued benefit (i.e. a lump sum distribution) then becomes the greater of the benefit calculation using the § 1.417(e)-(1) IRS adjustment factors or the plan's stated interest rate and mortality table." (Docket No. 245 at 5 (citing 26 C.F.R. § 1.417(e)-(1)(d)(1).)  Norton declares that "[t]hese applied calculations afford pension plan participants with *a guaranteed actuarial equivalent* of their Accrued Benefit when taken in the form of a lump sum distribution." (Docket No. 245 at 5 (emphasis added); *see also* Docket No. 251 at 9.) Norton's actuary Mr. Parks states that Norton's formula results in a lump sum that is actuarially equivalent to the increasing and sixty months

4

certain guaranteed MRI because it "begins by selecting an annuity factor based on 60-month certain payments." (Docket No. 251-1 at 2.)

In its Response, the Class argues that Norton's formula does not calculate the actuarial equivalent lump sum. (Docket No. 250 at 9.) The Class contends that Norton's formula merely "recalculates a participant's '212 minimum lump sum' under Section 4.02(b)(6) of the Plan document." (Docket No. 250 at 9.) The "212 minimum lump sum" refers to the lump sum that results from the multiplication of the increasing MRI by a factor of 212. (*See* Docket No. 143-5 at 44; 245 at 6; 250 at 10.) In his Declaration, the Class's actuary Mr. Libman states that "[t]he 212 factor is based on an assumed zero percent (0%) effective interest rate, meaning the discount interest rate and the Index rate are assumed to be the same." (Docket Nos. 250 at 10; 250-1 at 5.) He also contends that the 212 factor is based on "an assumed retirement age of 65" and, therefore, it is "a minimum assumption . . . [that] does not accurately reflect the actuarial equivalent value." (Docket Nos. 250 at 10; 250-1 at 5.) Mr. Libman argues that the "[t]he actuarial equivalent [must] use[] the actual effective interest and the actual retirement age." (Docket No. 250-1 at 6.) Mr. Libman concludes that "the lump sum factor would be greater for a participant retiring prior to age 65 and/or where the index rate exceeds the discount interest rate." (Docket No. 252-3 at 3.)[2]

## B.  The Class's Proposed Formula

Before addressing the substance of the Class's formula, the Court must address Norton's argument that the Class's reliance on and inclusion of a Declaration by its actuary Mr. Libman in

---

[2] In its Response to the Class's Motion to Strike, Norton argues that the Class has conceded that Norton correctly calculated the MRI for all class members and then concludes the Class's formula seeks to "double dip." (Docket No. 253 at 3.) The Class disagrees with Norton's characterization. (Docket No. 254 at 5-6.) This Court concludes that the Class did not concede that Norton correctly calculated the Class member's MRI. The Class's actuary Mr. Libman merely stated that "[t]he Plan's proposed damages formula *appears* to properly calculate the amount of the 212 minimum lump sum in Section 4.02(b)(6). The Plan has taken the corresponding MRI and multiplied by 212. This application is correct. Absent the respective data points, *I cannot confirm whether the underlying MRI is correct*." (Docket No. 250-1 at 5 (emphasis added).) Mr. Libman's statement in no way concedes that Norton correctly calculated class member's MRI. Therefore, Norton's argument regarding the Class's agreement with its calculation of the MRI and subsequently the Class's formula attempting to "double dip" is without merit.

its damages brief was improper. (Docket No. 253 at 7-9.) Mr. Libman has worked as an actuary and consultant since 1975. (Docket Nos. 250-1 at 1; 250-2 at 1.) Norton argues that Mr. Libman's Declaration is inappropriate because (1) the Court previously granted Norton's Motion to Strike Mr. Libman's expert report and (2) Mr. Libman's declaration violates Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. (Docket No. 253 at 7-9.)

First, Norton is correct that this Court previously struck Mr. Libman's expert report. (Docket No. 213.) However, the Court stated that Mr. Libman's report was "not admissible *at this time.*" (Docket No. 213 at 3 (emphasis added).) This Court found that Mr. Libman's report was inadmissible as it engaged in contract interpretation of the Plan document, and contract interpretation is a question of law to be decided by the Court. (Docket No. 213 at 2.) Additionally, the Court stated that it would "not be performing any of the calculations required by [the Plan's] provisions . . . [as] those calculations are left for the parties to perform, consistent with the Court's instructions." (Docket No. 213 at 3.) At this juncture, the Court must perform the calculations required by the Plan's provisions because the parties have been unable to agree as to the correct formula. Consequently, the Court finds that Mr. Libman is qualified and uses reliable and relevant testing and principles to support his opinion that Norton's formula does not provide an actuarially equivalent lump sum. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).[3]

Second, Norton argues that Mr. Libman's Declaration violates Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. (Docket No. 253 at 9.) Norton contends that Mr. Libman's Declaration "was never previously disclosed to Defendant or its counsel[], nor does Libman's re-packaged affidavit meet the 'must' disclose requirements of Rule 26." (Docket No. 253 at 9.) In response, the Class argues that it previously advocated for the parties to submit new expert

---

[3] The Court is satisfied with the Class's explanation concerning the discrepancy in Mr. Libman's calculations of Plaintiff David Khaliel's actuarial equivalent lump sum. (Docket No. 254 at 4-5.)

6

reports that would comply with Rule 26(a)(2)(B). (Docket No. 254 at 4.) The Class further contends that Norton opposed the production of new expert reports and expert depositions that would comply with Rule 26(a)(2)(B). (Docket No. 254 at 4.) The Class is correct that Norton opposed the submission of new expert reports and stated that "[i]f either party believes that their previously identified experts are necessary to explain or expound on their proposed damages formula, they can secure and file affidavits from such experts along with their briefs." (Docket No. 236 at 2-3.) As Norton previously advocated against the submission of new expert reports in compliance with Rule 26(a)(2)(B) and suggested the parties could "file affidavits from [their] experts along with their briefs," it is estopped from contesting the Class's inclusion of Mr. Libman's Declaration in its brief. The Court will now address the substance of the Class's formula.

The Class provides an alternative formula that it argues calculates the actuarial equivalent lump sum. The Class describes its formula in the following manner:

> Class members are entitled to the greater of the minimum "212 minimum lump sum" and the "actuarial equivalent" lump sum. Calculating the 212 lump sum is a mechanical calculation whereby the MRI payable under Section 4.02(a) is multiplied by 212. Calculating the actuarial equivalent lump sum is also a mechanical calculation applied in the same way to each Class member, whereby the MRI payable under Section 4.02 is multiplied by a lump sum factor. This lump sum factor is determined based on three components: (1) a discount interest rate; (2) an index rate; and (3) a mortality table.

> The Plan document provides for two lump sum factors with a participant entitled to use the factor that produces the greatest benefit. The first lump sum factor is based on the discount interest rate "which would be used as of the first day of the Plan Year in which the benefit determination occurs by the Pension Benefit Guaranty Corporation" and the "1984 Unisex Pension Mortality Table set back three (3) years for age." Id.  The second lump sum factor is based on the discount interest rate "for 30-year Treasury securities for the second month prior to the beginning of the applicable Plan Year" and the mortality table prescribed "by the Secretary of Treasury as set forth in IRS Revenue Ruling 2001-26."

> In calculating the respective lump sum factors, an adjustment is required to account for the Plan's "increasing monthly income" and

7

"sixty (60) months certain" features. The Plan increases a participant's monthly income each year by an "Index." The Index is equal to "the rate being paid on 3-year Treasury Notes as of the first day of December preceding the Plan Year for which such Index is being credited, as published in the Federal Reserve Statistical Release, plus one-half of one-percent (0.5%)." To account for the value of the "increasing monthly income," the discount interest rate utilized in calculating the lump sum factor must be adjusted to account for the future increased benefits in order to determine the effective interest rate. This effective interest rate is then used as the discount rate for the applicable mortality table in order to determine the actuarial equivalent lump sum factor.

To account for the value of the "sixty (60) months certain" feature, the actuarial equivalent lump sum factor is multiplied by 1.015. This 1.5% adjustment reasonably reflects the value of the Plan's guaranteed payment of benefits for 60 months (removing the mortality expense).

(Docket No. 250 at 10-12.)

Norton contends that the Class's proposed formula is "fraught with rather obvious actuarial errors." (Docket No. 251 at 9.) In particular, Norton disagrees with (1) the Class's use of the Plan's "index rate," (2) the Class's proposed "corresponding effective rate," and (3) the Class's use of the factor 1.015. (Docket No. 251 at 9.)

### 1. The Index Rate

In its formula, the Class uses the Index rate in effect at the time of a plan participant's retirement. (Docket No. 250 at 11.) Norton argues that instead of using the Index rate in effect on a particular date, the rate should be based upon a historical average of Treasury bond yields after removing the effects of inflation. (Docket No. 251-1 at 3-4.)

Norton states that the Class's use of the "Plan's 'index rate' – which is used to establish the cash balance interest credit to participant's 401(k)-like account – to value the annually increasing annuity benefit in the form of a lump sum distribution . . . is pulled from thin air and is . . . not compelled by either the law or the Plan text." (Docket No. 251 at 10.) Norton's actuary Mr. Parks reasons that "any one year's 'index' is not appropriate to be used over a much longer lifetime calculation since such an annual index does not consider the impact of wide interest rate

fluctuations over a long period of time." (Docket No. 251-1 at 4.) Furthermore, Norton argues that only two variables are used to define "actuarial equivalent" under the Plan and, therefore, the Class's "index rate" is an "altogether new, non-Plan metric [being used] to derive one's 'actuarial equivalent.'" (Docket No. 253 at 4.)

In response, the Class argues that its use of the "Index" rate is rooted in the Plan itself and is appropriate for the calculation of a plan participant's lump sum. The Class's actuary Mr. Libman states that Norton's proposed historical average "is by definition inaccurate." (Docket Nos. 252-2 at 15; 252-3 at 4.) To support its position, the Class points to Section 4.02(a) in which the Plan states that the participant's monthly income "shall be increased, on each January 1 following the date the Member's Monthly Retirement Income commences, by *the Index determined for the Plan Year*." (Docket No. 143-5 at 39 (emphasis added); *see also* Docket No. 252-2 at 12.) Section 2.30 of the Plan defines "Index" as "the rate being paid on 3-year Treasury Notes as of the first day of December preceding the Plan Year for which such Index is being credited." (Docket No. 143-5 at 26.) Following the January 1, 2004 amendments, the "Index" definition was increased by "one-half of one-percent (.5%)." (Docket No. 143-10 at 2.) The Class argues that as the Index rate is defined as "the rate by which a Class member's annuity benefit increases each year, and [the Plan] . . . requires the rate be 'determined for the Plan Year," the Index rate in effect at the time of retirement is the most appropriate rate to use in determining the effective interest rate." (Docket No. 252-2 at 12.) Mr. Libman reasons that "[j]ust as the discount rate is measured at a point in time, so too is the Index rate. By tying the Index rate and the discount rate together, the same assumptions are applied to the lump sum calculation." (Docket No. 252-3 at 4.) Mr. Libman contends that since the enactment of ERISA, the IRS has required interest rates to be determined as of a fixed date. (Docket Nos. 252-2 at 13; 252-3 at 5.) According to the Mr. Libman, "[i]f the discount rate is determined as of a specific date, the Index rate which is a function of similar bond yields should logically be determined as of the same fixed date." (Docket Nos. 252-2 at 13; 252-3 at 5.)

The Class also disagrees with Norton's argument made in its Response to the Class's Motion to Strike that there are only two variable used to define the actuarial equivalent: (1) "the 30-year Treasury securities rate for the second month prior to the beginning of the applicable Plan Year" (the discount rate) and (2) "the mortality table published by the Secretary of the Treasury." (Docket No. 253 at 4.) Norton argues that the Index rate is an additional variable that should not be used to calculate the actuarial equivalent. (Docket No. 253 at 4.) Norton's position is puzzling as Norton has itself stated that in order to calculate the present value of the increasing 60-month certain annuity, "three different factors need to be determined . . . "the mortality table, the [discount] interest rate, and the COLA (cost of living adjustment) rate." (Docket No. 145-1 at 27.) Having reviewed the relevant sections of the Plan, namely Sections 2.02 (the definition of actuarial equivalent), 4.02 (form of benefit), and 4.03 (normal retirement benefit), this Court does not find merit in Norton's argument. The Court does not believe that Section 2.02 forecloses the use of a third factor. Furthermore, it in fact appears that the parties have been in agreement until now that there are three factors that make up the actuarial equivalent lump sum. The Court agrees with the Class that "the parties' dispute to date with regard to the calculation of the 'actuarial equivalent' lump sum has [largely] concerned . . . what COLA rate should be used when calculating a lump sum." (Docket No. 254 at 9.) While the Class has advocated for the use of the Index rate, Norton has argued that the use of a historical average of Treasury bond yields is more appropriate for the COLA rate. Therefore, the Court finds that the "actuarial equivalent" lump sum has three components

Additionally, Norton argues that the "lower the utilized Index Rate, the greater the lump sum distribution." (Docket No. 251 at 9-10 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 430 (2011)).) In its Surreply, the Class disagrees with Norton's statement and argues that "the lower the Index [rate], the lower the present value lump sum [because] [t]he future annuity does not increase as quickly, and therefore, the lump sum needed today is reduced." (Docket No. 252-2 at 13.) Additionally, the Class distinguishes the case cited by Norton because the Supreme Court in

*Amara* was "analogizing the discount rate, not a cost of living (COLA) rate such as the Index." (Docket No. 252-2 at 13.) The Class states that the discount rate provides the present value of future annuity payments. (Docket No. 252-2 at 13.) Therefore, according to the Class, the lower the discount rate, the greater the lump sum. (Docket No. 252-2 at 13.)

### 2. The Effective Interest Rate

Norton argues that the Class uses a negative effective interest rate "to artificially inflate potential recoverable damages." (Docket No. 251 at 10.) Alternatively, Norton uses an interest rate of 3 percent that is based upon a historical average of Treasury bond yields. (Docket Nos. 251 at 10; 251-1 at 3.) Norton's actuary Mr. Parks states that "for valuing interest over a long period of time[,] . . . the best measure is a smoothed average of historical rates over a long period of time, corrected for inflation." (Docket No. 251-1 at 4.) In its Surreply, the Class responds that its effective interest rate is based upon the following formula:

$$\text{Effective Interest Rate} = [1 + \text{Discount Rate}) / (1 + \text{Index Rate})] - 1$$

(Docket No. 252-2 at 11.) The Class's actuary Mr. Libman states that its effective interest rate calculation "reflects the impact of future inflation on the discount interest rate." (Docket No. 252-2 11.) Additionally, Mr. Libman contends that the Class's effective interest rate formula "is regularly utilized in calculating pension obligations." (Docket No. 252-2 at 11.)

### 3. The Class's use of the factor 1.015 (1.5%)

Lastly, Norton disagrees with the Class's use of the factor 1.015 (1.5%). The Class's formula utilizes a two-step process to determine the actuarial equivalent of the increasing, sixty months certain benefit instead of beginning with an annuity factor based on a sixty month certain benefit as Norton does in its formula. (Docket Nos. 251 at 10; 251-1 at 3.) First, the Class's formula "select[s] a 'life only' (no guaranteed) annuity factor; and then convert[s] the 'life only' factor to guaranteed 60-months payment by applying the constant multiplier 1.015." (Docket No. 251 at 10.) Norton argues that the Class's application of the factor 1.015 to account for the sixty months certain provided under the plan, "is unsupported by the law, by the Plan, and by common

11

sense since it presumes every person in the Class is the same age as Named-Plaintiff David Khaliel." (Docket No. 251 at 10.) Norton's actuary Mr. Parks states that "[t]he more precise actuarial calculation begins with an annuity factor based on 60-month certain payments for the particular class member, based upon his/her age at distribution." (Docket No. 251-1 at 3.)

Norton's disagreement with the Class's use of the factor 1.015 is significant, as it does not appear that it has previously made its concerns known. In a prior Opinion in this case, this Court noted that:

> Plaintiffs allege the Defendant incorrectly determined their lump sum benefit by failing to adjust for the value of a sixty (60) months certain benefit. Plaintiffs allege this adjustment is done by multiplying the [MRI] by 1.015. It appears *Defendant has admitted this is the proper way to make such an adjustment*.

(Docket No. 217 at 28 (emphasis added) (citing Docket No. 143-7, NOR 485; 143-15, No. 47).)

In its Surreply, the Class disagrees with Norton's characterization of its use of the factor 1.015. (Docket No. 252-2 at 16-17.) The Class states that in its formula, "the actuarial equivalent lump sum factor is multiplied by 1.015 (1.5%) to account for the value of the 60-month certain feature of the Class member's annuity benefit, and then multipl[ied] by the MRI." (Docket No. 252-2 at 16-17.) The Class argues that its use of 1.015 is supported by the Plan and is consistent with the law. (Docket No. 252-2 at 17.) Furthermore, the Class asserts that Norton's actuaries "have consistently used the 1.015 . . . factor." (Docket No. 252-2 at 17.) Within the Plan document, the Class points to Section 4.02(b)(2) of the 1997 Plan where "there is a table containing the various minimum factors to use for converting the 60 month certain annuity." (Docket No. 252-3 at 3; *see also* 143-5 at 42.) The table contains the factor used to convert a 60-month certain annuity to a life annuity (with zero payments guaranteed). (Docket Nos. 143-5 at 42; 252-2 at 18.) With zero payments guaranteed, the life annuity is 101.5% (a factor of 1.015) of the 60-month certain annuity. (Docket No. 252-2 at 18.) In addition to finding support for its use of 1.015 in the Plan document, the Class also argues that its use of the factor 1.015 is supported

by the law. The Class cites to Revenue Ruling 71-446 in which the IRS "provided guidance that a 60 months certain annuity was to be valued at 97% of the life-only annuity." (Docket No. 252-2 at 19.) The Class and its actuary Mr. Libman reason that based on the IRS's guidance in the aforementioned Revenue Ruling, "the 1.015 factor in the Plan, also written as 98.5% of the life-only annuity, is both reasonable and actuarially sound." (Docket No. 252-2 at 19.) Lastly, the Class contends that in practice Norton has "consistently used the 1.015 factor to convert a participant's 60-months certain annuity benefit to a life-only annuity benefit." (Docket No. 252-2 at 18.) Mr. Libman states that Norton has used the 1.015 factor in practice and referred to it as the "historic factor." (Docket No. 252-3 at 3.) The Class argues that Norton has not only used the factor 1.015 in the past but it has done so regardless of the plan participant's age. (Docket No. 252-2 at 18 (providing examples of Norton's use of the 1.015 factor in converting a 60-month certain annuity to life annuity for two participants of different ages at retirement).)

### C.    The Court's Conclusion

In its October 31, 2013 Opinion, this Court ordered Norton to "recalculate [the Class's] Monthly Retirement Income and corresponding lump sums . . . [and to] ensure the recalculated lump sums are at least *actuarially equivalent* to the Monthly Retirement Income, appropriately accounting for the increasing monthly income (cost of living adjustment) and sixty (60) months certain of the Monthly Retirement Income. (Docket No. 217 at 44 (emphasis added).) After extensively reviewing the parties' formulas and their arguments, this Court finds that Norton did not provide a formula that will ensure that the recalculated lump sums are at least actuarially equivalent to the Monthly Retirement Income. Norton goes to great lengths to critique the Class's proposed formula, but it does not adequately explain to this Court how its own formula results in an actuarially equivalent lump sum. Norton makes several conclusory statements that its formula results in an actuarial equivalent lump sum, but it does little to explain to the Court how this is so. (Docket Nos. 245 at 5; 251 at 8-9; 253 at 3.) Alternatively, the Class has gone to great lengths to not only create a formula and demonstrate how it is actuarially equivalent but also to respond to

any of Norton's criticisms concerning its formula. Consequently, the Court will ORDER Norton to utilize the Class's formula to recalculate the Class Members' Monthly Retirement Income and corresponding lump sums.

## II.      Members of the Class

The parties continue to disagree as to whether or not the Court's certification of the Class was proper, and if indeed there is a class, who belongs within the class. Concerning the certification of the class, this Court has previously considered and denied Norton's motion to alter or amend the class certification order. (*See* Docket No. 158.) Having considered Norton's renewed arguments against class certification, this Court finds that its previous certification will stand.

With regards to who belongs within the certified class, the parties disagree on the following two matters: (A) whether plan participants whose MRI was calculated solely under Section 4.03(a)(1) (the cash balance benefit) of the plan are members of the class and, therefore, entitled to the recalculation of their lump sum to include the value of the increasing monthly income and the sixty (60) months certain income and (B) whether plan participants who received lump sum benefits between January 30, 2003 and December 31, 2003 are members of the class as their receipt of their lumps sums was prior to the 2004 amendments to the Plan.

### A.      Plan Participants Whose MRI was Calculated Solely under Section 4.03(a)(1)

The parties have been unable to agree as to whether or not plan participants whose MRI was based upon a cash balance benefit are members of the class and entitled to the recalculation of their lump sum to include the value of the increasing and sixty (60) months certain income.

Norton contends that there were two claims in the Class's Seconded Amended Complaint that the Class abandoned in the process of seeking class certification. (Docket No. 245 at 8.) The one currently at issue is the Class's claim that "the separate cash balance component of the

'greater of' calculations shorted participants when their cash balance accounts were first established in 1991." (Docket No. 245 at 8.) Norton argues that the cash balance benefit and the defined benefit are two separate benefit calculations and, therefore, the Court's liability finding only applies to those plan participants who received a defined benefit.

To support its argument, Norton cites to the Court's earlier Memorandum and Opinion, the Class's expert Michael Libman's deposition, and a statement made by the Class's counsel during a previous hearing. (Docket No. 251 at 5.) With regards to Mr. Libman's testimony, Norton claims that he "agreed that the [defined] benefit was altogether distinct and separate from one's plan cash balance benefit and that there were no mathematical errors of any sort with respect to Named Plaintiff Khaliel's Plan calculated cash balance potential, alternative distribution" (Docket No. 251 at 4-5.) The Class counters that its expert Mr. Libman "did not offer any such agreement." (Docket No. 252-2 at 6.) After reviewing Mr. Libman's testimony, it appears that he did agree, though perhaps not as equivocally as suggested by Norton, that Named Plaintiff Khaliel's cash balance account was correctly calculated in 1991 and correctly re-set in 2004. (Docket No. 252-11 at 3-4, 6.) However, it does not appear from the cited portions of the deposition that he agreed that the defined benefit and the cash balance benefit are all together separate and distinct. (*See* Docket No. 252-11 at 1-10.)

As for Class counsel's statement at a previous hearing, Class counsel does not dispute the statement but rather states that it was a misstatement and points to other statements made during the hearing that support the Class's position. (Docket No. 252-2 at 6-7.) During the hearing at issue on December 13, 2012, the following exchanged occurred:

> The Court: Well, that was my next question. Do you believe the class definition should be modified?
>
> Mr. Grabhorn: No. I think the one right now satisfies it because the Court has already actually addressed the statute of limitations, and so now it comes down to most of these are material calculations. If someone, by way of example, retired

> before January 1 of '04, we don't even have to do the
> calculation under (c) of the definition.
>
> *If they don't have a TRAC [defined] benefit, we don't have to
> do (a) or (b).* This starts narrowing the field down. There's not
> 9,000 out there. I haven't produced 9,000 participants with
> lump sums. And it really helps to narrow it down.

(Docket No. 165 at 36-37 (emphasis added).)  The italicized sentence is significant because Class counsel's statement refers to parts (a) and (b) of the Class definition. Class counsel essentially stated that unless a plan participant received a defined benefit, he or she is not entitled to a recalculation of his or her lump sum to include the value of the increasing and sixty (60) months certain income. The Class argues that Norton's "selective citation omits the balance of the dialogue" during the hearing between the parties and the Court. (Docket No. 252-2 at 6.) After reviewing the portions of the hearing transcript cited by the parties, the Court agrees that Class counsel's statement was a mere "slip of the tongue," and it was inconsistent with the Class's overall argument. The Court will not prejudice the Class for a mere misstatement by its counsel.

The Class argues that its "claims concerning the calculation of lump sum benefits apply equally to all class members regardless of which part of Section 4.03 provided the largest MRI benefit, whether the cash balance or the grandfathered (defined) benefit." (Docket No. 250 at 6.) The Class contends that it "did not abandon [its] contractual claim that the Plan must provide the actuarial equivalent lump sum for all participants, whether a cash balance or a grandfathered (defined) MEH/ NKC benefit." (Docket No. 250 at 6 n.2.) The Class is adamant that whether plan participant's MRI was calculated under Section 4.03(a)(1), (2), (3) is irrelevant to whether or not the participant is a member of the class. (Docket No. 252-2 at 5.) The Class reasons that "[w]hile [Norton] is correct that the MRI is calculated under different formulas for subsection (1), (2), and (3), this distinction is without significance and conflates the issue . . . [because] each participant is entitled to the greater of the resulting MRI calculations." (Docket No. 252-2 at 5.)  The Class contends that "the issue is the lump sum calculation based on the MRI, regardless of the source"

16

and, therefore, "all participants are entitled to an MRI paid under Section 4.02(a)." (Docket No. 252-2 at 5.)

The Court addressed this subject in its earlier Memorandum and Opinion concerning the parties' motions for summary judgment. (Docket No. 217 at 27.) This Court stated that:

> While [Norton] appears to argue there is a difference in treatment regarding calculation of a lump sum depending on which type of benefit is being used (Defined Benefit or Cash Balance), the Court has found the Plan document does not textually support this assertion. The actual calculation of the lump sum is the same regardless of which type of benefit (Defined or Cash) one uses for determination of the MRI for a retiree . . .

(Docket No. 217 at 27.) With regards to the calculation of a plan participant's lump sum, this Court has already addressed this dispute among the parties and is not persuaded by Norton's further argument to change its previous findings. The calculation of a plan participant's lump sum is the same whether the cash balance benefit or the defined benefit is used to calculate the participant's MRI under either the 1997 plan prior to the amendments or under the amended plan. Therefore, this Court finds that plan participants whose MRI was based upon a cash balance benefit are members of the class and entitled to the recalculation of their lump sum to include the value of the increasing and sixty (60) months certain income.

### B.  Plan Participants Who Received A Lump Sum Between January 30, 2003 and December 31, 2003

The parties do not agree as to whether or not those plan participants who elected to receive a lump sum prior to the January 1, 2004 amendments to the plan are members of the class. In its Damage's brief, Norton argues that the Plan's "defined 'Accrued Benefit' was not altered to be reflective of one's Monthly Retirement Income (MRI) until January 1, 2004" and, therefore, Norton's damages formula should apply only to those Plan participants who received an early retirement lump sum distribution on or after January 1, 2004. (Docket No. 245 at 13-14.) The Class counters that this Court's decision was rooted in the Plan's language in Sections 4.05(d)

17

and 4.03(b) and, therefore, plan participants who received a lump sum prior to the January 1, 2004 amendments are members of the Class. (Docket No. 250 at 7.) Both of the Plan's sections cited by the Class state that "in no case shall [a member's] monthly retirement be less than the Member's Accrued Benefit *as of December 31, 2003*." (Docket Nos. 143-10 at 2, 4; 217 at 30-32.)

With regard to Norton's argument, the Court certainly relied upon the definition of Accrued Benefit from the 1997 Plan document in making its determination that "the MRI (the accrued benefit as of December 31, 2003) is increasing and for sixty months certain." (Docket No. 217 at 32.) One need only read Section 2.01 to determine that the 1997 Plan's definition of Accrued Benefit reflects a participant's MRI. The 1997 Plan's definition of Accrued Benefit that this Court relied on in its previous Memorandum Opinion is as follows:

> 2.01 Accrued Benefit
>
> (a)Effective prior to January 1, 2004, the term "Accrued Benefit" as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:
>
> (1) The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(1) or
>
> (2) The greater of the amount in paragraph (A) or (B):
>
>> (A) The Member's projected Monthly Retirement Income at his Normal Retirement Date under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, . . .
>> (B) The Member's Monthly Retirement Income under Section 4.03(a)(2)(B) or (3)(B).

(Docket Nos. 143-5 at 10-11; 217 at 31.) Therefore, the Court finds little merit in Norton's argument that "the Plan's defined 'Accrued Benefit' was not altered to be reflective of one's [MRI] until January 1, 2004" and thus only those early retirees who took a lump distribution on or after January 1, 2004 are members of the Class. The 1997 Plan's definition of Accrued Benefit was pivotal to the Court's ruling, and it is reflective of one's MRI.

However, the Class also does not present a compelling argument as Sections 4.05(d) and 4.03(b) were added to the Plan as part of the January 2004 amendments. While the Class is correct that the Court reached the ultimate conclusion that the MRI is "an increasing monthly income and is for sixty (60) months certain," the Court did so by starting its analysis with the newly added Sections 4.05(d) and 4.03(b). (Docket No. 217 at 30.) To determine the inclusion of those who took a lump sum between January 30, 2003 and December 31, 2003 in the class, this Court must look solely at the 1997 Plan before the 2004 amendments. After careful consideration, the Court holds that the MRI is an increasing monthly income and is for sixty (60) months certain under the 1997 Plan and, therefore, those plan participants who received a lump sum prior to the January 1, 2004 Plan amendments are members of the class. The Court will note the relevant provisions below that result in the inclusion of these participants in the class.

The starting point for this analysis is Section 4.05(b) Early Retirement Benefit, which reads:

> Upon the Member's retirement on his Early Retirement Date, he shall be entitled to a **Monthly Retirement Income equal to the largest of the amounts provided under the applicable provisions** of paragraphs (1), (2), or (3) below, plus the amount provided under paragraph (4) below, if applicable.
>
> (1) The Sum of:
>   - a. **The benefit described in Section 4.03(a)(1)(A)** . . .
>   - b. **The benefit described in Section 4.03(a)(1)(B)**, determined as of the Member's Early Retirement Date
> (2) For a Member with a Methodist Accrued Benefit, a reduced **Monthly Retirement Income equal to his Accrued Benefit determined under Sections 2.01(a)(2) and 4.03(a)(2)** as of his Early Retirement Date . . .
> (3) For a Member with an NKC Accrued Benefit, a reduced Monthly Retirement Income equal to his **Accrued Benefit determined under Sections 2.01(a)(2) and 4.03(a)(3)**.

Section 4.05(b) requires the Court to move to Section 4.03(a) Normal Retirement Benefit and Section 2.01 Accrued Benefit.

4.03(a) When a Member lives to his Normal Retirement Date, he shall be entitled to retire and to receive a Monthly Retirement Income in an amount certified to the Trustee by the Retirement Committee. **The amount of the Member's Monthly Retirement income under the basic form described in Section 4.02(a)** and payable, at his Normal Retirement Date shall be equal to the largest of the amounts provided under the applicable provisions of paragraphs (1), (2) or (3), plus the amount provided under paragraph (4) hereof, if applicable.

(1) The sum of:
  (A) the Member's Methodist Accrued Benefit or NKC Accrued Benefit, if and as applicable, converted to a single sum . . .
  (B) an increasing monthly income accrued commencing January 1, 1991
(2) For a Member with a Methodist Accrued Benefit, the greater of (A) or (B) (which have been omitted here) . . . .
(3) For a Member with an NKC Accrued Benefit, the greater of (A) or (B) (which have been omitted here) . . . .

2.01(a) The term "Accrued Benefit" as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:

(1) The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(1) or

(2) The greater of the amount in paragraph (A) or (B):

  (A) The Member's **projected Monthly Retirement Income at his Normal Retirement Date** under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, . . .
  (B) The Member's Monthly Retirement Income under Section 4.03(a)(2)(B) or (3)(B).

The basic form referred to in 4.03(a) is described under Section 4.02(a) Form of Benefit as follows:

The basic form of Retirement Benefit (to which the formula indicated in Section 4.03 applies) shall be an **increasing monthly income commencing on the Member's** Disability, **Early**, Normal or Late Retirement Date or on the date specified in Section 5.01 and **continuing for sixty (60) months certain and for his lifetime thereafter**.

While these provisions do not run seamlessly together and they are not entirely clear, they do appear to lead to the conclusion that the MRI is an increasing monthly income and is for

sixty (60) months certain under the 1997 plan. Most importantly for this Court's analysis, Section 4.02(a) explicitly states that the basic form of retirement benefit is increasing and continues for sixty (60) months certain. (Docket No. 143-5 at 39.) Furthermore, Section 4.02(a) specifically references Early Retirement. (Docket No. 143-5 at 39.) Lastly, Section 4.02(a) of the Plan explicitly provides that the formula in Section 4.03 applies to the basic form of Retirement Benefit described under 4.02(a). (Docket No. 143-5 at 39.) Section 4.05(b) with which this Court began its analysis incorporates Section 4.03(a) and Section 2.01(a). (Docket No. 143-5 at 49.) Section 4.03(a), which 2.01 uses for the actual determination of a member's Accrued Benefit, states the amount of a member's MRI is "under the basic form described in Section 4.02(a)." (Docket No. 143-5 at 46.) There is no indication in sections 4.05(b) (which concerns a member's early retirement), 4.03(a) (the provision governing the determination of the amount of a member's MRI), 2.01(a) (the definition of Accrued Benefit), or 4.02(a) that the basic form described under 4.02(a) is not the proper form to use when a member retired early under the 1997 plan prior to the 2004 amendments. Therefore, this Court finds that those plan participants who retired early and received a lump sum between January 30, 2003 and December 31, 2003 are members of the class, and they are entitled to have their benefits re-calculated with an MRI that is both increasing and for sixty (60) months certain.

### III.   Prejudgment Interest

Additionally, the Class has asked this Court to award it pre-judgment interest. In their Response to Norton's Damages Brief, the Class asks the Court to award it "interest on the past due benefits (measured as the difference between the recalculated lump sum and the lump sum previously paid to each Class member)." (Docket No. 250 at 13.) Norton responds that the "statutory enforcement section that is the ERISA predicate for this suit (29 U.S.C. § 1132(a)(1)(B)) does not afford a prevailing party pre-judgment interest."

It is well established in the Sixth Circuit that even though ERISA does not require the award of pre-judgment interest, "the district court may [award pre-judgment interest] at its discretion in accordance with general equitable principles." *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685-86 (6th Cir. 2013) (citing *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir. 2000)). However, "[i]nterest awards should not be punitive, but should simply compensate a beneficiary for the lost interest value of money wrongly withheld from him or her." *Rybarczyk*, 235 F.3d at 985 (citing *Ford v. Uniroyal*, 154 F.3d 613, 618 (6th Cir. 1998). An award of excessive pre-judgment interest that results in the overcompensation of an ERISA plaintiff is punitive and contravenes "ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing." *Ford*, 154 F.3d at 618 (citing *Hizer v. General Motors Corp., Allison Gas Turbine Div.*, 888 F. Supp. 1453, 1463 (S.D. Ind. 1995). "Similarly, an exceedingly low prejudgment interest rate fails to make the plaintiff whole by inadequately compensating him or her for the lost use of money." *Id.* The Sixth Circuit Court of Appeals has found that "to allow [a Defendant plan] to retain the interest it earned on funds wrongfully withheld would be to approve of unjust enrichment." *Rybarczyk*, 235 F.3d at 986 (quoting *Sweet v. Consolidated Aluminum Corp.*, 913 F.2d 268, 270 (6th Cir. 1990)). Consequently, "[a] proper determination of pre-judgment interest involves a consideration of various case-specific factors and competing interests to achieve a just result." *Schumacher*, 711 F.3d at 686. The factors include but are not limited to the following: "the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Id.* at 687.

The Sixth Circuit Court of Appeals does not provide a specific formula that district courts are to use in the calculation of pre-judgment interest. It has approved of district courts' awards of pre-judgment interest calculated according to 28 U.S.C. § 1961. *Rybarczyk*, 235 F.3d at 986; *see*

22

*also Ford*, 154 F.3d at 619. However, it has also overturned a "mechanical application" of that rate. *Schumacher*, 711 F.3d at 685 (reversing a district court's use of 28 U.S.C. § 1961 when the rate was at an all-time low of 0.12%). In addition to the use of 28 U.S.C. § 1961, the Sixth Circuit Court of Appeals has approved awards of pre-judgment interest that "were tied to prevailing market rates, thus reflecting what the defendants would have had to pay in order to borrow the money at issue." *Rybarczyk*, 235 F.3d at 986.

Here, the Class suggests a pre-judgment interest rate of 8%. (Docket No. 250 at 13.) The Class bases this number on the "Plan's assumed interest rate of 8% as stated in the Plan's annual reports on Forms 5500 for the same time period." (Docket No. 250 at 13.) The Class contends that "[t]his interest rate reflects the Plan's own assumptions as to valuation liability as represented to the Internal Revenue Service in its annual Form 5500 filings." (Docket No. 250 at 13.) Lastly, the Class argues that the 8% interest rate will make the class members whole and, therefore, is neither excessive nor insufficient. (Docket No.250 at 14.) In its Reply, Norton does not suggest a rate and instead focuses solely on the fact that ERISA does not mandate the award of pre-judgment interest. (*See* Docket Nos. 251 at 11-12; 253.) Norton urges this Court to view Congress's silence on the subject as intentional and, therefore, this Court does not have discretion to grant pre-judgment interest. (Docket No. 251 at 11-12.) However, as explained above, it is well established in the Sixth Circuit that it is within a district court's discretion to award pre-judgment interest in "accordance with general equitable principles" in an ERISA action. *Rybarczyk*, 235 F.3d at 985.

This Court finds that an award of pre-judgment interest at a rate of 8% to the Class would be excessive and therefore punitive. The Court believes that an interest rate based upon 28 U.S.C. § 1961 would be more appropriate to make the Class whole and avoid an excessive punitive award. The rate established under 28 U.S.C § 1961 is tied to the average 52-week United States Treasury bill rate. *Rybarczyk*, 235 F.3d at 985. 28 U.S.C. § 1961(a) mandates that interest is to be

23

calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." Instead of using the weekly average 1-year constant maturity treasury yield for the calendar week preceding the date of this opinion, the Court has calculated the mean interest rate under the rate prescribed by 28 U.S.C. § 1961 for January 30, 2003 onward. The Court believes this will provide "a closer approximation of the likely return on [the Class's] unpaid benefits." *Rybarczyk*, 235 F.3d at 986 (citing *Algie v. RCA Global Communications, Inc.*, 60 F.3d 956, 960 (2d Cir.1995). The mean of the weekly average 1-year treasury constant maturity from the week of January 30, 2003 to the date of this Court's order January 6, 2016 is 1.51%. Alternatively, the mean of the annual average 1-year treasury constant maturity from the year 2003 to the year 2015 is 1.52%. Like the lower court in *Ford*, this Court will select a flat rate of 2% per annum "to avoid the complexities of compounding interest." 154 F.3d at 619. Thus the slight discrepancy between the two averages is irrelevant. The Court believes this interest rate serves to make the Class members whole and is not punitive for Norton. Therefore, the Court will GRANT in part and DENY in part the Class's request for pre-judgment interest.

### IV.    Provision of Data

The parties have been unable to agree on the data that Norton must provide to the Class for the recalculation of class members' benefits. Norton provided Class counsel with an excel spreadsheet containing data necessary for the recalculation of class members' benefits on June 19, 2014. (Docket No. 246 at 2.) Subsequently, on July 21, 2014 and August 26, 2014, Norton sent Class counsel updated versions of the excel spreadsheet. (Docket No. 246 at 2.) According to Norton, the spreadsheet contains information regarding "601 'grandfathered' (NKC or MEH) participants." (Docket No. 239 at 2.) These "grandfathered" participants "belonged to predecessor plans, became participants of the defendant Plan, and had a traditional defined 'accrued benefit' as of December 31, 2003." (Docket No. 246 at 3.) For each of the 601 identified participants,

Norton provided the following: name, social security number, birthdate, date of hire, payment form, total lump sum distribution issued, date of retirement or lump sum payment, amount of vested accrued benefit at normal retirement date, set aside amount (if any), age at benefit commencement date, early retirement factor, cash balance amount, source of the demographic and distribution information, and source of the accrued benefit information. (Docket No. 246 at 3-4.)

The Class argues that the information provided is insufficient as the class is much larger than the 601 "grandfathered" participants identified by Norton. (Docket No. 247 at 5-6.) The Class contends "Norton excluded every Class member whose lump sum was based on their cash balance benefit and every class member who was not entitled to a subsidized early retirement." (Docket No. 247 at 6.) The Class argues that "[u]nder the Court's summary judgment ruling all class members are entitled to receive a lump sum that is actuarially equivalent to their unreduced [MRI] amount, including the cost-of-living adjustment and the 60-month certain feature." (Docket No. 247 at 6.) The Class "seeks the identity of each participant who received a lump sum benefit on or after January 30, 2003 [and] [f]or each such participant, the Class seeks the corresponding data points necessary to re-calculate their respective lump sum benefits . . . ." (Docket No 249 at 2.)

In response, Norton argues that those plan participants who received a cash balance benefit instead of a defined benefit are not members of the class and, therefore, Norton did not include these individuals in the data provided to the Class.[4] (*See* Docket No. 248 at 3-8.) As the Court has found that the calculation of a plan participant's lump sum is the same whether the cash balance benefit or the defined benefit is used to calculate the participant's MRI, the Court will

---

[4] Norton also argues that it should not have to provide data regarding plan participants who received a "minimum lump sum distribution" or for those plan participants that received a lump sum disability retirement benefit as neither of these lump sums were at issue in this case. (Docket No. 248 at 8-9.) As the parties and the Court's opinion concerning liability did not address these two forms of lump sums available under the plan, Norton need not provide data concerning plan participants who received one of them because these lump sums are not at issue in this case.

ORDER that Norton provide data for all early retirees who received a lump sum regardless of whether the cash balance benefit or the defined benefit was used to calculate their MRI. Additionally, Norton must provide data for all of those who meet this criteria and retired on or after January 30, 2003.

## CONCLUSION

To conclude that this matter is complex is probably an understatement. There have been hard fought disputes on class certification, discovery, and the production of data. There has been more than considerable briefing on the many issues involved in this controversy. The Court further understands that there has been delay by the Court in issuing several of its rulings. The complexity of comprehending and analyzing lengthy interrelated documents and deciphering the nuisances therein has been time consuming on the part of counsel and the Court. The Court is not inclined to entertain any motion for reconsideration. Frankly, the Court has given this matter its best shot. Too much time has elapsed between the earlier ruling and the current posture of this case. The Court originally thought agreeing on a formula would not be a time consuming process. Obviously, it was time consuming. It is time for another court, if the parties are so inclined, to look at this matter with new eyes.

For the reasons enumerated above, and consistent with the Court's conclusions above, this Court will ORDER:

1.  The Plaintiffs' Motion to Strike is DENIED and their request to file a surreply is GRANTED.

2.  The Defendant must utilize the Plaintiffs' formula to recalculate the Class Members' Monthly Retirement Income and corresponding lump sums.

3.  Plan participants whose MRI was based upon a cash balance benefit are members of the class and entitled to the recalculation of their lump sum to include the value of the increasing and sixty (60) months certain income.

4.  Those plan participants who retired early and received a lump sum between January 30, 2003 and December 31, 2003 are members of the class, and they are entitled to have their benefits re-calculated with an MRI that is both increasing and for sixty (60) months certain.

5.  The Court will GRANT in part and DENY in part Plaintiffs' request for pre-judgment interest.

6.  Defendant must provide data for all early retirees who received a lump sum regardless of whether the cash balance benefit or the defined benefit was used to calculate their MRI. Additionally, Norton must provide data for all of those who meet this criteria and retired on or after January 30, 2003.

cc: Counsel