UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ELIZABETH CLEMONS, ET AL.                                          *Plaintiffs*

v.                                                    Civil Action No. 3:08-cv-00069-RGJ

NORTON HEALTHCARE, INC.                                            *Defendant*
RETIREMENT PLAN

\* \* \* \* \*

**MEMORANDUM OPINION & ORDER**

This matter is before the Court on Defendant Norton Healthcare, Inc. Retirement Plan's ("Norton") Motion for Summary Judgment [DE 307], Plaintiffs' Elizabeth Clemons, et al.'s Motion for Summary Judgment [DE 308], and Norton's Motion to Exclude a Portion of Exhibit C of the 2019 Libman Report [DE 309]. Plaintiffs also filed a Rule 56(c)(2) Objection to Norton's Factual Positions. [DE 316]. These matters are fully briefed and ripe for review. For the reasons below, Norton's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, Norton's Motion to Exclude a Portion of Exhibit C of the 2019 Libman Report is **DENIED**, and Plaintiffs' Rule 56(c)(2) Objections are **GRANTED IN PART AND DENIED IN PART**. The parties must submit a proposed schedule as set forth below, and the Court will set a status conference.

## I.    BACKGROUND

Plaintiffs, Elizabeth A. Clemons, David R. Khaliel, and Larry W. Taylor ("Plaintiffs") are retired former employees of Norton and participants in the Norton Health Care, Inc. Retirement Plan ("Plan"). Plaintiffs claim the Plan underpaid their retirement benefits. They allege that Norton did not properly calculate their lump-sum pension benefit under the retirement plan

1

document and/or as required by the Employee Retirement Income Security Act ("ERISA"). Plaintiffs argue the Plan was required to complete the following steps, in order, when calculating their benefits:

>Step 1: Calculate the participant's normal retirement benefit.
>
>Step 2: Determine the form of benefit payable to the participant.
>
>Step 3: Calculate the alternative forms so participant may make election.
>
>Step 4: Adjust for early (or late) commencement of benefits.
>
>Step 5: Pay the participant's benefit.

[DE 45; DE 66].

Norton Healthcare alleges that it acted reasonably and lawfully when calculating the lump-sum pension benefits and that its calculations should be upheld unless Plaintiffs show that the calculations are arbitrary and capricious or violate ERISA's statutes/regulations.

### A. This Court's Pre-Appeal Summary Judgment Rulings

This Court[1] previously certified a class under Federal Rule of Civil Procedure 23(b)(1)(A) and 23(b)(2). [DE 66]. This Court certified the "Class" as follows:

>All participants in the Norton Healthcare, Inc. Retirement Plan, its predecessors and successors, whose contractual lump-sum pension benefits:
>
>(a) Did not include the value of the basic form of benefit – an "increasing monthly retirement income" (annual cost-of-living adjustment) – when election of such basic form would have yielded the highest value for the participant; and/or
>
>(b) Did not include the value of the "alternative" lump-sum benefit where the basic form of benefit is multiplied by 212, when election of

---

[1] The Honorable Jennifer B. Coffman originally presided over this case. After briefing on cross-motions for summary judgment were completed, Judge Coffman retired, and the case was reassigned to the Honorable Thomas B. Russell. Judge Russell presided over this case until 2018 when the case was reassigned to the undersigned post appeal.

such alternative benefit would have yielded the highest value for the participant; and/or

(c) Did not include the value of the early retirement subsidy.

[DE 66 at 1189–90].   The class claims are alleged in the second amended complaint [DE 42]: that (1) Norton Healthcare breached the "contractual terms of the pension plan" in violation of ERISA § 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) by its "failure to include the value of the 'increasing monthly income' in the calculation of lump sum benefits and 'cash balance' starting and reset balances,"; (2) Norton Healthcare breached the "contractual terms of the pension plan" due to its "failure to include the value of the early retirement benefit ('no reduction for early termination') in the calculation of lump sum benefits and 'cash balance' starting and reset balances," in violation of ERISA § 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3); and (3) Norton Healthcare breached "the contractual terms of the pension plan" by its "failure to calculate the lump sum benefit by multiplying Plaintiffs' increasing monthly income by 212" in violation of ERISA § 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).   [DE 42 at 412–13; DE 66 at 1190]. Ultimately, the class was defined as "all retirees who took lump-sum distributions after January 30, 2003, regardless of whether their benefit was ultimately determined on a cash-balance or defined-benefit basis, but not disability retirees or those receiving mandatory lump-sum payments." [DE 279 at 7221].

This Court previously found for Plaintiffs on liability. [DE 217].

The Court found that the Class Members' Monthly Retirement Income ("MRI") is an increasing monthly income for sixty (60) months certain.

Additionally, the Court concluded that application of the Plan's Section 4.02(b)(6) for the determination of the Class members' lump sums does not result in a reduction of benefits for Early Retirement.

As a result of the Court's aforementioned findings, the Court ordered Norton to "recalculate Plaintiffs' Monthly Retirement Income and corresponding lump sums"

3

and to "ensure the recalculated lump sums are at least actuarially equivalent to the Monthly Retirement Income, appropriately accounting for the increasing monthly income (cost of living adjustment) and sixty (60) months certain of the Monthly Retirement Income."

[DE 257, (citing DE 217 at 33, 36–37, 44)].  After the Court's rulings on liability, the parties were unable to agree as to:

(I) the formula used to calculate the Class's Monthly Retirement Income and corresponding lump sum, (II) who among the Plan's participants qualifies as a member of the class, (III) whether or not the Class members are entitled to pre-judgment interest, and (IV) what data Norton must provide to the Class.

[DE 257].  In resolving these disagreements, the Court made numerous holdings:

The Court finds that the "actuarial equivalent" lump sum has three components [the 30-year Treasury securities rate, the mortality table, and the Index rate].

The Court holds that the MRI is an increasing monthly income and is for sixty (60) months certain under the 1997 Plan and, therefore, those plan participants who received a lump sum prior to the January 1, 2004 Plan amendments are members of the class.

This Court finds that those plan participants who retired early and received a lump sum between January 30, 2003 and December 31, 2003 are members of the class, and they are entitled to have their benefits re-calculated with an MRI that is both increasing and for sixty (60) months certain.

The Court believes that an interest rate based upon 28 U.S.C. § 1961 would be more appropriate to make the Class whole and avoid an excessive punitive award.

[DE 257 at 7098, 7107, 7109, 7111].  The Court then entered an Order and Judgment in favor of Plaintiffs against Norton "in an amount to be calculated consistent with this Court's separately entered Memorandum Opinion [which was DE 257]." [DE 258].  In the Order and Judgment, the Court stated:

The Defendant must utilize the Plaintiffs' formula to recalculate the Class Members' Monthly Retirement Income and corresponding lump sums. Plan participants whose MRI was based upon a cash balance benefit are members of the class and entitled to the recalculation of their lump sum to include the value of the increasing and sixty (60) months certain income. Those plan participants who retired early and received a lump sum between January 30, 2003 and December 31,

4

2003 are members of the class, and they are entitled to have their benefits re-calculated with an MRI that is both increasing and for sixty (60) months certain. Plaintiffs' request for pre-judgment interest is GRANTED in part and DENIED in part. Defendant must provide the Plaintiffs with the data necessary to perform the calculations consistent with this Court's separately entered Memorandum Opinion.

[DE 258]. Norton then filed a Notice of Appeal [DE 259], Plaintiffs filed a Notice of Cross Appeal [DE 264], and the case was stayed pending appeal. [DE 260].

### B. The Sixth Circuit's Rulings and Remand

On appeal, the Sixth Circuit vacated the finding of liability in part and vacated the damages award; upheld the certification of a class only for liability purposes; addressed some legal and contractual issues raised by the parties, but not all; and remanded the case to the district court for determination of several issues. [DE 279].

#### i.  Ruling on *Firestone* deference

First, the Sixth Circuit held that "if the Plan *clearly* gives the administrator *Firestone* deference, then *contra proferentum* has no place in reviewing the administrator's decisions. The arbitrary-and-capricious standard stays intact." [DE 279 at 7204]. "*Firestone* deference . . . must include the ability to choose between two reasonable interpretations of the Plan . . ." [*Id*. at 7202]. Thus, "[t]o the extent that the Plan is truly ambiguous, *Firestone* requires the district court to defer to Norton's reasonable interpretation." [*Id*. at 7205]. This Court "may not invoke *contra proferentum* to 'temper' arbitrary-and-capricious review." [*Id*. at 7201]. This standard is more fully discussed below, but the Sixth Circuit held *Firestone* deference applies absent limited circumstances.

#### ii.  Rulings on Interpretation/Construction of the Plan

Before construing the Plan, the Sixth Circuit articulated the steps for calculating an individual's retirement benefit under the Plan:

First, identify the applicable rules.

Second, use those rules to determine the individual's Monthly Retirement Income (MRI), which is, essentially, the individual's accumulated pension entitlement expressed as an amount per month.

Third, convert the MRI to the form of benefit selected by the individual, one of several different annuities or a lump sum.

[DE 279 at 7205].  The Court will summarize each step below and the issues remanded by the Sixth Circuit.

### 1.  Step 1: Identify Appropriate MRI Rules

Here, under the first step, the Sixth Circuit found the starting point to be §4.05, which governs early retirement, and Subsection (d), which states:

Effective only for a member who terminates employment on or after January 1, 2004, upon such Member's retirement on the Member's Early Retirement Date, the Member shall be entitled to a Monthly Retirement Income equal to the benefit described under Subsection 4.03(b), determined as of the Member's Early Retirement Date . . . provided, in no case shall such Monthly Retirement Income be less than the Member's Accrued Benefit as of December 31, 2003.

[DE 279 at 7206].[2]  Thus, the Sixth Circuit found the language unambiguous that the calculation must "follow the rules in § 4.03(b)," even though that section "refers to the rules for a person retiring on their *Normal Retirement Date*," rather than the rules for early retirees.  [DE 279 at 7206] (emphasis in original).

### 2.  Step 2: Calculate MRI

Moving to the second step, the Sixth Circuit went through the rules identified in step one to calculate a retiree's MRI, first noting that §4.03(b) was added to the Plan in the same 2004

---

[2] The 2004 Amendment initially added Subsection (d) which started with the phrase "Effective January 1, 2004, . . ." [DE 308-1 at 8319]. But the 2004 Amendment was later clarified and the phrase "Effective January 1, 2004 . . .," at the beginning of 4.05(d) was replaced with "Effective only for a Member who terminates employment on or after January 1, 2004, . . ." [DE 307-11 at 7886]. The parties cite the 4.05(d) "Effective January 1, 2004" language throughout their briefing.

amendments that added 4.05(d). §4.03(b) is the new "cash-balance scheme" that Norton created in 2004. [DE 279 at 7207]. The Sixth Circuit also noted that §4.03(a), as amended in 2004, became the "defined-benefit scheme applicable before 2004," [DE 279 at 7207], sometimes referred to by the parties as the "grandfathered benefits." Thus, the grandfathered benefits were set forth in 4.03(a), while the new cash-balance scheme is set forth in 4.03(b).

§4.03(b) states in relevant part as follows:

(b)   Effective January 1, 2004, **the amount of the member's Monthly Retirement Income** under the Basic Form described in section 4.02(a) and payable at the members' normal retirement date **shall be determined as set forth in paragraphs (1) and (2) hereof** . . . provided, in no case shall such monthly retirement income be less than the member's accrued benefit as of December 31, 2003.

(1)   First, the Member's Monthly Retirement Income **determined under Paragraphs 4.03(a)(1), (2), and (3)** as of December 31, 2003 . . .

(2)   Second, the Member's Monthly Retirement Income as **determined under Paragraph 4.03(b)(1)**, increased monthly as follows:

(A)   beginning January 1, 2004 and each January 1 thereafter with respect to the Monthly Retirement Income accrued for the prior Plan Year, by a factor which, when compounded on a simple basis for twelve (12) months, would produce the Index for the applicable Plan Year, and

(B)   commencing January 1, 2004, by an increasing monthly income accrued at the rate of one two hundred twelfth a percentage of the Member's Compensation for any Plan Year in which the Member completes one thousand (1000) Hours of Service based on the following schedule [omitted].

[DE 279 at 7207 (citing 4.03(b)(1)–(2)) (emphasis added)][3].

_____

[3] The Sixth Circuit noted that Section 4.03(b) contains a third step, but it is inapplicable to this case. [DE 279 at 7207, n.4].

7

The Sixth Circuit held that under 4.03(b), MRI is determined by reference to the two subparagraphs, (b)(1) and (b)(2), and not by reference to the basic-form rules in 4.02(a) that are mentioned in the first paragraph of 4.03(b). [DE 279 at 7207, 7211–12]. The Sixth Circuit explained that §4.03(b)(1) and (2) provide a two-step process that renders two numbers that combine to be the MRI. Under §4.03(b)(1), the first amount is calculated under §4.03(a)(1), (2), and (3), which is the "amount accrued under the old defined-benefit system" found in § 4.03(a). [DE 279 at 7208 "[j]ump in the time machine . . .[t]he old plan had a defined-benefit system, governed by § 4.03(a)."]. So, the first step in calculating MRI is governed by §4.03(a), the old defined-benefit system. §4.03(a) provides:

> When a Member lives to his Normal Retirement Date, he shall be entitled to retire and to receive a Monthly Retirement Income in an amount certified to the Trustee by the Retirement Committee. The amount of the Member's Monthly Retirement income under the basic form described in Section 4.02(a) and payable, at his Normal Retirement Date shall be equal to the largest of the amounts **provided under the applicable provisions of paragraphs (1), (2) or (3) hereof**, plus the amount provided under paragraph (4) hereof, if applicable.

[DE 279 at 7208 (emphasis added); DE 308-1 at 8317].  Thus, under the first step in determining MRI you must determine which subparagraph of 4.03(a)—(1), (2), or (3), plus (4)—applies.  These subparagraphs of 4.03(a) provide as follows:

(1)    The sum of:

    (A)    the Member's Methodist Accrued Benefit or NKC Accrued Benefit, if and as applicable, converted to a single sum on the basis of an interest rate of eight percent (8%) per annum, compounded annually, and the 1984 Unisex Pension Mortality Table set back three (3) years for age, the resulting amount being divided by 212, and

    (B)    an increasing monthly income accrued commencing January 1, 1991, at the rat of one two hundred twelfth (1/212) of five percent (5%) of the Member's Compensation for any Plan Year in which the Member completes one thousand (1000) Hours of Service and increased month, beginning on the January 1 following the Plan

8

Year in which such monthly income is accrued, by a factor which, when compounded on a simple basis for twelve (12) months, would produce the Index for the applicable Plan Year.

(2)     For a Member with a Methodist Accrued Benefit, the greater of (A) or (B):

(A)     one and seventy-five hundredths percent (1.75%) of the Member's Averaging Monthly Earnings, such amount multiplied by the Member's years of Credited Service to a maximum of thirty (30), minus the lesser of (i) and (ii) . . .

. . .

(3)     For a Member with an NKC Accrued Benefit, the greater of (A) or (B):

(A)     one and two-thirds percent (1-2/3%) of the Member's Average Monthly Earnings, such amount multiplied by the Member's years of Credited Service, minus the lesser of (i) and (ii):

(i)     six hundred twenty five thousandths (0.625%) of the Member's three (3) year average of Monthly Earnings (not to exceed the taxable wage base) up to his Covered Compensation, multiplied by the Member's years of Credited Service to a maximum of thirty (30);

(ii)    eight hundred thirty-three thousandths (.833%) of the lesser of the Member's Average Monthly Earnings, three (3) year average of Monthly Earnings (not to exceed the taxable wage base) or Covered Compensation, multiplied by the Member's years of Credited Service to a maximum of thirty (30).

(B)     the NKC Accrued Benefit.

Such monthly amount shall be converted to a single sum on the basis of the interest rate or rates which would be used as of the first day of the Plan year in which the benefit determination occurs by the Pension Benefit Guaranty Corporation for determining the present value of a Member's lump sum distribution on plan termination [in no event, however, will a Pension Benefit Guaranty Corporation immediate rate in excess of nine percent (9%), and the deferred rates related thereto, be used] and the 1984 Unisex Pension Mortality Table set back three (3) years for age, and the resulting amount divided by 212; provided, effective January 1, 2000, the amount resulting from such conversion shall be no less than the amount which results from a conversion based upon the interest rate for 30-year Treasury securities for the second month prior o the beginning of the applicable Plan

> Year and the mortality table prescribe by the Secretary of the Treasury and the resulting amount divided by 212.
>
> . . .

[DE 307-12 at 7890–93].[4]  The Sixth Circuit noted that subparagraph 4.03(a)(3)(A), referring to the "Traditionally Accrued (or 'TRAC') benefit," applies to Plaintiff Khaliel, while subparagraph (3)(B) refers "to the Accrued Benefit under the pre-merger plan." [DE 279 at 7208].

The numberless paragraph after subparagraph (3)(B) that begins with "Such monthly amount shall be . . ." converts "a nonincreasing monthly benefit . . . into an increasing benefit— one that begins smaller but increases over time to account for inflation." [DE 279 at 7209].  The Sixth Circuit affirmed this Court's previous ruling that the numberless paragraph after subparagraph (B) applies to all § 4.03(a)(3) (both subparagraphs (A) and (B)) based on the unambiguous structure of the section. [DE 279 at 7209–10].

Then, after the amount is determined from the old defined-benefit system in 4.03(a) as required by the new cash-balance system in 4.03(b)(1), the Sixth Circuit moved next to §4.03(b)(2), and the number "is then 'increased' by the benefit accrued under the cash-balance system established in 2004." [DE 279 at 7207].   Thus, the amount from "4.03(a) plus the amount accrued under § 4.03(b)(2)" provides an individual's MRI. [DE 279 at 7210].  The Sixth Circuit next proceeded to the third step, converting the MRI into the form elected by the plan member, which in this case is the lump-sum benefit.  [*Id.*]

### 3.   Step 3: Convert MRI into appropriate form, the lump-sum benefit

Under the third step, the Sixth Circuit converted the MRI to the form elected by the plan member.  A plan member can receive his MRI in the "basic form" defined in § 4.02(a) or in one

---

[4] 4.03(a)(4) is inapplicable and not quoted.

of six alternative forms listed in §4.02(b).  [DE 279 at 7210].  The form at issue here is the "lump sum" form set forth in § 4.02(b)(6).

The basic form benefit is set forth in § 4.02(a) as follows:

4.02    Form of Benefit

(a)     Basic Form: The basic form of Retirement Benefit (to which the formula indicated in Section 4.03 applies) shall be an increasing monthly income commencing on the Member's Disability, Early, Normal or Late Retirement Date . . . and continuing for sixty (60) months certain and for his lifetime thereafter.

[DE 308-1 at 8295].  The alternative lump-sum benefit is set forth in in § 4.02(b)(6) as follows:

(6)     A lump sum payment payable at the Member's Disability, Early, Normal or Late Retirement Date . . . calculated by multiplying the increasing Monthly Retirement Income determined under the applicable Section by 212 and, if the Monthly Retirement Income is due to Early Retirement or Disability Retirement, dividing by one (1) minus the appropriate reduction factor under Section 4.05(b)(5), Section 4.06(a)(5) or Section 5.01(c)(5), as applicable.

[*Id*. at 8299].

This Court had previously ruled, referencing the first paragraph of 4.03(a), the grandfathered benefits system, that "4.03(b), which is applicable for the determination of the amount of the MRI, explicitly states the MRI shall be in 'the basic form described in Section 4.02(a).'" [DE 217 at 6770].  But the Sixth Circuit found this holding was only half-true as "Section 4.03(b) states that 'the amount of the Member's [MRI] under the basic form described in Section 4.02(a) . . . *shall be determined as set forth in paragraphs (1) and (2) hereof . . .*'" [DE 279 at 7212].  The reference in 4.03(a) to the "basic form described in 4.02(a)" directs "the reader on how to apply the output of the MRI calculation . . ." [DE 279 at 7212]. The Sixth Circuit thus held that the MRI used in the lump-sum calculated from 4.02(b)(6) is not required to be equivalent to the basic form under 4.02(a), which requires an increasing income for sixty months certain.  But the

Sixth Circuit held that the lump-sum rule in §4.02(b)(6) itself requires the Plan to use an "increasing Monthly Retirement Income determined under the applicable Section." [DE 279 at 7212]. Thus, regardless of §4.02(a) or any other part of the Plan, "4.02(b)(6) itself requires that the input be an increasing MRI." [*Id.*] The Sixth Circuit thus said, "the expert testimony in the record . . . suggests the MRI will always be increasing at this stage in the math, but the district court is free to examine this issue in more detail." [DE 279 at 7212]. The Sixth Circuit further held that because §4.02(b)(6) "is silent about the sixty-months-certain issue, we hold that the Plan itself does not require the lump sum to account for that variance." [DE 279 at 7212]. Accordingly, the sixty-months certain from §4.02(a) is not required under 4.02(b)(6), although that section also requires that the benefit be increasing.

### a. Actuarial Equivalence Required by ERISA

While ruling that the MRI will be increasing, but not necessarily for sixty-months-certain based on the language of the Plan, the Sixth Circuit then held that "ERISA requires that any lump-sum alternative be the 'actuarial equivalent' of the basic-form benefit," citing 28 U.S.C. 1054(c)(3), and held that "[b]ecause the district court did not address actuarial equivalence, a remand is necessary to answer this question." [DE 279 at 7212]. The Sixth Circuit noted that "4.02(b)(6) does not appear to include the sixty-months-certain feature of the basic-form benefit. ERISA requires Norton to account for that feature." [DE 279 at 7213]. So, while the language of the Plan did not require the MRI to account for the sixty months certain from 4.02(a), the actuarial equivalence requirements of ERISA do.[5]

---

[5] As will be discussed below, the Plan's definition of actuarial equivalence also requires the sixty-months-certain feature in the basic form benefit be included in the lump sum.

Thus, the Sixth Circuit said this Court must decide whether the "actuarial-equivalence requirement is satisfied" which "is a factual dispute." [*Id.* at 7213.] The Sixth Circuit expounded:

> Further, Norton has complied with ERISA only if all its actuarial assumptions are valid, taken together. In other words, the calculation in § 4.02(b)(6)—multiplying the § 4.03(b) MRI by 212 and then dividing by one minus any applicable reduction factor—must produce a lump sum that is actuarially equivalent to the increasing, sixty-months-certain lifetime annuity provided under the basic-form rules. *See West,* 484 F.3d at 400. All of the Plan's other actuarial conversions, such as calculations from § 4.03(a)(3), must also be valid. According to Norton's experts, they are. The district court, however, struck the experts' reports and did not address this issue in its liability order . . .

[*Id.*] To summarize, in order for the lump-sum calculation in 4.02(b)(6) to be actuarially equivalent to the basic form of benefit, it must: (1) have valid assumptions (all taken together), (2) produce a lump-sum actuarially equivalent to the increasing, sixty-months-certain lifetime annuity provided under the basic-form rules,[6] and (3) all of the Plan's actuarial conversions, like calculations from 4.03(a)(3), must be valid. The Sixth Circuit thus vacated this Court's grant of summary judgment, remanding "for further examination of the actuarial-equivalence issue." [*Id.*] The Sixth Circuit said that this Court should consider the parties' experts' explanations on this issue, including Norton's, and in a light most favorable to Norton, although the Court need not ultimately accept those explanations as the factfinder. *Id.*

> b. *Applying the §4.05(b)(5) Reductions Factors Referenced in the §4.02(b)(6) Lump-Sum Benefit to the Calculation of an Early Retiree's MRI*

The Sixth Circuit's final ruling on the Plan language involves the §4.05(b)(5) reduction factor[7] referenced in §4.02(b)(6)'s lump-sum calculation. §4.02(b)(6) states that "if the Monthly

---

[6] That it must account for the increasing, sixty-month certain feature of the basic form of benefit is required by ERISA, not the Plan language.

[7] When this opinion refers to "reduction factor[s]," "reduction," or "reducer[s]" it is generally referring to the reduction made to MRI in Section 4.05(b)(5) or the other reductions found in 4.05(b)(1), 4.05(b)(2), 4.05(b)(3), or 4.05(b)(5). Section 4.05(b)(4) does not include a reduction.

Retirement Income is due to Early Retirement . . . [the lump-sum shall be calculated by] dividing [the MRI] by one (1) minus the appropriate reduction factor under **Section 4.05(b)(5**), Section 4.06(a)(5) or Section 5.01(c)(5), **as applicable**." [DE 279 at 7214 (emphasis added)].   The appropriate reduction factor here is the one found in §4.05(b)(5) as it addresses early retirement, while the other Sections 4.06(a)(5) and 5.01(c)(5) pertain to disability retirement and severance pay, which are not applicable in this case. [DE 279 at 7214, n.8]. This Court previously held that the Plan language was unambiguous in that the §4.05(b)(5) reduction factor no longer applied in calculating an early retiree's MRI because after the 2004 Amendments, such calculation is governed by 4.05(d), and the normal retirement MRI calculation in 4.03(b). But the Sixth Circuit reversed, holding that the Plan is patently ambiguous as to whether the reduction in §4.05(b)(5) still applies to early retires. [DE 279 at 7215]. The Sixth Circuit states that "the Plan is ambiguous on an issue of significant importance to the parties—whether the early retirement reducers apply to the Retirees bringing this lawsuit." [DE 279 at 7198].

The ambiguity is found in converting an early retiree's lump-sum under §4.06(b)(6), which contains a cross-reference to 4.05(b)(5), after the 2004 amendments.  §4.05(b) states as follows:

(b) **Effective prior to January 1, 2004,** upon the Member's retirement on his Early Retirement Date, he shall be entitled to a Monthly Retirement Income equal to the largest of the amounts provided under the applicable provisions of paragraphs (1), (2) or (3) below, plus the amount provided under paragraph (4) below, if applicable.

(1)   The sum of . . .

(2)   For a Member with a Methodist Accrued Benefit . . .

(3)   For a Member with an NKC Accrued Benefit . . .

(4)   The benefit described in Section 4.03(a)(4) . . .

(5)    Anything herein to the contrary notwithstanding, **the Monthly Retirement Income described in paragraphs (1), (2), (3) and (4) above be reduced or further reduced by** one three hundredths (1/300) for each month by which the Member's Early Retirement Date precedes his Normal Retirement Date.

[DE 307–12 at 7895 (emphasis added)].

Before the 2004 amendments, §4.05(b) was the section that addressed early retirement benefits.  But in the 2004 amendments, the language "Effective prior to January 1, 2004," which is bolded above, was added to the beginning of the §4.05(b) so that the MRI calculated in paragraphs (1), (2), (3), and (4) refer to calculations of MRI before January 1, 2004.  The 2004 amendments added §4.05(d), which is "Effective January 1, 2004," and uses Sections 4.03(b) to calculate the early retirees' MRI under the new cash-balance system.  Thus, after January 1, 2004, an early retiree's MRI calculations no longer go through §4.05(b)(1)–(5), and §4.05(b)(5) is expressly limited by its language to the MRI in paragraphs (1), (2), (3), and (4) directly above it.  But, when the MRI is taken and converted to a lump-sum in the final step of the process, §4.02(b)(6) contains a cross-reference to the reducer in §4.05(b)(5) which was not amended and remained part of the Plan after the 2004 amendments.

Plaintiffs argued the 2004 amendments meant the 4.05(b)(5) reduction cross-referenced in 4.02(b)(6) no longer applied in calculating an early retiree's MRI because an early retiree's MRI was no longer calculated under §4.05(b) per the 2004 amendments, but instead calculated under the normal-retirement rules in §4.03 without the reduction found in §4.05(b)(5), creating a windfall for early retirees. [DE 279 at 7215]. This is also supported by the plain language of §4.05(b)(5) which expressly limits itself to "the Monthly Retirement Income described in paragraphs (1), (2), (3) and (4) above," sections that no longer apply to calculate early retirees' MRI. [DE 279 at 7215]. In other words, "[s]ince the Retirees' MRI was no longer calculated by way of those paragraphs,

it is hard to see how subsection (b)(5) would apply . . ." [DE 279 at 7215].  The Sixth Circuit agreed these were valid points. [DE 279 at 7215].

But the Sixth Circuit also found Norton presented valid counterarguments.  Norton argued it intended for the reducer in 4.05(b)(5) to continue to apply and that §4.02(b)(6) contemplates all early retirees will have their benefits reduced by the specific provisions cross-referenced. [DE 279 at 7215]. This Court previously found Plaintiffs' interpretation eliminating the reducers was supported by the "as applicable" language at the end of §4.02(b)(6), which specifies that "the cross-reference to the reducers only operates if § 4.05(b)(5) is applicable on its own terms; that is, only if the retiree's MRI has been calculated under § 4.05(b)(1)–(4)." [DE 279 at 7215]. Norton argued that the language "as applicable" meant the reducers still applied.  The Sixth Circuit agreed with Norton that 4.02(b)(6)'s use of "as applicable," instead of "if applicable," is intentional because "if applicable" is used other places in the Plan and "as applicable" may mean that §4.05(b)(5) applies even if the MRI is not calculated by 4.05(b)(1)–(4).  [*Id.*] Thus, the Sixth Circuit disagreed with this Court's construction of the "as applicable" language supporting elimination of the reducer. [*Id.*]

The Sixth Circuit found the language in the Plan from §4.06(b)(6) cross-referencing §4.05(b)(5) patently ambiguous because "the Plan commands us to apply a section that, by its terms, does not apply. This is a classic example of patent ambiguity." [DE 279 at 7216].  And thus, the Sixth Circuit ruled that this Court was obligated on summary judgment, and under *Firestone*, "to determine whether Norton's interpretation was a reasonable way to solve the ambiguity." *Id*. The Sixth Circuit noted "*Firestone* requires the courts to defer to Norton's interpretation unless it is arbitrary and capricious." [DE 279 at 7216]. Because "the record lacks a complete explanation for Norton's position," the Sixth Circuit opined a remand was the best course. [*Id.*]

16

Judge White's concurrence agreed that there is an ambiguity that requires remand to determine the parties' intent, deferring to Norton's interpretation unless it is arbitrary and capricious. [DE 279 at 7225].   But Judge White disagreed that the question is whether the 4.05(b)(5) reduction applies. Judge White asserts that under the plain language of the Plan, the 4.05(b)(5) reducer does not apply as all of 4.05(b) was rendered inapplicable by the 2004 amendments, and, instead, the question is "whether 4.02(b)(6) should be applied in accordance with its explicit terms, or whether the final adjustment (dividing by 1 minus the reduction factor) should be ignored because the reduction was never taken."  Judge White points out that "dividing by one (1) minus the appropriate reduction factor under Section 4.05(b)(5) . . . as applicable" increases the MRI rather than decreasing it. [DE 279 at 7225 ("divid[ing] that product by 1 minus the appropriate reduction factor under 4.05(b)(5), the lump-sum payment goes up, not down; dividing a number by a number that is less than 1 increases the number."]. She noted that this made sense before the 2004 amendments because an early-retirement reduction was taken in §4.05(b)(5) when calculating the MRI before reaching the Section 4.06(b)(6) lump-sum calculation.   Thus, when the lump-sum was calculated, the cross-reference to and application of the § 4.05(b)(5) reduction had the effect of increasing the number and reversing the 4.05(b)(5) reduction that was previously taken in calculating the MRI. [DE 279 at 7225]. Therefore, it helps to think of the final adjustment in 4.02(b)(6) (one minus the reduction factor) as a reversal of the reduction factor before the 2004 amendments.  Judge White states that because the 4.05(b)(5) reduction should not be taken after the 2004 amendments, she would find a decision by the fiduciary to not apply the 4.02(b)(6) reversal of the reduction (that was not taken) to be reasonable, as it would increase the early retirees MRI under 4.02(b)(6) without the reduction of 4.05(b)(5) having been made. [DE 279 at 7226, n.1].   But Judge White then stated that because the retirees did not make this

17

argument—that their MRI should be increased by the 4.02(b)(6) reversal, only that Norton should not reduce their MRI under 4.05(b)(5)—the court did not have to address the real ambiguity.  [DE 279 at 7226].

Judge White also pointed out that Norton not only applied the 4.05(b)(5) reduction to the early retiree's MRI, but also applied the other no longer applicable reducer in 4.05(b)(3), which she found arbitrary and capricious. [DE 279 at 7226, n.2]. Judge White also observed that under the 2004 amendments, reduction for early retirement became unnecessary because under the new § 4.03(b) "the Member accumulates increases to his or her MRI based on interest, 4.03(b)(2)(A), and service, 4.03(b)(2)(B), until the date of retirement, at which point the benefits are payable." [DE 279 at 7226]. If an employee "retires early," he or she "receives the benefit earlier 'but ceases to accumulate added benefit for time worked and added value on the benefits already earned . . . [t]he bottom line is that when the Plan was modified to tie off the old benefit and tie benefits to the date of retirement, the early retirement penalties became irrelevant." [DE 279 at 7226].

In response to Judge White's concurrence, the majority opinion noted that there is a third plausible option, which is that the 4.05(b)(5) reversal in the lump-sum calculation in 4.02(b)(6) "must be viewed in light of the reduction that traditionally precedes it.  By retaining the reversal, Norton argues, the Plan implicitly contemplates some sort of earlier reduction. Otherwise, the text of the Plan would create an elephantine buyout hidden in an unlikely mousehole . . ." [DE 279 at 7216, n.9]. Judge White concluded that this interpretation would be arbitrary and capricious, but the majority disagreed because the record was insufficient. [DE 279 at 7216].  Nonetheless, the Sixth Circuit remanded the issue to this Court to apply *Firestone* deference to Norton's

18

interpretation of Plan as to whether the reducer in § 4.05(b)(5) still applies to the retirees in this case after the 2004 amendments.

### iii.   Ruling on Statute of Limitations

Next, the Sixth Circuit addressed the parties' arguments on the applicable statute of limitations. [DE 279 at 7217]. This Court had previously held that a five-year statute of limitations applied to the claims, and thus was limited to members that retired after 2003. *Id*. But the Sixth Circuit held that to the extent Plaintiffs' claims "are based solely on the improper interpretation of the Plan terms," Kentucky's fifteen-year statute of limitations for contract claims applies. *Id*. But Plaintiffs' "actuarial-equivalence claims remain governed by the statutory limitations period" of five years because those claims are based on a violation of ERISA's statutory protections, which requires a lump-sum be actuarially equivalent. [*Id*. at 7217–18]. Thus, depending on which statute of limitations applies, some class members could have retired as long ago as 1993.

### iv.   Ruling on Scope of the Class

Finally, the Sixth Circuit addressed Norton's arguments about this Court's certification of the class. [DE 279 at 7218]. The class was defined as "all retirees who took lump-sum distributions after January 30, 2003, regardless of whether their benefit was ultimately determined on a cash-balance or defined-benefit basis, but not disability retirees or those receiving mandatory lump-sum payments." [DE 279 at 7221]. The Sixth Circuit affirmed this Court's certification, "but only as it relates to the liability and plan-interpretation aspects of the case." [*Id*. at 7221.] But the Sixth Circuit also held that this Court, "abused its discretion by failing to engage in a meaningful analysis under *Dukes* when certifying a damages class" and vacated this Court's opinion "on this point and remand[ed] for a more thorough analysis." *Id*. The Sixth Circuit noted that this Court's previous ruling on this issue contained "no substantive discussion of certifying a damages class under Rule

23(b)(2)" and this Court "never addressed the due-process issues raised by *Dukes* at all, much less

. . . in light of the facts of this case." [*Id*. at 7221–22.]  The Sixth Circuit also vacated this Court's

certification of a damages class under Rule 23(b)(1)(A) for failing to address the issue of due

process concerns raised in *Dukes*.  [*Id*. at 7222.] The Sixth Circuit vacated this Court's certification

of the damages class under Rule 23(b)(1)(A) and (b)(2) as follows:

> In sum, to the extent that the district court certified the class for plan-interpretation
> purposes, that decision is affirmed.  To the extent that its certification extended to
> damages calculations, we vacate the certification and remand for further
> proceedings consistent with this opinion.  We do not reach the remainder of the
> parties' class-certification arguments.  The parties also raise arguments about the
> damages formula adopted by the court and the appropriate rate of prejudgment
> interest.  Because our resolution of the merits of this case requires us to vacate the
> award of damages, these issues are no longer ripe.

*Id*.  Thus, the Sixth Circuit did not reach additional arguments about the class certification, the

damages formula adopted by this Court, or the appropriate rate of prejudgment interest.

In summary, the Sixth Circuit affirmed this Court's previous ruling on summary judgment

except that it vacated it in part "insofar as [this Court] held that the plan unambiguously subsidized

early retirement; (b) held that the plan required Norton to pay a lump-sum including the value of

sixty-months-certain benefits; and (c) disposed of the actuarial-equivalence issue." [*Id*. at 7223.]

It also vacated this Court's damages order, "including as it relates to class certification at the

damages stage . . ." [*Id*.]

### C.  Motions to be resolved by District Court in this Order

After remand, this Court ordered the parties to submit a joint statement of remaining issues

in light of the Sixth Circuit's ruling.  [DE 286].  The parties failed to agree upon a joint statement,

instead submitting their own statements of remaining issues.  [DE 293-1; DE 293-2].

A scheduling order issued [DE 294] and the parties timely filed Motions for Summary

Judgment on the Merits. [DE 307, Norton Mot. Summ. J.; DE 308, Pls. Mot. Summ. J.].  These

motions are fully briefed. [DE 318, Pls. Resp.; DE 321, Norton Reply; DE 315, Norton Resp.; DE 324, Pls. Reply]. Norton moved to exclude a portion of Exhibit C of the 2019 Libman Report. [DE 309]. This motion is fully briefed. [DE 317, Pls. Resp.; DE 322, Norton Resp.; DE 327, Pls. Surreply]. Plaintiffs filed a "Rule 56(c)(2) Objection" to Norton's "Factual Positions." [DE 316]. This motion is fully briefed. [DE 344, Norton Resp.; DE 345, Pls. Reply]. The Court will address the motions below.[8]

## II.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions.") *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). In *Taft*, the Sixth Circuit set forth the standard in reviewing cross-motions for summary judgment: "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."

---

[8] After addressing Plaintiffs' Rule 56(c) objections and Norton's motion to exclude the Libman report, these are the issues the Court must resolve: first, whether Plaintiffs' MRI referenced in the lump-sum provision 4.02(b)(6), as calculated under the "applicable section" (which is 4.05(d) (and as a result 4.03(b)) is "increasing" as required by the language of the lump-sum provision 4.02(b)(6). The Sixth Circuit made clear this "increase" does not have to be for sixty months certain or identical to the basic form benefit in 4.02(a). Second, whether the lump-sum in 4.02(b)(6) is the "actuarial equivalent" of the basic-form of benefit, including whether Norton's actuarial assumptions are valid, taken together. Third, whether early retirees have their lump-sum benefit in 4.02(b)(6) reduced by the early retirement reducers in Section 4.05(b). Fourth, and finally, whether Plaintiffs' MRI is calculated by adding the amount from 4.03(b)(1) (which is calculated from 4.03(a)) with the amount accrued under 4.03(b)(2).

21

929 F.2d at 248 (quoting *Home for Crippled Child. v. Prudential Ins.,* 590 F.Supp. 1490, 1495 (W.D. Pa. 1984)).

"Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252). But, where the burden of persuasion at trial is borne by the party moving for summary judgment, "the party's 'initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (citing *Cockrel v. Shelby Cnty Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) and quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56–138 (3d ed. 2000)).

While, in general, at summary judgment the Court views all facts and inferences drawn from the evidence in the light most favorable to the nonmoving party, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).  Plaintiffs did so here in their Rule 56(c)(2) Objection, so the evidence considered in ruling on their motion for summary judgment will consist only of what remains after evidentiary issues are resolved. *Kentucky Waterways All. v. Kentucky Utilities Co.*, No. CV 5:17-292-DCR, 2021 WL 1970025, at *4 (E.D. Ky. May 17, 2021) citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 387 (6th Cir. 2000) ("Summary judgment is, of course, closely linked with the *Daubert* analysis, although it might conceivably be available even with a different *Daubert* outcome.").

Where the party moving for summary judgment bears the ultimate burden of persuasion on an issue at trial, "a substantially higher hurdle must be surpassed." *Cockrel,* 270 F.3d at 1056–57

citing 11 James William Moore et al., Moore's Federal Practice § 56.13[1], and stating that, if the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."). "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Id*. citing *Hunt v. Cromartie,* 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Thus, summary judgment is only appropriate for a party that bears the burden of persuasion where a reasonable factfinder would conclude that the burden is met. *Id*.

### III.   DISCUSSION

The Court will first resolve Plaintiffs' Rule 56(c)(2) Objections in the order they were asserted, Norton's Motion to Exclude Portions of Libman's Report, and finally, the parties' Motions for Summary Judgment.

### A.  Plaintiffs' Rule 56(c)(2) Objections[9]

Plaintiffs object to twenty-seven statements of fact in Norton's Motion for Summary Judgment. [DE 216]. The standard under Rule 56(c)(2) "is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Farnhurst, LLC v. City of Macedonia*, No. 5:13-cv-668, 2016 WL 524361, at *2 (N.D. Ohio Feb. 10, 2016) (citing *Foreward Magazine, Inc. v. OverDrive Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011)). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on

---

[9] Several of Plaintiffs' objections are not proper Rule 56(c) objections as they argue the ultimate issue and go to the weight of material evidence, rather than admissibility.  However, the briefing on the Rule 56(c) objections was useful in resolving the cross-motions for summary judgment, because the summary judgment motions do not use the same language and terminology and did not address the issues remanded in the same order.  It was helpful to have the parties' arguments on some of the core disputes presented side-by-side.

the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." *Id*. (quoting Fed. R. Civ. P. 56 (2010 Advisory Committee comments)).

The Court notes that generally, "a district judge considering a motion for summary judgment is to examine '[o]nly disputes over facts that might affect the outcome of the suit under governing law.'" *Tucker v. Rose,* 955 F. Supp. 810, 814 (N.D. Ohio 1997) (citing *Anderson*, 477 U.S. at 248). Thus "[a] court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter." *Id*. (citing *Anderson*, 477 U.S. at 249). Similarly, any Rule 56(c)(2) objection to statements of non-material fact need not be determined by the Court. Each statement to which Plaintiffs object is set out below in italics.

> 1. Statement: "*Despite its complexity, however, the Plan was consistently interpreted and administered—without conflict or confusion—from the time of its formation in 1991 through the merger of two predecessor plans*."

Plaintiffs object to this statement because it is misleading and irrelevant. Plaintiffs do not dispute that the Plan has been consistently administered, only that it has been administered incorrectly. [DE 316 at 8629]. Plaintiffs also argue that the Plan terms control, and it is irrelevant how the plan is interpreted and administered. [*Id*. at 8630.] That the Plan has been administered consistently does not mean that it has been administered correctly. Whether the Plan has been consistently administered is relevant to whether the early retirement reducers in § 4.05(b) still apply after the 2004 amendments. While ordinarily the Plan terms control, the Sixth Circuit has instructed that the Plan is patently ambiguous on this issue of the early retirement reducers and directed this Court to determine whether Norton's interpretation that the early retirement reducers apply is arbitrary and capricious. Whether the Plan has been consistently interpreted is relevant to this question. The objection is **OVERRULED**.

2. Statement: "*This Court's predecessor found that plaintiff Clemons was not an appropriate class representative.*"

Plaintiffs object that this statement is misleading. [DE 316 at 8630]. Plaintiffs say Norton failed to produce the documents necessary to determine how the Plan calculated Clemons' lump-sum benefits, that she remains a class member, and that she may become a class representative for damages. [*Id.*] Norton counters that it is a fact that "in February of 2011, Judge Coffman . . . declined to name Elizabeth Clemons as class representative." [DE 344 at 9320]. Even though Judge Coffman declined to name Clemons as a class representative, it was not because Judge Coffman determined she was not an appropriate representative as a matter of whether her claims were in fact typical of the class's, but because "plaintiffs failed to provide proofs that Clemons' claims are typical of the class's." [DE 342 at 9259]. In other words, Judge Coffman did not consider the merits of whether Clemons could be a class representative. The statement is misleading. While the Court does not find this issue material for determining the competing motions for summary judgment, the statement is misleading and so the objection is **GRANTED**.

3. Statement: "*Taylor's claim differs from Khaliel's—which plaintiffs have used throughout to illustrate their claims—because Taylor left his employment with Norton Healthcare before 1991 and thus was not entitled to accruals under the new 1991 formula*."

Plaintiffs object that this statement is misleading, arguing that Taylor's benefits commenced under the 1997 Plan as amended in 2004, which is like Khaliel, and that contrary to Norton's suggestion, Taylor has not sought further accruals since his employment ended. [DE 316 at 8360]. Norton responds that Taylor's employment with Norton ended July 1, 1988 before the Plan was adopted in 1991, he vested in a traditional pension benefit under the NKC plan, and he received a lump-sum distribution of his vested traditional pension in 2006. [DE 344 at 9320].

Plaintiffs do not address this objection in their reply. Because this question is not necessary to the outcome of the present motions, this objection need not be resolved.

      4.   Statement: "*From 1991 until January 1, 2004 amendments, the Plan really operated as two separate, parallel plans.*"

Plaintiffs object to this statement as false. [DE 316 at 8630]. Plaintiffs argue that "[f]ollowing the 1991 merger, the plan has been administered as a single plan. While it employed three plan formulas between 1991 and 2003, it remained a single plan." [*Id*.] There is one Plan and one Plan document after the NKC plan and the MEH plan merged in 1991. Indeed, Norton's statement that Plaintiffs object to acknowledges "the Plan" and is not arguing that there were two separate plans as a technical matter. Instead, Norton's statement is conveying that, as a practical matter, there were two distinct plans within "the Plan" because there were two benefit formulas, (1) the grandfathered formulas that came from the NKC and MEH plans and (2) the new cash balance formula that was created in 1991. There is no dispute that there were distinct benefit formulas within the Plan from 1991 to 2004 and this statement is true. Plaintiffs' fourth objection is **OVERRULED.**

      5.   Statement: "*The grandfathered NKC plan, like essentially all defined benefit plans, paid employees less if they retired earlier.*"

Plaintiffs object to this statement as "false and unsupported by the evidence." [DE 316 at 8631]. Plaintiffs argue that the Plan and ERISA requires any alternative benefit, including an early retirement benefit, be the "actuarial equivalent of the accrued benefit" and that a participant does not "receive less of a benefit simply because they retire early." [*Id*.] Plaintiffs also object that the statement that all plans pay less if an employee retires earlier is a false characterization of Plaintiffs' expert's (Liebman) testimony about plan reductions for early retirement. [*Id*.] Plaintiffs point out that Liebman testified that "[m]ore plans have reduction [for early retirement] than don't.

But I have worked on a number of plans that did not have reduction [for early retirement]." [*Id.*] Norton counters that Liebman concedes that "before the 2004 amendments, a participant with grandfathered benefits who retired early would have those grandfathered benefits reduced for early retirement." [DE 344 at 9307; DE 307-8, Libman 2012 Dep. at 7821–22].  Plaintiffs' expert does not dispute that before the 2004 amendments, under the grandfathered NKC plan, an early retiree had his MRI reduced by § 4.05(b)(5). [DE 307-8 at 7821–24].  So, the statement "[t]he grandfathered NKC plan . . . paid employees less if they retired earlier" is not inaccurate and Plaintiffs' objection is **OVERRULED** to the extent it intended to apply to that aspect of the sentence.

The next issue is whether the rest of the statement that "*all defined benefit plans*, paid employees less if they retired earlier" should be stricken. (emphasis added). This statement is unsupported by the evidence cited by Norton. It is also irrelevant. Norton argues that Libman "could not identify any specific traditional defined benefit plan that did not, as a routine matter, contain a reduction for early retirement." [DE 344 at 9307]. But reviewing that testimony, the questions asked were not limited to traditional defined benefit plans and Libman was not asked to identify a "specific traditional defined benefit plan that did not . . . contain a reduction for early retirement." In the line of questioning cited by Norton, the questions were more general and broader, and Libman was asked about the purposes for which he has seen a reduction eliminated from a plan, but not plans that never had a reduction to begin with.. And Libman also testified that "more plans have a reduction than don't. But I have worked on a number of plans that did not have a reduction." [DE 307-8 at 7792].  Thus, Plaintiffs' objection to the statement that "all defined benefit plans paid employees less if they retired earlier" is **GRANTED**.

> 6.  Statement: "*In the early 2000s, Norton Healthcare, like many plan sponsors, became concerned about plan expenses.*"

Plaintiffs argue this statement is an argument of counsel and not supported by evidence. Norton counters that it "cited and attached multiple documents" but only mentions "notes from the August 2003 meeting of the Norton Healthcare, Inc. Finance Committee" in its reply brief [DE 321 at 8988 citing DE 307-9, Finance Committee Notes]. These finance committee notes state that "Mr. Howell and Mr. Gagel presented an overview of the NHC Pension Proposal," and state one of the outcomes of the "Pension Redesign Proposal" would be "[s]avings on both a cash and budget basis." [DE 307-9, Finance Committee Notes].[10] They also state under the "Overhead" heading that "[b]enefit disproportionally weighted to former NKC/MEH employees" and "[p]lan funding costs combined without financial goals prohibit adding a 403(b) match, which is necessary to remain competitive." These notes indicate that Norton was concerned about plan expenses, among other concerns cited in the document. Although it is not presented in an admissible form, *i.e.* from a witness with personal knowledge, it could be presented in a form that would be admissible through the testimony of Steven Gagel ("Gagel"), the Plan's former enrolled actuary, who presumably presented the content in this document. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Libman cites to the finance committee notes in his report as well. [DE 307-19 at 8191]. Plaintiffs also argues this statement is irrelevant, but the Court is tasked with considering Norton's interpretation as to the ambiguous provisions of the 2004 Amendments in resolving whether the retirees' benefits should be reduced under Norton's interpretation of the Plan. As to whether "many sponsors" were similarly concerned about expenses, Parks discusses

---

[10] The page ID for this document, the August 28, 2003, Finance Committee Notes, is illegible. It is bates stamped NOR002920.

in his report that during the time around the 2004 Amendments "funding expenses of final pay defined benefit pension plans drover employers to which to cash balance plans to control the ultimate and ever-increasing costs." [DE 307-7, p. 8]. Plaintiffs' objection to the statement is **OVERRULED.**

> 7.   Statement: "*Norton Healthcare decided to amend the plan, effective January 1, 2004, to "tie off" future accruals under the grandfathered NKC and MEH plans.*"

Like the previous objection, Plaintiffs object that this statement is merely an argument of counsel, not supported by evidence, and irrelevant. [DE 316 at 8632]. Norton cites the Finance Committee Notes and Gagel's deposition testimony.  The Finance Committee Notes referenced above under the sixth objection state under the "Overhead" heading that "[b]enefits disproportionally weighted to former NKC/MEH employees" and under the "Proposed Plan Design Changes" heading states "[t]ie off and determine present value of NKC/MEH benefit and roll into cash balance account." [DE 307-9, Finance Committee Notes].  As mentioned above, Gagel could introduce these notes as a witness with personal knowledge.  Gagel's affidavit also states that "[e]ffective January 1, 2004, the Plan was amended to 'tie off' or end accruals to the traditional defined benefit and permit future accruals only under the cash balance formula." [DE 307-3 at 7478]. Plaintiffs' expert Libman also agreed in his deposition that "[e]ffective 1/1/04, one of those benefits was frozen, and all future accruals were on a so-called cash balance benefit formula . . . Q: [s]o the defined benefit portion was frozen? . . . A: [a]s of December 31, 2003, yes." [DE 307-8 at 7737–38].   Libman also agreed in his rebuttal report that "the Plan was amended effective January 1, 2004 to stop further accruals under the TRAC formula." [DE 307-19 at 8184]. This objection is **OVERRULED**.

8.  Statement: "*Yet the summary provided to plan participants about the 2004 amendments made no mention of eliminating the early retirement reduction for defined benefit pensioners. (Ex. 8).*"

The "summary provided" is a plan brochure that Norton attaches to its motion for summary judgment. [DE 307-10]. Plaintiffs' first object that the plan brochure [DE 307-10] Norton relies on to make this statement was not provided or disclosed before the close of discovery and that Norton did not identify it or rely on it before disclosing its expert's, John Parks' ("Parks"), report dated February 28, 2019. Norton counters that the document was not located until after the Sixth Circuit's remand holding part of the Plan ambiguous and directing the Court to examine Norton's intent.  Norton admits it did not turn it over until it disclosed Parks' report. [DE 344 at 9308]. To determine whether failure to timely disclose was harmless or substantially justified, a court evaluates the late disclosure according to five factors:

(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, No. 13-4172, 2015 WL 5446917, at *25 (6th Cir. Sept. 17, 2015).

As an initial matter, while Plaintiffs object this document was not disclosed until years after remand, Plaintiffs do not argue the above factors or that they have been prejudiced by the late disclosure.  The document would cause Plaintiffs surprise under the first factor, but Plaintiffs have had an opportunity to cure that surprise after the document was disclosed with the expert report under the second factor.   Allowing the document would not disrupt the trial under the third factor. As to the fourth factor, this document is relevant to Norton's intent. But it is not dispositive, and as Plaintiffs point out, some of its language supports Plaintiffs' argument that the 2004 Amendments removed the early retirement reduction in § 4.05(b) as the brochure states that "[g]oing forward" the Plan had "a single set of rules for everybody." [DE 327]. Finally, Norton

claims it did not locate this document until after the remand when evidence of its intent became relevant to the analysis.  Balancing these factors, the late disclosure is harmless and thus it will not be stricken because of late disclosure.

Plaintiffs object the document is irrelevant. The Sixth Circuit directed the Court to examine Norton's interpretation of the Plan where ambiguous, and, if it is reasonable and not arbitrary or capricious, this Court must accept it. [DE 279 at 7216].  This document would be irrelevant if the Plan language was clear as to whether the early retirement reducers still apply. But because the Plan is ambiguous on this issue, the Court may consider this document. Plaintiffs also cite to this document in support of their argument. The document is relevant and thus it will not be stricken based on relevance.

Finally, Plaintiffs object the document is inadmissible because Norton has neither authenticated the document, nor has it submitted evidence it was provided to plan participants. [DE 316 at 8632].  Norton argues it could "readily" authenticate this document through Norton administrators involved in its creation under Fed. R. Evid. 901(b)(1) (witness with personal knowledge) or 902(b)(4) based on the document's distinctive characteristics (the Norton logo, dates, and information about the Plan consistent with the text). [DE 344 at 9309]. It is perplexing that Norton did not authenticate the brochure through an affidavit as an exhibit to its response brief.  Thus the characteristics of the brochure must be reviewed to see if they appear sufficiently distinctive so as to be genuine under Fed. R. Evid. 901(b)(4). Norton cites *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) but that case involved the authentication of a letter under different circumstances. Nevertheless, the Norton logo and contents suggest the brochure's authenticity.

Plaintiffs do not dispute Norton's authenticity under 901(b)(4) in their reply brief and there is sufficient information based on the document's characteristics for the Court to consider it genuine and authentic.   However, Plaintiffs continue to argue that Norton has presented no evidence that the brochure was distributed.   This is true, and, although the brochure appears genuine and like a final product, there is no evidence that the brochure was final or distributed. This issue goes more to the weight the Court should give the brochure, not its admissibility.   Thus, Plaintiffs' objection is **OVERRULED**.

> 9.  Statement:  "*Plaintiff Khaliel began work for NKC in November 1974. He retired effective March 1, 2005 at age 62, with an accumulated 28.38 years of credited service as of January 1, 2004. Khaliel was an early retiree because he elected benefits 32 months before his normal retirement date. (See Ex. 5, § 2.41.) Khaliel chose the optional lump-sum benefit. The grandfathered NKC benefit produced the largest benefit for Khaliel, in the amount of $398,959.90. (DN 45, Ex. D.).*"

Plaintiffs object to this statement as incomplete and misleading. First, Plaintiffs appear to object to the statement that Khaliel was "an early retiree," and state that he was a § 5.01 Vested plan participant entitled to receive the greater of his accrued benefit determined at his Normal, Early, Late, or Section 5.01 Vested retirement date. [DE 316 at 8635]. Plaintiffs appear to be referencing the language in § 4.05(d) which states that a member's MRI is calculated under § 4.03(b) as of the member's early retirement shall not be less than the member's accrued benefit as of December 31, 2003. Plaintiffs further appear to dispute that the grandfathered NKC benefit produced the largest benefit for Khaliel. Whether Khaliel received what he was entitled to under the Plan is a legal determination to be made below. Plaintiffs also reference the Section 5.01 Vested Terminated Benefit, but that section begins with the statement "[w]hen the employment of a Member by the Employer shall be terminated for any reason other than death or retirement (including Early, Normal Late and Disability Retirement)," which indicates the section is limited to members that are terminated for reasons other than death or retirement. Thus, this section

appears irrelevant to Khaliel, as he retired and was not terminated. This aspect of the objection is **OVERRULED**.

Plaintiffs also argue that Khaliel's NKC benefit was not $398,959.90 because Norton incorrectly calculated his "212 lump-sum" by improperly reducing it for early commencement and "not us[ing] the actuarial lump-sum factor based on his retirement age and effective interest rate." [DE 316 at 8636]. This statement by Norton is factual insofar as it is how Norton calculated Khaliel's lump-sum benefit and the number Norton came to. Whether this calculation is correct involves questions of fact and law this Court must decide. Whether the calculation (1) was supposed to include the § 4.05(b) reducers and (2) whether the calculation is actuarially equivalent to the increasing, sixty-months-certain lifetime annuity provided under the basic-form rules, are questions that the Court will resolve below and are not taken as fact. The objection is **OVERRULED**.

> 10. Statement: "*The case has followed a long, winding procedural road well summarized by the Court of Appeals' opinion. (Appeals Docket, 71-2, pp.2-8.) The appellate court recently vacated the grant of summary judgment in favor of the plaintiffs, reopening the question of whether the Plan has any liability to class representatives Khaliel and Taylor, who represent a liability class of employees who retired after 2003 and elected to receive their retirement benefits in a lump sum. (Id., pp. 2-3, 36; 71-3).*"

Plaintiffs object that this statement is incomplete and misleading. Although the Sixth Circuit affirmed various aspects of this Court's previous ruling on summary judgment, it is correct that the Sixth Circuit vacated that ruling [DE 279 at 7189 ("because the Plan is ambiguous in one crucial respect and may not comply with ERISA in another, we VACATE the district court's summary judgment order and REMAND for further examination . . .")]. The scope of this mandate involves two questions: whether the lump-sum calculation (1) was supposed to include the § 4.05(b) reducers and (2) whether the calculation is actuarially equivalent to the increasing, sixty-

33

months-certain lifetime annuity provided under the basic-form rules as required by ERISA.  It is correct that summary judgment was vacated and that the Plan could have no liability to Plaintiffs depending on the Court's decision on those two issues. The objection is **OVERRULED** in this respect.

Plaintiffs also argue that the Sixth Circuit did not limit the class to "employees who retired after 2003." [DE 316 at 8637]. Norton's statement does not state or imply that the Sixth Circuit limited the class to employees who retired after 2003.  But both Khaliel and Taylor retired after 2003.  Thus, Plaintiffs' objection is **DENIED.**

Finally, Plaintiffs object to Norton's citation to pages 2 and 3 of the Sixth Circuit's opinion, arguing these citations do not support its statement impliying the class is limited to members retiring after the 2004 amendments.  Norton has accurately cited the Sixth Circuit's opinion. The objection in this respect is **OVERRULED**.

> 11. Statement: "*From the outset, the plaintiffs have used only the benefits calculation for plaintiff Khaliel to illustrate their theories concerning alleged underpayment.*"

> 12. Statement: "*During the first several years of litigation, plaintiffs focused only on post-2003 retirees, using Khaliel's benefits calculation to illustrate their claims. However, after the summary judgment order in 2013, plaintiffs have argued that this theory applies to all participants who elected lump sum benefits. The Court of Appeals correctly recognized that plaintiffs are all post-2003 early retirees who elected lump sum benefits. (Appeals Docket, 71-2, p. 19).*"

The objections to statements 11 and 12 are considered together as Plaintiffs argue that the class is not limited to post-2003 early retirees. The Court **GRANTS** this objection insofar as the class is not limited to post-2003 retirees.  The Sixth Circuit's opinion reversed this Court's previous ruling that limited the class to post-2003 retirees, holding that the statute of limitations is 15 years on the contractual claim, therefore those retirees could go back as far as 1993. [DE 279 at 7218].  The objection is also **GRANTED** insofar as the statement implies Plaintiffs have only

calculated the lump-sum for Khaliel as Plaintiffs have pointed to several instances in the record where they have applied the calculation to other class members. [DE 326 at 8639]. At the same time, the statements from the Court of Appeals that are cited by Norton are accurate as to the scope of the class when presented to the Court of Appeals. At that time, the class was limited by this Court's previous ruling on the statute of limitations and thus only included employees who retired after the 2004 amendments.

13. Statement: "*If the plaintiffs' theory were correct, the 2004 amendments would have effectively changed the retirement age from 65 to 55, eliminating the need to maintain the plan's "Early Retirement" Section, 4.05. (Ex. 4 ¶¶20-23).*"

This statement comes from paragraph seventeen of Parks' supplemental report. [DE 315-8 at 8547].[11]   Libman disputes this statement in his rebuttal report. [DE 307-19 at 8189–90]. Libman essentially argues that this is outside the scope of an actuary's opinion and that the Plan could not have legally been amended to change the normal retirement age to 55 with a 10-year service requirement because it would violate "the IRC vesting requirements" and Plan requirements. [*Id.*] Plaintiffs also argue this is speculation about Norton's intent.  The Court does not see this as speculation about intent.  This is an observation about Plaintiffs' theory of the case that it would render the early retirement section in 4.05 meaningless. Plaintiffs also argue this opinion deviates from an actuary's job of following plan terms, but the Sixth Circuit has said the Plan is ambiguous on whether the early retirement reducers apply, so the Court does not view this as a deviation from the Plan terms.  Parks' statement also raises another point, which is that there would be no reason to leave § 4.05(b)(1)–(4) in the Plan under Plaintiffs' theory, but that section

---

[11] Parks' supplemental report is also attached to Norton's motion for summary judgment at [DE 307-6] but the header on that document is illegible and so the Court will cite Parks' supplemental report [DE 315-8] attached to Norton's response to Plaintiffs' motion for summary judgment.

was left in the Plan and the 2004 amendments inserted the phrase "Effective Prior to January 1, 2004" at the beginning of subsection (b).  This objection is **OVERRULED**.

> 14. Statement: "*In addition to the plan text, the history of the 2004 amendments refutes plaintiffs' theory that the amendments—instead increased it dramatically by up to doubling the retirement benefit owed to the very beneficiaries whose disproportionally generous grandfathered formulas were tied off by the amendments.*"

Plaintiffs argue this statement is irrelevant and unsupported by evidence.  Plaintiffs argue the Plan terms control. But on this , the Court has been directed by the Sixth Circuit to evaluate Norton's interpretation considering the ambiguity.  Plaintiffs assert that the Sixth Circuit held the 2004 amendments eliminated the reduction factors for members retiring after January 1, 2004.  But that is not true.  The Sixth Circuit recognized the text of the plan strongly suggests members retiring after January 1, 2004 get the benefit of the normal retirement rules without the reduction for early retirement, but ultimately held there is a patent ambiguity on this question in the Plan text. The objections based on these arguments are **OVERRULED**.

Plaintiffs also argue the "doubling the retirement benefit" statement is speculative, unsupported and fails to account for reduction in future accruals. [DE 316 at 8645]. Citing Parks' deposition, Plaintiffs argue that Norton's expert did not perform an actuarial calculation to determine the effect of removing the early retirement reducers, and so there is no basis to say that removing the reducers doubled the retirement benefit. [DE 316 at 8645].  But Plaintiffs' theory of the case is that by removing the early retirement reducers, the benefits to the Plaintiffs were increased.  Plaintiffs argue that Parks did not perform an actuarial calculation on the savings that resulted to the Plan from the 2004 and thus Norton cannot demonstrate the 2004 amendments reduced the liability of the Plan. While the Court agrees this type of evidence may have been relevant, the Court can still consider evidence of Norton's intent as to reducing liability to the Plan,

regardless of whether a calculation was performed on the actual impact. And Parks opines in his rebuttal opinion that this would have increased the Plan expenses by 40-50%. [DE 307-13, Parks 2019 Reb. Report at 7899].

Plaintiffs' expert Libman asserts that the savings impact of the 2004 amendments must be considered in its entirety, not just the early retirement reducers. He opines that tying off future accruals for the grandfathered TRAC benefits, as well as other savings improving the crediting interest rate and other changes, provided a substantial savings to the Plan, and thus any cost increases to the Plan from removing the reducers for early retirement would still result in a net lowering of liability to the Plan. [DE 307-19 at 8190–92]. Thus, Plaintiffs argue it is misleading to say that the elimination of the reducers increased liability dramatically without considering the savings of the tie off. Plaintiffs make a valid point that the Court considers, but the fact that there were other substantial savings from the 2004 amendments does not make Norton's statement misleading, and Plaintiffs' objection on this basis is **OVERRULED**.

Plaintiffs argue that this statement is inaccurate and unsupported by the Form 5500. [DE 316 at 8645–47]. Plaintiffs' expert Libman states that the net effect of the 2004 amendments as shown on the Form 5500 exceeded $14.65 million for a multitude of reasons that might not be attributable to leaving the early retirement reducers in place. [DE 316 at 8646]. These arguments go to the weight the Court will give to the points found in the Form 5500 and do not make the statement by Norton unsupported. Plaintiffs also argue Norton's statement that the grandfathered TRAC benefits were disproportionally generous is irrelevant as the Plan terms were chosen and drafted by Norton. That the grandfathered TRAC benefits were disproportionally valuable is relevant to Norton's intent, regardless of those benefits being so because of Norton's plan. The

Court does not find this fact irrelevant to Norton's intent on the 2004 amendments. These additional bases for Plaintiffs' objection are **OVERRULED**.

> 15. Statement: "*The finance committee notes, government filings, and plan summary provided to beneficiaries uniformly show that Norton Healthcare intended the 2004 amendments to decrease the plan's overall liability and to correct the fact that the plan was unfairly weighted in favor of grandfathered beneficiaries.*"

Plaintiffs argue this statement is irrelevant, misleading, and unsupported by evidence. Plaintiffs argue the Plan terms control and Norton's intent is irrelevant. Plaintiffs are incorrect as the Sixth Circuit made plain that Norton's intent as to the early retirement reducers in the 2004 amendments is relevant. [DE 279 at 7216, ("[b]ut since we cannot discern the contours of the parties' intent from the text of the document, *Firestone* requires the courts go defer to Norton's interpretation unless it is arbitrary and capricious.")]. Plaintiffs argue there is no evidence these items were provided to Class members. Norton points out that the government filings are available to the public and were cited in Plaintiffs' complaint. As for the Plan Brochure, it is true there is no evidence it was distributed although it appears in a final form. But Plaintiffs continue to argue that Norton has presented no evidence that the brochure was distributed. This is true, and although the brochure appears genuine and like a final product, there is no evidence that the brochure was final or distributed. There is also no evidence that the Plan Brochure was considered by Norton in interpretating the Plan. This issue goes to the weight the Court will give the brochure, not its admissibility. The Court is tasked with considering Norton's intent, not what the Plan participants knew.

Likewise, Plaintiffs argue the finance committee notes are of little evidentiary value on Norton's intent as they only show that Norton intended the switch to cash balance formula to eliminate the 200% differential between TRAC and cash balance and did not mention other amendments that increased the Plan's index rate and eliminated the early retirement reducers.

Plaintiffs point out that Parks testified it is not uncommon for a plan sponsor to add, modify, or disregard a proposal. While all these points may be true, again, they all go to the weight of the finance committee notes, not their admissibility. This objection is **OVERRULED**.

> 16. Statement: "*Norton Healthcare said nothing at all to plan participants about an alleged change that, according to plaintiffs . . .*"

Plaintiffs argue this statement is irrelevant, misleading, and unsupported by evidence. Plaintiffs argue the Plan terms control and that this Court previously held the plan summaries were not legally binding and not part of the Plan itself. While clear Plan terms do control, because the Sixth Circuit held the Plan patently ambiguous as to the early retirement reducers, the Court may consider extrinsic evidence of Norton's intent to understand Norton's interpretation of the Plan on this issue. It is still true that these other documents are not part of the Plan. But they can provide evidence of Norton's intent, so they are relevant.

Plaintiffs argue this statement is misleading because the 2004 summary plan description specified to participants that there would no longer be any reduction under the Plan for early retirement:

> For plan members who terminate employment on or after January 1, 2004, if you terminate employment prior to normal retirement age (age 65), your benefit will consist of the vested portion of your retirement account, **with no reduction for early termination . . .**

[DE 316 at 8648; DE 45-7, Summ. Plan Description, at 591] (emphasis added). This statement, under the heading "Early Retirement," indicates Norton intended for the early retirement reducers to be eliminated for any plan member who terminates employment on or after January 1, 2004. It is not limited to only include members who were not a part of the NKC or MEH plans. It is not qualified by the cash benefit formula. But the language says, "if you terminate employment prior

to normal retirement age (age 65) . . . no reduction for early termination."[12] But the next paragraph further supports Plaintiffs' argument as it speaks in terms of early termination before January 1, 2004 and references the grandfathered TRAC benefits:

> **For plan member who terminated employment prior to January 1, 2004**, you can take early retirement if you are at least 55 years old and were credited with at least 10 years of service at the time of your termination. **Your early retirement benefit will be equal to the total amount credited to your retirement account while you were a member of the plan, plus the lump sum value of the early retirement benefit you had earned under the MEH plan or the NKC plan.** For information on how early retirement benefits were determined under the MEH or NKC plan, please consult a prior version of the SPD, or contact the Pension Administrator.

[DE 45-7 at 591 (emphasis added)]. This second paragraph makes clear that for a member who terminated employment before 2004, the early retirement benefit is calculated as it was "while you were a member of the plan," which is before the 2004 amendments took effect. This paragraph is consistent with the paragraph that preceded it and is cited by Plaintiffs for the proposition that for members who terminated employment after January 1, 2004, there would be no reduction for early termination. The difference in the two paragraphs is the date of termination –after 2004 versus before, and no other qualifications are made. This evidence can be construed against the argument that Norton did not intend to eliminate the early retirement reducers. But, as this court previously held, the language "your retirement account with no reduction for early termination" was in reference to the new cash balance account. [*Id.*]

Norton does not address this argument about the "no reduction for early termination language" from the summary plan description in its response to Plaintiffs' objections or in the

---

[12] It does not matter that it says "early termination" rather than "early retirement." Early termination is found in Section 5.01 of the plan and involves a termination not the result of death or retirement. But it appears termination is used in the more general sense in this paragraph of the summary plan description, and the parties have not argued otherwise.

summary judgment briefing.  Norton argues in the summary judgment briefing that the 2004 summary plan description supports Norton's intent to eliminate the early retirement reducers because it states in the "Overview" section:

> Accrued Benefit – If you were covered by either the NKC or MEH plan as of December 31, 1990, you are guaranteed a retirement benefit at least as much as – and maybe more than – it would have been under the previous plan.  Effective January 1, 2004, your benefits under the NKC or MEH plan were 'tied off' . . . your retirement benefit under the Plan will never be less than your accrued benefit under the NKC or MEH plan. For information on how your benefit was determined under the NKC or MEH plan, see previous versions of this SPD, or consult the Pension Administrator.

[DE 321 at 8988 (citing DE  45-7, Summ. Plan Description, at 586, 590)]. While this language supports Norton's intent that the grandfathered TRAC benefits would be tied off with no future accruals, it does not necessarily indicate that Norton intended to keep the early retirement reducers. The language that the benefit would be "at least as much as – and maybe more than – it would have been under the previous plan" could suggest that Norton intended to eliminate the early retirement reducers.  Removing the reducer would result in a benefit under the previous plan being "more than" it was under the old plan despite the tie off.

What Norton told the plan participants about the Plan and the 2004 amendments is relevant to the question of its intent. But, as explained below, documents are not presented in which Norton expressly and explicitly tells participants that the reduction for early retirement was being eliminated from the grandfathered benefit.  Thus, the statement is not misleading and the objection is **OVERRULED**.

17. Statement: "*According to the plaintiffs, the 2004 amendments immediately increased the retirement benefit of one retiree, Clarissa Ponder, by $1,035,892.53—yet plaintiffs conceded participants like Ms. Ponder were never told of such an incredible, immediate windfall.*"

Plaintiffs explain that Ponder was a late retiree, not an early retiree, and thus the issue with early retirement reducers is inapplicable to the calculation of her benefits. Norton did not respond to this objection. Norton's statement is false and misleading; thus, the objection is **GRANTED**.

18. Statement: "*Additionally, the Form 5500 government filings made no mention of any increase in the plan's liabilities—which the Form 5500 was required to disclose—and instead indicated the Plan would owe $14 million less to beneficiaries as a result of the amendments.*"

Plaintiffs object that this statement is irrelevant and unsupported by the evidence. As with the summary plan description, Plaintiffs argue the Plan terms control and that this Court previously held there was no legal significance to the Form 5500. As mentioned above, while clear Plan terms do control, because the Sixth Circuit held the Plan patently ambiguous as to the early retirement reducers, the Court looks to Norton's intent to understand Norton's interpretation of the Plan on this issue. The Form 5500 is not the Plan. But it can provide evidence of Norton's intent, so Plaintiffs' objection to relevance is **OVERRULED**.

Plaintiffs' also assert that the statement that the form "made no mention of an increase in liabilities" is misleading because there were numerous reductions in liabilities, and the savings from the 2004 amendments must been looked at as a whole. Plaintiffs make a fair point. Just because an overall decrease in liability was shown, that does not mean that all liabilities decreased. Libman makes the point that the savings impact of the 2004 amendments must be considered in its entirety, not just the early retirement reducers. [DE 307-19, at 8191]. He opines that tying off future accruals for the grandfathered TRAC benefits, as well as other savings by improving the crediting interest rate and other changes, resulted in substantial savings to the Plan. Any increase

cost increase to the Plan from removing the reducers for early retirement would still result in a net lowering of liability to the Plan. [DE 307-19, at 8190–92]. Thus, Plaintiffs argue it is misleading to say that the elimination of the reducers increased liability dramatically without considering the savings of the tie off.  It is curious that Norton did not perform a calculation of the various impacts of the 2004 amendments to demonstrate that the early retirement reducers were included. [DE 307-20, at 8234, 136:14–20 (Q "have you ever performed that calculation to determine the impact of the 2004 amendments?" A "I have never done an actuarial evaluation to determine that, correct.")]. Parks does, however, opine in rebuttal that eliminating the reducers and indexing would have increased the Plan's overall liability by 40-50%. [DE 307-13, at 7899]. But without a specific breakdown on the impact of the various aspects of the amendment on liability, simply showing a decrease in liability on the Form 5500 does not demonstrate an intent that the reducers would still apply. Plaintiffs make a valid point, yet Norton's statement is not as misleading as much as it is unpersuasive, therefore Plaintiffs' objection on this basis is **OVERRULED**.

> 19. Statement: "*Additionally, Parks has consistently explained that the 212 lump sum calculation accounts for the value of the 60-month certain feature. As Parks demonstrates, this added value is reflected in the calculation of Khaliel's monthly benefit, and specifically in the conversion factor 170.305, which is used in his calculations under the plan and represents the present value of $1 payable 60 months certain and life thereafter as a level annuity for someone age 65. Parks explains that the plaintiffs' expert inappropriately takes a second bit at the apple by utilizing this same conversion factor and then separately increasing the value of the annuity by 1.5% at another point in his calculations.*"

This statement addresses one of the issues remanded, which is whether the lump-sum calculated under § 4.02(b)(6) includes the sixty-month-certain feature of the basic-form of benefit. [DE 279 at 7213].  The objection goes to weight of material evidence so the statement will not be stricken. Plaintiffs' objection is **OVERRULED**, but, as discussed below, summary judgment will be granted to Plaintiffs on this issue.

20. Statement: "*The 212 factor used by the plan—as adjusted by dividing by one minus the appropriate reduction factor for an early retiree—represents an appropriate lump sum conversion sufficient to ensure that participants received at least the actuarial equivalent of their accrued benefits.*"

Plaintiffs object that this statement is false and misrepresents the evidence. [DE 316 at 8652]. Plaintiffs argue that there is no evidence that Parks supports the statement that "[t]he 212 factor . . . represents an appropriate lump sum conversion sufficient to ensure . . . the actuarial equivalent . . ." [DE 316 at 8652].  Plaintiffs argue that Parks testified the 212 adjustment factor "is only an estimate and requires adjustment for the retiree's actual age and effective interest rate." [DE 316 at 8652, n. 92].  The Court has reviewed the testimony from Parks' 2019 deposition, and it is not clear that he agrees that the 212 proxy in the final lump-sum calculation would have to adjusted to reflect the actual age of the member and the effective interest rate at that time. [DE 307-20, Parks 2019 Dep. at 8225–27, p. 95–105]. It seems he and counsel were talking past each other and conflating the 212 adjustment in calculating the annuity with the 212 factor in the final lump-sum calculation.  Regardless, as addressed below, Norton's calculation of the benefit accounts for the retiree's actual age and effective interest rate.  Because this objection goes to weighing material evidence, it will not be further considered here.

21. Statement: "*Plaintiffs do not explain how the 212 calculation fails to provide the actuarial equivalent of Khaliel's accrued benefit.*"

Because this objection goes to weighing material evidence, it will not be considered here.

22. Statement: "*The 212 lump sum calculation simply yields a smaller number than the plaintiffs claim, because the starting point of the increasing monthly benefit (i.e., plaintiff Khaliel's monthly income in the plan's basic form) is smaller than the plaintiffs contend.*"

Because this objection goes to weighing material evidence, it will not be considered here.

44

23. Statement: "*If a plan offers a subsidized early retirement benefit (i.e., an early retirement benefit that is more generous than the actuarial equivalent of the accrued benefit at normal retirement age), the plan is not required to include the value of that subsidy in any optional lump sum form.*"

This statement is a question of law.  Norton argues that it is not required, as a matter of law, to ensure a certain lump-sum benefit is actuarially equivalent.  Plaintiffs' objection is not a proper Rule 56(c) and thus, Norton's statement will be considered below in the analysis of the actuarial equivalence issue.

24. Statement: "*The Court of Appeals also observed that the lump sum calculation in subsection 4.02(b)(6) maintained for early retirees* [sic] *a reversal of an early reduction taken in the process of calculating the monthly benefit, causing the appellate court to wonder whether the plan called for an earlier reduction for early retirement.*"

Plaintiff objects to this statement as false and misleading. Plaintiff argues that this Court and the Sixth Circuit held the 2004 Amendment eliminated the reduction factors for members retiring on or after January 1, 2004.  The Court disagrees.  This Court previously held as much.  But the Sixth Circuit did not.  It held the plan is ambiguous on this issue, reversing this Court's previous decision. The Court understands the reversal is in the second part of the lump-sum calculation found in 4.02(b)(6) ("diving by one (1) minus the appropriate reduction factor under Section 4.05(b)(5) . . . as applicable") rather than Section 4.05(b)(5) (this is the reduction, not the reverser) and Section 5.01.  Norton's statement accurately represents the Sixth Circuit's ruling, which found the reversal to indicate that the reducers should apply because under the old plan the reversal was taken to reverse the previous application of the reducer found in § 4.05(b)(5).  Thus, it made little sense to apply to a reversal if no reduction had been taken.  The objection is **OVERRULED**.

Plaintiffs argue that Norton's counsel in charge of drafting the 2004 amendments recognized that the reversal in § 4.02(b)(6) would no longer apply after the amendments. The email states in part:

> Tie-off of Methodist and NKC benefits (everything else). Primarily, the tie-off is effected through the new Subsection 2.01(c) (in Item 2) and the new Subsection 4.03(b) (in Item 4). The way 4.03(b) works is that the Member's current benefit is converted at new Paragraph 4.03(b)(1), then the interest credit is applied to this conversed benefit at Subparagraph 4.03(b)(2)(A) and the pay credit applied to it at Subparagraph 4.03(b)(2)(B). Thus, for new hires, the calculation resulting from the Paragraph 4.03(b)(1) conversion [illegible] and therefore when the interest credit is applied for the first year, the result is also zero. For future years, the pay credit will be added to the zero initial benefit to start accruals and interest credits applied in the year after the pay credit accrues.
>
> The other changes clarify that all other benefit determination will relate to the Subsection 4.03(b) calculation. Thus, Late, Early, Disability, vested, and Death Benefit determinations now relate back to the new Subsection (see the new language added in items [6]-10).
>
> One additional change made in the case of Early, Disability, and Vested benefits is that, as the amendment is currently drafted, the benefit determination does not have a further reduction for early commencement (that is, the 1/300 per month reduction found, for instance, at Paragraph 4.06(a)(5)). It is my understanding that we are going to a straight cash-balance format at this point, in which the Member gets his or her cash balance at termination, if eligible, regardless of whether the termination occurs prior to Normal Retirement Date…. This also means that the application of these reductions to certain forms of benefit in Section 4.02 no longer apply--see, for instance, Paragraph 4.02(b)(6) which applies the early commencement reductions to the lump sum conversion.

[DE 316 at 8664 (citing DE 308-1)]. Plaintiffs argue Hamilton's email demonstrates that Norton intended for the early retirement reducers to not apply. Norton argues that the email supports the Plan's interpretation. Norton asserts the "email confirmed that the amendments 'tied-off' the grandfathered NKC benefits, and it also confirms that the early retirement reduction factors did not apply to benefits under the new cash balance formula." [DE 321]. Norton asserts that "[i]mplicit in the email is that the frozen grandfathered benefits—which remained the minimum

46

available benefit for grandfathered beneficiaries and are the only benefits in dispute as to this issue—continued to be calculated just as before 2004." [DE 321 at 8989].

Plaintiffs also argue that Parks testified that the reversal in § 4.02(b)(6) of the reducers in 4.05(b) results in the retirees' TRAC benefits no longer being reduced for early retirement after January 1, 2004, [DE 316 at 8665], the net effect being a wash. Norton argues this is not true, because the reversal in 4.02(b)(6) only applies to the reducer in 4.05(b)(5) and not the reducers in subparagraphs (1)–(4) and thus the reversal only applies to half of the reduction, leaving the other reductions in place. [DE 344].

The Hamilton email and effect of the reversal in § 4.02(b)(6) is discussed below as to whether the reducers in § 4.05(b) still apply to the grandfathered benefit. It is not proper for consideration as a factual objection here.

> 25. Statement: "*From day one, Norton's actuarial experts have explained that the formula in subsection 4.02(b)(6) provides a generous calculation of the actuarially equivalent lump sum, ensuring that participants who elected lump sum benefits received at least the actuarial equivalent of their benefit in the basic form.*"

Plaintiffs' objection to this statement is not a proper use of Rule 56(c) as this statement goes to the ultimate issue of whether the lump-sum calculation provided the actuarial equivalent of the benefit in its basic form. It will be addressed below on the parties' cross-motions for summary judgment.

> 26. Statement: "*Parks demonstrated that Khaliel's lump sum benefit was the actuarial equivalent of his accrued benefit in the basic form. (Ex. 11, ¶¶ 28-32, 36). In short, Parks is able to "check the math" and show that the actuarial assumptions baked into the subsection 4.02(b)(6) lump sum formula are sound and that they ensure that the lump sum is at least the actuarial equivalent of the accrued benefit in its basic form. (Id.).*"

Plaintiffs' objection to this statement is not a proper use of Rule 56(c) as this statement goes to the ultimate issue of whether the lump-sum calculation provided the actuarial equivalent

of the benefit in its basic form.  It will be addressed below on the parties' cross motions for summary judgment.

> 27. Statement: "*By using the plan's assumptions concerning interest rate and expected mortality for a participant like Khaliel, Parks demonstrates that the basic form of the benefit was actuarily equivalent to the benefit in the form of a level (non-increasing) benefit. He then uses this actuarily equivalent level benefit and an IRS-mandated conversion factor (UP 1984 @ 3% with a three-year setback) to calculate the lump sum equivalent of this level benefit. (Id., ¶ 31). The result of these calculations is $398,960, the same figure that results from the calculation of the lump sum under the formula in subsection 4.02(b)(6).*"

Plaintiffs' objection to this statement is not a proper use of Rule 56(c) as this statement goes to the ultimate issue of whether the lump-sum calculation provided the actuarial equivalent of the benefit in its basic form.  It will be addressed below on the parties' cross motions for summary judgment.

### B. Norton's Motion to Exclude Portion of Libman Report

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, 'a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements. First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable.'

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

A court must determine whether evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. A key consideration is "whether the reasoning or methodology underlying the testimony is sufficiently valid." *Id*. at 592–93. The inquiry is "a flexible one," and "[t]he focus must be solely on the principles and methodology, not on the conclusions they generate." *Id*. at 594–95. While *Daubert* requires the court to serve as gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. at 596.

To assist with this determination, the Supreme Court in *Daubert* laid out several factors[13] for the courts to consider. *Daubert*, 509 U.S. at 592–94. Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences

---

[13] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (quoting *Daubert*, 509 U.S. at 592–94).

throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.*

Norton moves to exclude portions of Exhibit C to Plaintiffs' expert's, Michael Libman's, report. [DE 309]. Norton wants the portion of this chart excluded that addresses calculating benefits for retirees that do not have "grandfathered" benefits, "late" retirees, or "deferred vested" retirees because Norton argues that Libman's report does not explain the methodology he used for calculating these benefits. In other words, Norton wants everything excluded from Exhibit C that does not address Khaliel's benefits for a similarly situated class member that retired early and has "grandfathered" benefits. Plaintiffs counter that Libman's report and it methodology was not limited to only those retirees with "grandfathered" benefits who retired early and elected a lump-sum. Plaintiffs say Libman's report explains that the same methodology applies to each plan member who elected a lump-sum benefit. [DE 317].

In its Reply, Norton raised for the first time its argument that Libman fails to identify the source of data. Specifically, Norton argues Libman does not disclose where he got the data to make calculations for the remaining retirees, other than from the documents provided by Norton during this litigation. Norton also argues he fails to provide sub-calculations. [DE 322]. Norton cites the requirements of Fed. R. Civ. P. 26 in support of this argument. The Court permitted Plaintiffs to file a sur-reply because the argument was raised for the first time in a reply brief, in which they argue that the values in columns A–K contain Plan member data produced by Norton, and that the remaining columns have values Libman derived from the data in columns A–K.

Plaintiffs point out that Norton never raised its concern about the source of the data before its reply brief. [DE 327-1 at 9164]. Plaintiffs further explain that Norton produced a series of spreadsheets pursuant to the previous damages order which contained Plan member data and that each of the data points with limited exception in columns A–K come from these spreadsheets and can be readily found.  [DE 327 at 9165].

The Court agrees with Plaintiffs that Exhibit C of Libman's report is sufficiently reliable and Norton's motion is **OVERRULED**.

### C. Parties' Motions for Summary Judgment

Finally, the Court addresses the merits issues remanded from the Sixth Circuit. At the outset the Court notes neither party ordered the analysis of the issues in their motions for summary judgment in the same order or with the same language as the issues were set forth by the Sixth Circuit, making it difficult to resolve the parties' motions. Based on the Sixth Circuit's opinion, and the record, there are four issues to be resolved.  The first is whether Plaintiffs' MRI, referenced in the lump-sum provision 4.02(b)(6), as calculated under the "applicable section" (which is 4.05(d) (and as a result 4.03(b)) is "increasing" as required by the language of the lump-sum provision § 4.02(b)(6). The Sixth Circuit made clear this "increase" does not have to be for sixty months certain or identical to the basic form benefit in 4.02(a).  [DE 279 at 7209–10]. The second is whether the lump-sum in 4.02(b)(6) is the "actuarial equivalent" of the basic-form of benefit, including whether Norton's actuarial assumptions are valid, taken together. The third is whether early retires have their lump-sum benefit in 4.02(b)(6) reduced by the early retirement reducers in § 4.05(b).  The fourth is whether Plaintiffs' MRI is calculated by adding the amount from 4.03(b)(1) (which is calculated from 4.03(a)) with the amount accrued under 4.03(b)(2).  Because

the first, third, and fourth issues involve calculating MRI, the Court addresses those first, and then

will address actuarial equivalence.

     **i.**    <u>Issue 1:  Whether Plaintiffs' MRI is "increasing" as required by 4.02(b)(6).</u>

The Sixth Circuit stated that

> 4.02(b)(6) itself requires that the input be an increasing MRI. Indeed, the expert
> testimony in the record, discussed above, suggests the MRI will always be
> increasing at this stage of the math, but the district court is free to examine this
> issue in more detail . . . [but] we hold that the Plan itself does not require the lump
> sum to account for [the sixty-months certain] variance.

[DE 279 at 7212].  This issue is whether Plaintiffs' MRI, referenced in the lump-sum provision

4.02(b)(6), as calculated under the "applicable section," which is 4.05(d) (and as a result 4.03(b)),

is "increasing" as required by the language of the lump-sum provision 4.02(b)(6). The Sixth Circuit

made clear this "increase" does not have to be for sixty months certain or identical to the basic

form benefit in 4.02(a).

     While the Sixth Circuit said this Court was free to reevaluate this issue, the Court agrees

with the parties that this issue was resolved by the Sixth Circuit in Norton's favor and there is no

need to reevaluate its ruling.  [DE 315 at 8434; DE 342 at 9242, 9249, 9251, 9282]. Norton states

that Plaintiffs conceded at the hearing that this issue had been resolved in Norton's favor. [DE 342

at 9282, Hr'g Tr.; *see also* DE 321 at 8992, DE 344 at 9320].  The Court agrees.  There is no

dispute the MRI is increasing as required by § 4.02(b)(6).  This is also explained in Norton's

expert's, Parks', report. [DE 315-8 at 8544]. The MRI referenced in 4.02(b)(6) is increasing as the

language of that Plan provision requires.[14]

---

[14] Plaintiffs' assert in support of their argument that the MRI is not increasing, that the Diversified Scoping
Report lists the "Forms of Payments" under the Plan. [DE 315-9, Scoping Report at 8595].  The first form
of payment listed is the "Standard Forms" which states: "Single Participant: 5 Year Certain & Continuous
. . . Note: The Plan states that the increasing 5 C & C is the normal form but this has not been the
administrative practice." [DE 315-9, Scoping Report at 8595].  Norton offers a plausible explanation for

**ii.**   Issue 2: Whether early retirees have their lump-sum benefit in 4.02(b)(6) reduced by the provisions of 4.05(b).[15]

The next issue to be resolved is whether early retirees have their lump-sum benefit in 4.02(b)(6) reduced by the early retirement reducers in § 4.05(b). [DE 279 at 7215]. On this issue "*Firestone* requires the courts to defer to Norton's interpretation unless it is arbitrary and capricious." *Id.*[16]   Under Norton's interpretation of the Plan, the early retirement reducers in § 4.05(b) continue to apply to the frozen grandfathered benefit of an early retiree that retires after January 1, 2004.  [DE 279 at 7216].  This court  previously held the early retirement reducers in § 4.05(b) no longer applied to an early retiree that retired after January 1, 2004, as such early retirees are governed instead by 4.05(d), and that conversion to a lump-sum under 4.02(b)(6) would not result in reducing benefits for early retirement. [DE 217 at 6774–75]. But the Sixth Circuit determined that the Plan is patently ambiguous as to whether § 4.05(b)'s early retirement reducers would still apply to an early retiree after January 1, 2004.  [DE 279 at 7216].

*i.    Standard of Review for Norton's Benefit Decisions*

Challenges to benefits decisions under ERISA are based on the administrative record available to the insurer at the time of the final denial, *see Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998), and are generally reviewed under a de novo standard. *See Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505–06 (6th Cir. 2005).

---

[15] this statement, [DE 321 at 8993], that this was referencing the basic form of benefit in the pre-1991 plans and the Plan had more often paid participants in the form of an actuarially equivalent level benefit as a result.  This meaning of the statement from the Scoping Report need not be determined by the Court because Plaintiffs concede the annuity is increasing.

[15] Norton agrees the cash balance benefit provision is excepted from the early retirement reduction factors. [DE 46 at 43, Norton Appellate Brief, Case No: 16-5063, *Clemons et al v. Norton Healthcare*].  This analysis only applies to whether the Section 4.05(b) reducers apply to calculating the grandfathered benefit that was frozen and tied-off as part of the 2004 Amendments.

[16] Norton similarly describes this issue as "(2) Whether the early retirement reduction factors continued to apply to Plaintiffs' grandfathered benefits after the 2004 amendments . . ." [DE 307].

But "[w]hen the plan vests the administrator with discretion to interpret the plan . . . the [C]ourt reviews the benefits denial under the 'arbitrary and capricious' standard." *Corey v. Sedgwick Claims Mgmt. Servs., Inc.,* 858 F.3d 1024, 1027 (6th Cir. 2017) (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)). This standard is also known as "*Firestone* deference." *See Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 267 (6th Cir. 2018). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *McDonald v. W.-S. Life Ins.,* 347 F.3d 161, 172 (6th Cir. 2003)). "Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator' decision as long as the plan was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits." *McDonald*, 347 F.3d at 172.

Here, the Plan provides the plan administrator with discretion to determine eligibility for benefits and construe the terms of the Plan:

6.06 Powers and Authority

> (3) Each Committee shall have all powers and discretion necessary or helpful for carrying out its responsibilities, and the decisions or actions of such Committee in good faith in respect of any matter hereunder shall be conclusive and binding upon all parties concerned.

(b) Without limiting the generality of the foregoing, the Retirement Committee shall be the Plan Administrator and shall have the power and discretion:

> (4) to make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan.

     (2)     to construe all terms, provisions, conditions and limitations of the Plan.

     (3)     to determine all questions arising out of or in connection with the provisions of the Plan or its administration in any and all cases in which the Retirement Committee deems such a determination advisable.

[DE 308-1 at 8309–10].   The Plan vests the administrator with discretion to interpret it and thus satisfies the standard for applying *Firestone* deference. *Clemons*, 890 F.3d at 267. Under "*Firestone* deference," the Court must uphold a decision by the plan administrator if it was "the result of a deliberate, principled reasoning process" and is "supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd, Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Dig. Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003). Even if the plan administrator's conclusion conflicts with what the Court would have decided, "as long as there is a reasonable basis for the decision, it must be upheld." *Senzarin v. Abbott Severance Pay Plan for Emps. Of KOS Pharms.*, 361 F. App'x 636, 640 (6th Cir. 2011). And "when *Firestone* . . . applies, a court may not invoke *contra proferentum* to 'temper' arbitrary-and-capricious review." [DE 279].   Thus even if terms are ambiguous, the Court must defer to the plan administrator's interpretation unless the interpretation itself was arbitrary and capricious.   *Id*.

Further, under the arbitrary and capricious standard, the Court "must decide whether [Norton's] decision was rational in light of the plan's provisions."   *Shelby Cnty. Health Care Corp.*, 203 F.3d at 933.   Although this standard is deferential, it does not mean the court "rubber stamps" a plan administrator's decision. *Schwann v. Guardian Life Ins.,* 626 F.3d 299, 308 (6th Cir. 2010).   The court is required to review "the quality and quantity of the . . . evidence and the

opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins.,* 347 F.3d 161, 172 (6th Cir. 2003).

At the outset, Plaintiffs raise a point that most of Norton's support for its interpretation is post-hoc, and not explained by its Retirement Committee at the time it was making these decisions. The Court has grappled with what evidence it should consider in examining Norton's interpretation of the Plan, as *de novo* review would ordinarily be limited to the administrative record, and the evidence presented by Norton as to its intent is largely outside of that record. [DE 308 at 8260– 61]. But the Court is not applying *de novo* review, it is applying *Firestone* deference.  Plaintiffs argue *Firestone* does not apply because there is no evidence that the Norton Retirement Committee exercised its discretion. This court ruled that Norton exercised its discretion and did not waive its right to deferential review [DE 217 at 6757]. Norton asserts this argument was waived when Plaintiffs did not raise it on appeal, but Norton fails to cite the appellate record. [DE 315 at 8434]. Nonetheless, the Court reviewed Plaintiffs' appellate briefs. [DE 52, DE 60, Pls. Appellate Briefs, Case. No. 16-5063, *Clemons, et al. v. Norton Healthcare Inc. Ret.* ("Appeal")].  Plaintiffs mention this issue in their brief in response to Norton's appeal on the standard of review.  [DE 52, "Retirees challenged the fact that Norton. . . improperly dele[gated] the decision to a non-fiduciary third-party . . . it became a moot point based on the District Court's analysis . . ."]. Plaintiffs mention their previous argument to the district court in response to Norton's argument. [DE 52 at 46, Case No. 16-5063, Appeal.]. Plaintiffs stated "[r]etirees submit this decision to apply deferential review was contrary to controlling precedent requiring de novo review under similar circumstances . . . [h]owever, given the favorable judgment, Retirees simply submit the Court 'may affirm the district court's determination on any grounds.'" [DE 52 at 47; *see also* DE 324-2, Excerpt submitted by Plaintiffs]. Thus, they did not ask the Sixth Circuit to examine or reverse this ruling. And the Sixth

Circuit examined the standard of review in its opinion holding that "if the Plan clearly gives the administrator *Firestone* deference, then contra proferentum has no place in reviewing the administrator's decisions." [DE 279 at 7204].  In the paragraph before, the Sixth Circuit stated that "no one disputes that the Norton plan gives the administrator Firestone deference here . . ." [DE 279 at 7204]. Because Plaintiffs did not appeal this issue, it is waived and this Court's previous ruling that Norton did not waive deferential review stands as law of the case. [DE 315 at 8438–39 (citing *Kimberlin v. Quinlan,* 199 F.3d 496, 500 (D.C. Cir. 1999)].

> ii.   *Whether this issue is limited to the reducer in Section 4.05(b)(5) or includes the reducers in Section 4.05(b)(1)-(3).*

Plaintiffs also argue that whether the reducers apply does not matter because the reduction taken in 4.05(b)(5) is reversed when it is converted to a lump-sum through § 4.02(b)(6). [DE 318 at 8843; DE 308 at 8265–66].  Thus, the reversal washes out the reduction.  Plaintiffs assert that the MRI under 4.02(b)(6) must be divided by one minus the reduction factor taken under 4.05(b). Plaintiffs assert this applies to all reduction factors taken under 4.05(b), not just a reduction taken under 4.05(b)(5). According to Plaintiffs the formula for converting a lump-sum under 4.02(b)(6) where MRI was reduced for early retirement under both 4.05(b)(3) and 4.05(b)(5) will look like this:

$$\frac{\text{MRI} \times (1 - \text{Factor}_{4.05(b)(3)}) \times (1 - \text{Factor}_{4.05(b)(5)}) \times 212}{(1 - \text{Factor}_{4.05(b)(3)}) \times (1 - \text{Factor}_{4.05(b)(5)})}$$

[DE 308 at 8266].  Thus, according to Plaintiffs, any early retirement reduction taken under 4.05(b) will be cancelled out by applying the "1–RF" required under § 4.06(b)(6) essentially resulting in the MRI being multiplied by 212 and then being divided by 1. [DE 308 at 8265]. Plaintiffs argue that Norton's expert, Parks, agrees that all reducers from 4.05(b), not just 4.05(b)(5), are reversed

in 4.02(b)(6). [DE 308-1, Parks 2019 Dep. at 8339]. The Court has reviewed the Parks testimony and it is not clear that he testified all reducers were reversed.  His answer could be interpreted, when reading the questions leading up to the question and answer cited by Plaintiffs, to say that the other reducers may be taken as part of the calculation, not just the 1/300 reducer from 4.05(b)(5), "depending on how early it was." [*Id.*; *see also* DE 307-120 Parks 2019 Dep. at 8231].

Norton does not interpret the Plan to reverse the reducers in 4.05(b)(1)–(3) as part of the lump-sum calculation. Norton agrees with Plaintiffs that the 4.05(b)(5) reducer is reversed by the lump-sum conversion in § 4.02(b)(6). [DE 307-1 at 7462, DE 342 at 9285, Hr'g Tr. ("[e]ven if you accept their position that the early retirement reducer is applied, do they cancel out, because of that dividing by one minus, that's half true. It cancels out the . . . (b)(5) reducer but not the (b)(3) reducer."); *see also* Parks's original calculation for Khaliel, DE 321-1 at 9001 (demonstrating that reducers are taken under 4.05(b)(3) and (b)(5) but does not explain lump-sum calculation)]. Norton interprets the Plan such that even though all the early retirement reducers in 4.05(b) apply, only the reducer in 4.05(b)(5) gets reversed during the 4.02(b)(6) conversion to lump-sum.  For example, Norton applies the reducer in 4.05(b)(3) to Khaliel's MRI together with the reducer in 4.05(b)(5). This was made clear by counsel at oral argument, but Norton's expert Parks's explanation, found in his February 2019 Report, is hard to follow because although he writes out the steps for calculating Khaliel's benefit, he does not state which provision of the Plan he is applying for some steps. [DE 307-6 at 7540–42].  Norton, in converting the MRI to a lump-sum, only applies the reversal in 4.02(b)(6) to the reduction from 4.05(b)(5), not 4.05(b)(3).  Thus, under Norton's interpretation, the § 4.02(b)(6) reversal is not a complete wash of the § 4.05(b) reducers, and the Court must determine whether this interpretation of the Plan is arbitrary and capricious under *Firestone*.

   *iii. Whether Norton waived the argument that the § 4.05(b)(1)-(3) reducers*
     *apply*

   Plaintiffs argue that Norton only appealed whether the 4.05(b)(5) reducer referenced in

4.05(b)(6) applied and waived any argument that the reducers in 4.05(b)(1), (2), or (3) applied.

[DE 324 at 9058]. Plaintiffs do not cite the relevant portions of the appellate record in support of

this argument. Plaintiffs also impermissibly raise this argument for the first time in a reply brief,

depriving Norton of the opportunity to respond. Nonetheless, the Court examined Norton's

appellate briefs and records.  Norton identified "[w]hether the district court[] . . . properly . . .

prohibited the Plan from applying an early retirement discount to those Plan participants who

retired before the Normal Retirement age of 65 . . ." as an issue on appeal. [DE 13, Case 16-5063,

Appeal]. Norton's appellate brief states one issue was "[w]hether the district court erred by holding

that lump-sum benefits paid to retirees after 2004 do not need to be reduced in the event of early

retirement, even though the Plan's lump-sum benefits provision expressly requires an early

retirement reduction." [DE 46, at 11, DE 57, Case. No. 16-5053, Appeal]

   On appeal, Norton argued that the use of "notwithstanding" at the beginning of 4.05(b)(5)

"easily overrides any language that would otherwise limit the applicability of the general section

in which that reduction factor appears . . ."  [DE 57 at 30].  The general section is 4.05, including

its other reducers found in 4.05(b)(1), (2), and (3).  Judge White noted in her dissent that Norton's

expert's submission shows that Norton reduces MRI not just from 4.05(b)(5) but also from the old

4.05(b)(3) in the instance of Khaliel.  [DE 279 at 7226, n.2]. Even though the reduction for early

retirement arguments centered on the lump-sum calculation and its reference to 4.05(b)(5), not

application of 4.05(b)(1)–(3), Norton's argument was not waived. If there is some other support in

the record for Norton's waiver of this argument, Plaintiffs fail to present it.

      *iv.*    *The Text of the Plan*

On remand, both parties make arguments about the language of the Plan. Plaintiffs argue that under the Plan's plain language, the § 4.05(b) reducers do not apply to an early retiree after January 1, 2004. [DE 308 at 8265, DE 318 at 8854].  Plaintiffs' arguments about the "alternative § 4.02(b) lump-sum-the 212 lump-sum" pertain in part to the issue of whether Norton's interpretation of the ambiguous plan terms was arbitrary and capricious. [DE 308 at 8241, 8258-67].  Likewise, Norton continues to argue that the language of the Plan is clear that the 4.05(b) reducers do still apply after January 1, 2004 to the grandfathered formula for TRAC benefits for an early retiree. [DE 307-1 at 7463–66].  While these arguments are helpful to the Court in understanding the context, whether the Plan is ambiguous as to whether the early retirement reducers apply has already been resolved.  The Sixth Circuit ruled the Plan was patently ambiguous as to this issue.  The Court understands it is not ruling on whether there is an ambiguity; that has already been determined. But these arguments are relevant to whether Norton's interpretation was reasonable.  The Sixth Circuit directed the Court to look to Norton's intent and Norton's interpretation and determine whether it is reasonable or arbitrary and capricious.

Norton interprets the Plan to still apply the § 4.05(b) reducers to an early retiree retiring after January 1, 2004.  [DE 307-1 at 7463–65].  Norton argues that the text of the Plan and 2004 amendments support its interpretation that all the reducers found in § 4.05(b) still apply.  To understand Norton's interpretation, Norton emphasizes how the Plan operated before the 2004 amendments. Before the 2004 amendments, the Plan operated with two formulas:  the formula for grandfathered benefits from the predecessor NKC and MEH plans and the formula under the cash balance formula. [DE 307-1 at 7451–52 (citing DE 307-3, Aff. of Stephen Gagel ("Gagel Aff.") at 7477)].  Those entitled to grandfathered benefits were entitled to the larger of the grandfathered

formula or the cash balance formula. [*Id.*] According to Norton, the 2004 amendments were designed to "tie off," that is to stop, the future accruals under the grandfathered benefits. [DE 307-1 at 7453; DE 307-9, Finance Committee Notes; DE 307-3, Gagel Aff. at 7478; DE 307-8, Libman Dep. at 7737–38].  Under the 2004 amendments, beginning in 2004, those with grandfathered benefits would no longer continue to accrue benefits under the grandfathered benefit formula, but would still be entitled to the greater of the grandfathered benefit frozen by the 2004 amendments or the benefit calculated under the cash balance formula. [DE 307-1 at 7465].

Norton interprets a difference between the language "Effective prior to January 1, 2004" and "Effective January 1, 2004," that was added to the Plan as part of the 2004 amendments. Norton argues the 2004 amendments' drafters inserted the language "effective prior to January 1, 2004" to the beginning of each section describing the calculation of the frozen grandfathered benefits. [DE 307-1 at 7454]. These sections are "Accrued Benefit" §§ 2.01(a) and (b), "Normal Retirement Benefit" § 4.03(a), and "Early Retirement Benefit" § 4.05(b). [DE 307-1 at 7454].  And for the cash balance sections, Norton argues the language "Effective January 1, 2004" was added to the beginning of these sections. [*Id.*] These sections are "Accrued Benefit" § 2.01(c), "Normal Retirement Benefit" § 4.03(b), and "Early Retirement Benefit" § 4.05(d). Norton interprets sections that begin with "Effective prior to January 1, 2004" to refer and apply to the grandfathered frozen benefits even if an early retiree retired after January 1, 2004.  Norton does not interpret this language to mean the following section could not apply to someone that retired after 2004.[17]

---

[17] In support of this argument that the amendments' drafters inserted these phrases to tie off the grandfathered benefits, Norton cites DE 307-5, which is the Amended and Restated Norton Retirement Plan effective January 1, 1997, and DE 307-11, the 2004 Amendments.  Norton cites the language of the Plan in support of what the amendments' drafter intended. Norton also cites other documentary evidence discussed below.  Norton does not present testimony from the drafter of the 2004 amendments in support of this argument.

Under Norton's interpretation of the Plan, "[t]he starting point for calculating the grandfathers early retirement benefit for Khaliel is subsection 4.05(b)," but Norton argues even if the analysis starts with 4.05(d), the result is the same—the § 4.05(b) reducers apply. [DE 307-1 at 7461, n.30]. According to Norton's interpretation, an early retiree's grandfathered benefit, regardless of whether he or she retired after 2004, is calculated under § 4.05(b), and an early retiree's cash balance benefit is calculated under § 4.05(d). [DE 307-1 at 7468].  According to Norton, an early retiree received whichever benefit was larger. [*Id.*]

This court pre-appeal and the Sixth Circuit reasoned that after the 2004 amendments, § 4.05(d), rather that § 4.05(b), would become the relevant starting point for any early retiree who retired after 2004 because § 4.05(d) is expressly "Effective January 1, 2004" and § 4.05(b) (where the reducers are located) is expressly "Effective prior to January 1, 2004."  Because following the steps and calculations from § 4.05(d) never lead back through § 4.05(b), where the early retirement reducers are located, this court found the reducers no longer applied.  The Sixth Circuit agreed that the starting point for a post-2004 early retiree is 4.05(d), but still found the Plan patently ambiguous as to whether the reducers applied when converting the MRI to a lump-sum because the cross reference language of § 4.02(b)(6) "command that the MRI shall be reduced 'if the MRI is due to Early Retirement,'" and the reversal is still taken in § 4.02(b)(6), given the "as applicable" language applies to § 4.095(b)(5).  [DE 279 at 7215].[18]

Norton contends that the Sixth Circuit was incorrect and should have started the calculation of Khaliel's grandfathered benefit under § 4.05(b), not § 4.05(d).  [DE 307-1 at 7468–69, n. 43].

---

[18] As Judge White points out, Section 4.02(b)(6) does not use the word "shall" and applying its formula does not actually reduce the MRI —it increases it. But the majority opinion reads that implication into the language in the second half of Section 4.02(b)(6) ". . . and, if the Monthly Retirement Income is due to Early Retirement . . . diving by one (1) minus the appropriate reduction factor under Section 4.05(b)(5) . . . as applicable."  [DE 279 at 7215, 7224–25].

This argument is disingenuous, as Norton argued to the Sixth Circuit that "[t]o determine MRI for early retirees after January 1, 2004, a new provision was added: [Section 4.05(d)]."  [DE 46 at 18, Norton Appellate Brief, Case: 16-5063, Appeal].  Norton's arguments on appeal never seemed to draw a distinction for the starting point in calculating MRI between the grandfathered benefit and the cash balance formula.  Norton's arguments on appeal about reduction for early retirement are framed from the perspective of reducing the lump-sum for early retirement on the back end of the calculation at § 4.02(b)(6), not reducing the MRI for early retirement on the front end of the calculation by starting with § 4.05(b).  [DE 46, Norton Appellate Brief, DE 57 at 29, Norton Cross-Appellate Brief, Case: 16-5063, Appeal]. This is how the argument was framed for appeal. Norton's argument post-appeal that the analysis starts with § 4.05(b) seems to clarify a position that it was not stating well pre-appeal,[19] probably because the Sixth Circuit clarified the issue on appeal in its step-by-step analysis of the calculation of benefits.

But Norton argues that even by starting to calculate the benefit with § 4.05(d), it leads to the same place because of the provision in § 4.03(b) that "in no case shall such Monthly Retirement Income [calculated under the new cash balance formula] be less than the member's accrued Benefit as of December 31, 2003."  [DE 307-1 at 7469].  But calculating Khaliel's Accrued Benefit as of December 31, 2003 under § 2.01(a) Accrued Benefit (effective prior to January 1, 2004) never leads back to the reducers in § 4.05(b), except for the reducer in § 4.05(b)(5) referenced in the

---

[19] Gagel explained in his affidavit from 2010 that the reversal in the lump-sum calculation of the 4.05(b)(5) reduction factor results in a wash [DE 307-3 at 7481("Sections 4.02(b)(6) and 4.05(b)(5) cancel each other out.")].  Although Gagel never expressly states his calculation of MRI starts with Section 4.05(b), he does state in his 2010 affidavit that Khaliel's "benefit accrued through December 31, 2003 was determined under Section 4.05."  And then he never specifically references subsection (b) of 4.05, only subsection (d) of 4.05. But Gagel testified in his deposition that "subsection B [of Section 4.05] was effective prior to 1-1-04 which dealt with the old NKC and MEH benefits . . . that were tied off as of that date and for which an early retirement factor would have been necessary."  [DE 307-17 at 8168, p. 180].  Gagel went on to explain, "you preserve the level of the accrued benefit at 12-31-03 and that was why section B [of Section 4.05] would still apply because that was prior to 1-1-04."  [DE 307-17 at 8171, p. 190].

lump-sum calculation under § 4.02(b)(6).[20]  So, while starting with § 4.05(b) and § 4.05(d) may both ultimately lead to the lump-sum calculation in § 2.04(b)(6) that contains the reference to the reversal of the reducer in § 4.05(b)(5), starting with § 4.05(d) never otherwise leads back to the reducers in § 4.05(b).  Thus, under the express language of the Plan, the result is not the same if the calculation starts with § 4.05(d) instead of § 4.05(b).  Nor does the Sixth Circuit's reference to jumping in the time machine—which recognizes the language added to § 4.03 to tie-off the grandfathered benefit—mean that the reducers apply.  Because the language in § 4.03 also never leads back to § 4.05(b), one must still "jump in the time machine," [DE 307 at 7468], even if starting at § 4.05(d).

Norton points out that the 2004 amendments did not delete the provisions in § 4.05 for calculating early retirement benefits, and that their inclusion is intentional as there would have been no reason to leave § 4.05(b) in if the early retirement reducers were completely eliminated. [DE 307-1 at 7454].  This is a strong point.  If the calculation for a post-January 1, 2004 early retiree starts at § 4.05(d), the calculation never goes through the provision of § 4.05(b) except for the reference to § 4.05(b)(5) in the lump-sum calculation under § 4.02(b)(6).  But other sections that received the "Effective Prior to January 1, 2004" label—2.01 Accrued Benefit and 4.03(a) Normal Retirement Benefit—are still part of the calculation of a retiree's benefit after January 1, 2004 when the starting point is § 4.05(d).  Using § 4.05(d) as the start of the calculation for a post-January 1, 2004 retiree with grandfathered benefits renders § 4.05(b) superfluous.  And the drafters of the 2004 amendments added "Effective Prior to January 1, 2004" to the beginning of § 4.05(b).  There would have been no reason to add this language and § 4.05(b) could have been deleted

---

[20] Other places in the Plan explicitly reference old formulas and when they are to be used.  For instance, under Section 2.01(b)(1), "the Member's Accrued Benefit determined with respect to the benefit formula applicable for the Plan Year beginning on or after January 1, 1994 . . ." [DE 307-12 at 7888].

altogether if it were no longer applicable to early retirees. Likewise, the delineation between early retirement and normal retirement would not have been necessary in the Plan if the 2004 amendments eliminated the early retirement reducers.

Norton argues that the starting point is 4.05(b), while also arguing that the "accrued benefit as of December 31, 2003" language added to the new cash balance language requires Khaliel's benefit be calculated under the "before 2004" rules. [DE 307-1 at 7465–66]. Specifically, as mentioned above, Parks states "[t]he 'before 2004' benefit rules apply [for Khaliel] because the protected accrued benefit at 12/31/2003 is greater than determined under the rules starting 2004." [DE 307-1 at 7466, Parks DE 307-6 at 7538, ¶ 27]. This argument is less convincing, as a post-January 1, 2004 early retiree retiring at normal retirement age could also be entitled to their accrued benefit as of December 31, 2004 if it were larger, and that calculation would not require applying § 4.05(b). Thus, as pointed out above, the "accrued benefit as of December 31, 2003" does not necessarily support Norton's argument.

Norton points out that the "Effective prior to January 1, 2004" language is stated at the beginning of § 2.01 "Accrued Benefits," and all agree (including Plaintiffs) that § 2.01 still applied to Kahliel after the 2004 amendments. [DE 307-1]. While that is true, there is no dispute that § 2.01 still applied to Khaliel and the plain language of the Plan leads the calculation of Khaliel's benefit through § 2.01, unlike the reducers found in § 4.05(b). Specifically, calculating a retiree's benefit after January 1, 2004 begins with § 4.05(d). § 4.05(d) says that a member's MRI will be equal to the benefit under § 4.03(b) but in no event will be less than the Accrued Benefit[21] as of December 31, 2003. Proceedings under either option, § 4.03(b) or the Accrued Benefit as of December 31, 2003, will lead the calculation through § 2.01's Accrued Benefit. *See* § 4.03(b) ("·

---

[21] "Accrued Benefit" is both a title to Section 2.01 of the Plan and a defined term within Section 2.01.

. . in no case shall such monthly retirement income be less than the member's accrued benefit as of December 31, 2003."); § 4.05(d) (". . . in no case shall such monthly retirement income be less than the member's accrued benefit as of December 31, 2003."); § 2.01(a) ("Effective prior to January 1, 2004, the term "Accrued Benefit" as of any date of determination shall mean . . ."). The Accrued Benefit "as of December 31, 2003" must be calculated under § 2.01(a) or (b) because those are the sections of Accrued Benefit that are "Effective Prior to January 1, 2004," and thus were effective "as of December 31, 2003." This does not necessarily favor Norton's interpretation as it makes sense according to the plain language that § 2.01(a) would apply because the new § 4.05(d) expressly provides that early retirees shall not be "less than the member's accrued benefit as of December 31, 2003."   The plain language of the Plan expressly makes clear why the "Effective prior to January 1, 2004" language in 2.01(a) Accrued Benefit applies to early retirees retiring after December 31, 2003.  Thus, that the parties agree that § 2.01(a) Accrued Benefit applies, which contains the "Effective prior to January 1, 2004" language, is not compelling evidence that the reducers in § 4.05(b) apply.

But Norton also argues the "[a]crued benefit as of December 31, 2003" in § 4.03(b) language means the benefit must be calculated as it would have been on December 31, 2003, and the Plan retained the "before 2004" early retirement calculation in § 4.05(b).  [DE 321 at 8987]. This interpretation requires a bit of a leap, as the accrued benefit as of December 31, 2003 is found in § 2.01(a) and never leads to § 4.05(b).  It is still only in the lump-sum calculation under § 4.02(b)(6) that the reducer in (b)(5) of § 4.05 is first referenced.

Norton also argues that the language of § 4.02(b)(6) supports interpreting the calculation for a post-2004 early retiree to start with § 4.05(b).  According to Norton, retaining the cross reference to § 4.05(b)(5) implies that the early reduction factors were taken somewhere earlier in

the calculation, before reaching the lump-sum conversion.  This option was theorized by the Sixth

Circuit in footnote nine to its opinion, when it notes that § 4.02(b)(6) existed in the old Plan to

reverse a reduction taken earlier in the process and that "a [] plausible option is that the reversal

must be viewed in light of the reduction that traditionally precedes it. By retaining the reversal . .

. the Plan implicitly contemplates some sort of earlier reduction."  [DE 279 at 7216; DE 342, Hr'g

Tr., at 9285("[f]ootnote 9 is really the key to seeing why that [the Sixth Circuit's] mandate is

broader than that . . . dividing by one minus the early reduction factor . . . implies that it's reversing

reductions taken earlier in the process.")].  As with § 4.05(b), there would have been no reason to

keep the reversal in § 4.02(b)(6) if the reducers did not apply.  Keeping § 4.05(b), along with the

cross-reference in § 4.02(b)(6) signifies an intent for the reducers to still apply.

Norton contends that its experts agree with its interpretation of the Plan.  The Court has

examined Gagel's affidavit from 2012.  Gagel's affidavit summarizes "the provisions of the

Norton Plan (the language of which controls) that would be relevant to a calculation of Mr.

Khaliel's benefit."  [DE 307-3, Gagel Aff., at 7478].  Contrary to Norton's argument, Gagel does

not start his calculation with § 4.05(b).  [DE 307-3, Gagel Aff., at 7478]. In fact, Gagel starts with

§ 4.03(a)(3).  [DE 307-3 at 7479].  Then he does the analysis under § 4.03(b).  [DE 307-3 at 7478].

Gagel states that "the value of Plaintiff Khaliel's benefit accrued through December 31, 2003 was

determined under § 4.05."  [DE 307-3 at 7478].  But Gagel does not clarify whether he is

referencing subparagraph (b) or (d) of § 4.05 and does not expressly state whether the starting

point is § 4.05(b) rather than § 4.05(d).  Gagel's affidavit does not state that the reduction from §

4.05(b)(3) would be taken.  In fact, Gagel only mentions the reducers from § 4.05(b) in reference

to the reversal in § 4.02(b)(6).

Similarly, Parks' report provides a step-by-step statement for calculating Kahliel's benefit based on the provisions of the Plan, but Parks' report does not always cite the specific sections of the Plan in his step-by-step guide, and there is no citation to § 4.05(b)(3).  [DE 307-6 at 7541]. Parks' step by step analysis does not appear to start with § 4.05(b).  But there is no question Parks applies the § 4.05(b)(3) reducer, in addition to the 4.05(b)(5) reducer.  [DE 307-6 at 7541].  Parks explains that the early retirement reducers apply because the Plan "preserves the vested, accrued benefits of participants such as Khaliel as of Dec. 31, 2003" and "this amount is . . . calculated under the formula in effect as of December 31, 2003. At that time, there was no question the formula included the reduction for early retirement."  [DE 307-6 at 7538].

    *v.    Extrinsic Evidence of Norton's Intent*

Norton also argues that extrinsic evidence, as analyzed by its expert, supports its interpretation.  Both parties submit expert opinions on this issue, and Norton submits several extrinsic documents.  Parks' expert report from 2012 used § 4.05(b) and its reducers in 4.05(b)(3) and (b)(5) to calculate the early retirement benefit for Carol Lamb, who retired after January 1, 2004, but before her normal retirement date.  [DE 307-5, Parks 2012 report, at p. 15].[22]  Parks explains that "[t]he 'before 2004' benefit rules apply because the protected accrued benefit at December 31, 2003 is greater than determined under the rules starting 2004." [*Id.*]. Parks also made clear in his 2012 calculation for Khaliel that the 4.05(b)(3) and (b)(5) reducers were applied because "[t]he 'before 2004' benefit rules apply because the protected accrued benefit at 12/31/2003 is greater than determined under the rule starting 2004." [DE 307-5, Parks 2012 report, Exhibit C, at page 21].[23]  Parks updated his report in 2019 to expound upon his report from 2012

---

[22] The Page ID for this document is illegible. The page number of the document is referenced.
[23] The Page ID for this document is illegible.  The page number of the document is referenced.

and address the issues raised by the Sixth Circuit. [DE 307-6]. Parks opines that the 2004 amendments "did not eliminate the existing reduction in benefits for early retirement." [DE 307-6 at p. 8].[24]

Parks has been involved in this litigation since 2011 and examines several extrinsic documents that suggest a lack of intent by Norton to eliminate the reduction for early retirement for the grandfathered benefits. These include the 5500 Forms filed annually by the Plan, Section B to the Form 5500 certified by the Plan's actuaries, the Retirement Brochure, the 2003 Finance Committee Notes, and the Summary Plan Description. Along with these documents, Parks cites the consistent administration of the Plan by three different administrators. [DE 307-6, Parks. 2019 Supp. Report at p. 9, DE 307-13, Parks. 2019 Reb. Report at p. 16].[25]

Parks and Libman offer differing opinions about what Norton intended with the 2004 amendments. Parks opines that during that timeframe, funding expenses were driving employers to switch to cash balance, so it would not be logical that Norton, in amending the plan, intended to increase costs by eliminating the early retirement reducers. [DE 307-6]. Libman disagrees with this assessment, pointing out that oftentimes employers would provide a "wear-away period" when converting a traditional pension to cash balance formula, and that these "wear away" provisions negatively impacted employee morale. [DE 307-19 at 8190]. Libman opines that employers would improve early retirement subsidies to minimize the impact of converting from traditional benefit to cash benefit for longer-term employees. [*Id.*]. Libman opines that eliminating the early retirement reducers was consistent with Norton's reduction of future traditional benefit/grandfathered benefit. [*Id.*].

---

[24] The Page ID for this document is illegible. The page number of the document is referenced.
[25] The PageID for this document is illegible. The page number of the report is cited.

**The 2004 Form 5500 and its Schedules**.  [DE 307-14].  Parks opines that the Form 5500 and its schedules demonstrate that Norton did not intend to eliminate the early retirement reducers. [DE 315-8 at 8548, ¶¶ 20–22].  Libman disagrees with this assessment and argues that the Plan terms must be followed. [DE 307-19 at 8191]. The Sixth Circuit found the Plan terms ambiguous on this issue, so the Court is free to examine the implications of the Form 5500 as to Norton's intent.  Parks explains that eliminating the early retirement reducers would have increased the value of benefits, and disclosure was required on Schedule R to the Form 5500. [DE 307-6 at p. 9].  Schedule R contained no such disclosure.  Likewise, new amortization bases for plan events were required to be listed on Schedule B to the Form 5500.  Norton listed a reduced amortization base on Schedule B.  [DE 307-6 at p. 9].  Libman disagrees with Parks, as savings caused by other provisions of the 2004 amendments could have exceeded the increased costs of eliminating the reducers, still resulting in an aggregate savings. [DE 307-19 at 8191–92].  Libman also critiques Parks' opinions about Norton's intent as speculative.  [DE 307-19].  Both Parks and Libman are experienced actuarial experts, and their review of extrinsic evidence as to Norton's intent on the early retirement reducers is helpful.

**The Summary Plan Description**.  Parks reviewed the Summary Plan Description and found that it does communicate the reduction for early retirement was eliminated.  [DE 307-6 at page 8, DE 315-8, Parks 2019 Report].  Libman points out in his expert report that the Summary Plan Description [DE 45-7] states:

**Early Retirement**

**For plan members who terminate employment on or after January 1, 2004**, if you terminated employment prior to normal retirement age (age 65), your benefit will consist of the vested portion of your retirement account, **with no reduction for early termination** . . .

> **For plan members who terminated employment prior to January 1, 2004**, you can take early retirement if you are at least 55 years of old and were credited with at least 10 years of service at the time of your termination.  Your early retirement benefit will be equal to the total amount credited to your retirement account while you were a member of the plan, plus the lump sum value of the early retirement benefit you had earned under the MEH plan or the NKC plan.  For information on the early retirement benefits were determined under the MEH or NKC plan, please consult a prior version of the SPD, or contact the Pension Administrator.

[DE 307-19, Libman 2019 Reb. Report at 8192, DE 45-7, Summ. Plan Des. at 591].  Parks does not address this point in his rebuttal report, although Norton does.  [DE 307-13, Parks 2019 Reb. Report; DE 321, Norton Reply at 8988].  This court  previously discussed this language in its order ruling on the merits, [DE 217 at 6778], and although it ultimately did not consider it because Summary Plan Descriptions are not legally binding, it agreed that this language—"*your retirement account* with no reduction for early termination"—was in reference to the new cash balance account.  [*Id.*]  Although, at first blush, this language seems to support an intent to remove the early retirement reducers, the better reading is that this language only applies to the cash balance, which was not reduced for early retirement even before the 2004 amendments, and is consistent with Norton's interpretation of the Plan.

**Retirement Brochure**. Parks also reviewed the retirements benefit brochure and found it telling that it did not find a description of the early retirement reducer being eliminated.  [DE 315-8 at 8548, ¶¶ 20–22].  As discussed above, there is no evidence that the brochure was distributed.  Nonetheless, it may provide evidence of Norton's intent. It states, consistent with Norton's interpretation of the Plan, that "[e]mployees who were covered under one of the old plans are eligible, on resignation or retirement to receive the greater of two benefits.  The first is determined under the current plan and the second, a 'minimum benefit,' is based on the old plan rules," which

71

included a reduction for early retirement. [DE 307-10, Benefits Brochure, at p. 7].[26]  This description, as well as the other statements in the brochure about the MEH and NKC benefits, is consistent with Norton's interpretation of the Plan.  The "tying off the old plan" language in the brochure says the participant will get the greater of the new benefit or the old minimum benefit "under the old plan rules."  This implies that the reducers in § 4.05(b) for early retirement still apply.  The Brochure does not give any impression that NKU employees are getting an incentivized buyout.  Parks opines, "[i]n over a half century as a retirement plan professional, I have never witnessed a plan where the employer chose to increase overall liability by 40 to 50 percent and yet chose not to tell the employees of the change, nor to report this considerable increase in benefits and cost to the government."  [DE 307-13 at 7899].

**The Hamilton Email**.  Plaintiffs present a November 26, 2003 email from Jeff Hamilton, an attorney involved in drafting the 2004 amendments, as proof that Norton intended to eliminate the early retirement reducers.  [DE 308-1, Hamilton Email at 8364].  The email states: "To all, . . . . Attached is a draft amendment for the Retirement Plan, making the following changes effective 1/1/04," and lists several changes.  [*Id*.].  What appears to be item number 4 in the email states the "[t]ie-off of Methodist and NKC benefits (everything else).  Primarily, the tie-off is effected through the new Subsection 2.01(c)(in [I]tem 2) and the new Subsection 4.03(b) (in Item 4) . . ."  The final paragraph of the email states

> One additional change made in the case of Early, Disability, and Vested benefits is that, as the amendment is currently drafted, the benefit determination does not have a further reduction for early commencement--It is my understanding that we are going to a straight cash-balance format at this point, in which the Member gets his or her cash balance at termination, if eligible, regardless of whether the termination occurs prior to Normal Retirement Date.  If this understanding is not correct, please let me know--it would be a fairly simple matter to insert the 1/300 per month reduction into the amendment.  This also means that the application of these

---

[26] The PageID is illegible for this document.  The page number has been referenced.

> reductions to certain forms of benefit in Section [r].02 no longer apply . . . see, for
> instance, Paragraph 4.02(b)(6) which applies the early commencement reductions
> to the lump sum conversion.

[DE 308-1, Hamilton Email at 8364].  Like the language pointed out in the Summary Plan Description, at first blush, this paragraph appears to support that Norton intended to eliminate the early retirement reducers, or at least that it intended to eliminate the reducers for grandfathered benefits when taken in the form of a lump-sum ("[t]his also means that the application of these reductions to certain forms of benefit in § 4.02 no longer apply . . . for instance, Paragraph 4.02(b)(6) which applies the early commencement reductions to the lump sum . . ."). [*Id.*] No testimony or other documents relating to or elaborating on this email have been provided. However, the email is not inconsistent with Norton's interpretation of the Plan, in that it recognizes that the amendments tied off the grandfathered benefits ("[t]ie-off of Methodist and NKC benefits . . .") and that the early retirement reducers were eliminated for the new cash-balance formula ("[i]t is my understanding we are going to a straight cash-balance format").  The email does not state that the early retirement reducers would continue to apply to a grandfathered benefit frozen as of December 31, 2003, although Norton argues that it is implied.  [DE 321 at 8989].  While it could be implied, it may also be that it simply was not considered, leading to the lack of clarity in the 2004 Plan.

**2003 Finance Committee Notes.** Parks also found significant that the 2003 Finance Committee notes, when summarizing key proposed changes to the plan, do not mention eliminating the early retirement reducers.  [DE 307-6 at p. 10].  The finance committee notes are consistent with Norton's stated goal of the amendments—to end the grandfathered benefits. These notes explain that the grandfathered benefits were "disproportionally weighted to former NKC/MEH employees—can receive upwards of 200% more than non-NKC/MEH employees . . .

73

Plan design complicated, not well understood, and perceived poorly . . . especially by the NKC/MEH employees . . ."  [DE 307-9, 2003 Finance Comm. Notes at 7869].  These notes cut both ways.  Making the grandfathered benefits bigger by eliminating the reducers would have made the benefits more disproportionate.  At the same time, those employees perceived the plan poorly and may have given Norton incentive to subsidize early retirement, as Libman theorizes, to appease them as part of the "wear away" process of changing to cash balance and freezing the grandfathered benefit.  [DE 307-19 at 8190].  It would have also "[s]implied administration," as the notes point out.  [DE 307-9, 2003 Finance Comm. Notes].

Norton makes much of tying off the accruals under the grandfathered benefits and asserts that eliminating the reducers would have been antithetical to this purpose.  The tie off is achieved in the 2004 amendments through the "no less than as of 12/31/2003" language.  This is affirmed by the Hamilton email, discussed below, which states "Tie-off of Methodist and NKC benefits (everything else)," and that "[p]rimarily, the tie-off is effected through the new Subsection 4.03(b) . . . [t]he way 4.02(b) works is that the Member's current benefit is converted at new Paragraph 4.03(b)(1), then the interest credit is applied to this converted benefit at Subparagraph 4.03(b)(2)(A) and the pay credit applied to it at Subparagraph 4.03(b)(2)(B)."  [DE 308-1 at 8364]. Consistent with the language of the Plan, the tie-off of the Methodist and NKC benefits is achieved in the new § 4.03(b), a provision not reached when the calculation starts with § 4.05(b). Stopping accruals under the grandfathered benefit and freezing them as of 12/31/2003 would be consistent with continuing to apply the reducers because they applied as of Dec. 31, 2003.  Subsidizing early retirement would be antagonistic to that goal.

74

*vi.     Conclusion on 4.05(b) reducers.*

The Court has reviewed the Plan, evidence extrinsic to the Plan, and the parties' expert reports.  Attempting to apply the Plan as written does not lead to applying the early retirement reducers in the calculation.  However, as the Sixth Circuit held, the reference to § 4.05(b)(5) in the lump-sum conversion in § 4.02(b)(6) implies an early reduction was taken and creates ambiguity. Likewise, keeping § 4.05(b) in the text of the Plan with the added language "Effective prior to January 1, 2004," along with defining early retirement, also implies that it is there for a reason. It also implies that the definition of early retirement, the reducers in 4.05(b)(1)–(3), (5), and the cross-reference in 4.02(b)(6), are not meaningless.

The extrinsic evidence demonstrates Norton intended to tie off the grandfathered benefit and freeze it as of December 31, 2003—a time when there was no question the reducers, under the previous plan, applied. None of the extrinsic evidence directly addresses what Norton intended as to the early retirement reducers and the grandfathered benefit.   Perhaps Norton gave little thought to how eliminating early retirement reducers from the cash balance formula would impact the grandfathered benefits, but it was not intended to eliminate them from grandfathered benefits. Norton was concerned with the disproportionate benefit those funds received. The absence of early retirement reducers in most of the extrinsic evidence documents indicates a lack of intent to eliminate them.   Norton was also concerned with the plan's poor perception, particularly among participants with the grandfathered benefit.   But as Parks opines, eliminating the reduction for early retirement would be a benefit communicated to the Plan participants. [DE 307-6, Parks 2019 Supp. Report at page 8].   Some critiques of the extrinsic evidence are valid, as discussed above, and some of the analysis as to Norton's intent feels speculative. Yet, taken as a whole, and coupled with the absence of affirmative proof that Norton intended to eliminate the reducers, the extrinsic

evidence weighs in favor of Norton's interpretation of the Plan.  Gagel, involved with the 2004 amendments, has consistently opined since the beginning of this litigation that the 2004 amendments did not eliminate the early retirement reducers for grandfathered benefits. Applying Norton's interpretation to the mechanics of the Plan is a frustrating exercise, but it has a reasonable basis. § 4.05(b), the definition of early retirement, and the cross-reference to 4.05(b)(5) in 4.02(b)(6) would be rendered meaningless otherwise.  Thus, a reasonable factfinder could not find Norton's interpretation of the Plan arbitrary and capricious, and the Court must defer to it. Summary judgment is **GRANTED** in favor of Norton on this issue.  The early retirement reducers apply to a member's grandfathered TRAC benefit frozen as of December 31, 2003.

> **iii.** Issue 3: Whether MRI is calculated by adding 4.03(b)(1) (which is calculated from 4.03(a)) with the amount accrued under 4.03(b)(2).

Plaintiffs argue that "[b]eginning January 1, 2004, the MRI is the sum of the benefits determined under § 4.03(a) *plus* § 4.03(b)(2)."  [DE 324 at 9057].  The Sixth Circuit stated that "Section 4.03(b) contains instructions for calculating the MRI" and "instructs the reader that this benefit 'shall be determined' by a two-step process . . . Thus, § 4.03(b) tells us to add two numbers together to find the MRI."  [DE 279 at 7208-10].

The Sixth Circuit also recognized that "no one in this litigation has ever explained how the whole plan works, i.e., how to calculate benefits from start to finish."  [DE 279 at 7205].  This made the arguments "almost impossible to follow," so the Sixth Circuit drew a roadmap "for ourselves, addressing the parties' disputes as they arise." [*Id.*]  In devising this road map through the Plan, the Sixth Circuit determined in Step 2—calculating MRI—that an early retiree's MRI was the sum of § 4.03(a) and 4.03(b)(2).  The Sixth Circuit states:

> § 4.03(b) tells us to add two numbers together to find the MRI. The base number is the amount accrued under the old defined-benefit system [this base number comes from § 4.03(a)]. § 4.03(b)(1). That number is then 'increased' by the benefit accrued under the cash-balance system established in 2004. § 4.03(b)(2).

[ DE 279 at 7207].  Then, under Step 3, converting the MRI of an early retiree to a lump-sum, the Sixth Circuit stated "[t]o reiterate: a person's MRI under the plan is the appropriate amount from § 4.03(a) plus the amount accrued under § 4.03(b)(2)."  [DE 279 at 7210].

Under the Plan, grandfathered retirees were entitled to the greater of two benefits: the grandfathered plan which Norton tied off effective December 31, 2003, or the new cash balance benefit.  The Court agrees with the Sixth Circuit—the language of the Plan is clear that an early retiree's MRI is the "amount from § 4.03(a) plus the amount accrued under § 4.03(b)(2)."  The language in § 4.03(b) is clear.  But this is only true for calculating an early retiree's cash balance benefit, which begins with § 4.05(d), not the grandfathered benefit frozen as of Dec. 31, 2003.  As discussed above, Norton's interpretation of the Plan (as deferred to above) begins calculating the grandfathered benefit for an early retiree with § 4.05(b).[27]  § 4.05(b) has its own calculation of MRI, which includes the reducers, and does not lead to 4.03(b).  This is consistent with the 2003 Finance Committee Meeting notes Norton relies on, which state under "Proposed Plan Design Changes" that "Eliminat[ing] Defined Benefit Provision" (which is what the new § 4.03(b) did) will "[t]ie off and determine present value of NKC/MEH benefit and roll into cash balance account."  [DE 307-9 at 7869, Aug. 28, 2003 Finance Comm. Notes].  These notes are consistent with the MRI being 4.03(a) (by way of § 4.03(b)(1)) plus 4.03(b)(2), as 4.03(a) determines the "NKC/MEH benefit," and adding it to 4.03(b)(2) rolls it into the new cash balance created in 2004.

---

[27] As noted above, Norton never argued the calculation of the grandfathered benefit started with Section 4.05(b) on appeal.  In fact, Norton argued that the starting point was 4.05(d).  Naturally, the Sixth Circuit had no reason to know this was an issue and followed the Plan according to its plain language which leadss to starting with 4.05(d), as it applies "after January 1, 2004."

But this is for the new cash benefit formula, which Norton also had to calculate in addition to the grandfathered benefit.

Norton argues that Plaintiffs have never made this claim and it is not contained within the allegations of the Second Amended Complaint. [DE 315 at 8457]. Plaintiffs do not directly respond to this argument, but instead argue that this is part of the Sixth Circuit's "mandate." [DE 324 at 9057]. Nor have Plaintiffs sought to amend their claims to include it.[28]

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). However, the doctrine merely "directs a court's discretion, it does not limit the tribunal's power." *Id.*; *see also Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589–90 (6th Cir.1995). "In essence, the mandate rule is a specific application of the law-of-the-case doctrine." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir.1999). "The basic tenet of the mandate rule is that a district court is bound to the scope of the remand issued by the court of appeals." *Id.* The scope of a remand is determined by examining the entire order or opinion, to determine whether and how the court of appeals intended to limit a remand. *Id.* at 266–68; *Scott v. Churchill*, 377 F.3d 565, 569–70 (6th Cir. 2004)

The analysis above is consistent with the Sixth Circuit's mandate. The Sixth Circuit analyzed, step by step, how to calculate benefits, and "address[ed] the parties' disputes as they [arose]" in the calculation. [DE 279 at 7205]. The Sixth Circuit determined the Plan was

---

[28] Fed. R. Civ. P. 15(b) addresses amendments to pleading made during trial. It states that "(1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence."

ambiguous as to whether the early retirement reducers applied.  This ambiguity is arguably larger than just the cross reference in § 4.06(b)(6).  As set forth above, the ambiguity is not limited to § 4.02(b)(6). It also applies to calculating the MRI.  As determined above, the Court is deferring to Norton's interpretation that, for purposes of calculating the grandfathered benefit, the MRI is calculated from 4.05(b), not 4.05(d).  A post January 1, 2004 retiree was entitled to 4.03(a) plus the amount accrued under 4.03(b)(2) under the cash balance formula, but not the grandfathered formula.   Thus, the holding that Norton's interpretation—that the analysis for calculating grandfathered benefits starts with 4.05(b), and MRI under that section does not equate ("4.03(a) plus 4.03(b)")—comports with the Sixth Circuit's determination that MRI, for cash balance, was "4.03(a) plus 4.03(b)(2)."

      **iv.**   <u>Issue 4:   Whether the lump-sum calculated under § 4.02(b)(6) is the "actuarial equivalent" of the basic-form of benefit, including whether Norton's actuarial assumptions are valid, taken together.</u>

      The Sixth Circuit remanded the case for this Court to determine whether the lump-sum in § 4.02(b)(6) is the "actuarial equivalent" of the basic-form of benefit, including whether Norton's actuarial assumptions are valid, taken together.  As stated above, the class is "all retirees who took lump-sum distributions after January 30, 2003, regardless of whether their benefit was ultimately determined on a cash-balance or defined-benefit basis, but not disability retirees or those receiving mandatory lump-sum payments."  [DE 279 at 7221].  As the Sixth Circuit said, "ERISA requires that any lump-sum alternative be the 'actuarial equivalent' of the basic-form benefit."  [DE 279 at 7212 (citing 29 U.S.C. § 1054(c)(3))].  The Sixth Circuit found that the lump-sum benefit is based on an increasing monthly income, but it did "not appear to include the sixty-months-certain feature of the basic-form benefit."  [DE 279 at 7213].  Thus, "the calculation in § 4.02(b)(6)—multiplying the § 4.03(b) MRI by 212 and then dividing by one minus any applicable reduction factor—must

produce a lump-sum that is actuarially equivalent to the increasing, sixty-months-certain lifetime annuity provided under the basic-form rules" and "[a]ll of the Plan's other actuarial conversions, such as calculations from § 4.03(a)(3), must also be valid." [DE 279 at 7213]. As the Sixth Circuit stated, the Court must look to the parties' explanations and expert testimony on these issues.[29] The Sixth Circuit noted that this Court examined expert opinions, but only for purposes of damages, and it was not clear "whether or to what extent their competing formulas would have been different had the district court correctly interpreted the Plan," and it was not clear "whether this might have changed the district court's conclusions about the experts' persuasiveness." [DE 279 at 7213, n.7]. Accordingly, the Court now looks to the parties' explanations and expert testimony on these issues.

### 1. *Standard of Review as to Whether the Plan Complies with ERISA*

The parties disagree about the standard this Court is to apply in determining whether the lump-sum alternative is the actuarial equivalent of the basic-form of benefit as required by 29 U.S.C. § 1054(c)(3). [DE 308 at 8245; DE 315 at 8437]. Plaintiffs argue they are entitled to three different lump-sums that must be actuarially equivalent: a statutory lump-sum, a contractual lump-sum, and a 212 lump-sum calculated under § 4.06(b)(6). [DE 308]. The Sixth Circuit has explained that "[n]ormally, when a plan gives its administrator discretion to construe and interpret the plan . . . a court reviews the administrator's decision on the eligibility of benefits under the 'arbitrary and capricious' standard." *Daft v. Advest, Inc*., 658 F.3d 583, 594–95 (6th Cir. 2011) (citing *Firestone*, 489 U.S. 101, 115 (1989)). But "this deferential standard does not apply to a plan administrator's determination of questions of law . . . a court reviews those questions *de novo*." *Id*. On appeal, the Sixth Circuit recognized that the ambiguity over the reduction issue

---

[29] That is, whether the benefits paid to Plaintiffs were at least the "actuarial equivalent" of the basic form of benefit. [*Id*., pp. 25–26].

required *Firestone* deference but made no mention of *Firestone* in its analysis of whether the Plan complied with ERISA.  [*See* DE 279 at 7214, (stating about the reducer issue after analyzing the actuarial equivalence issue with no mention of *Firestone*,"[a]t long last, we reach the final plan-interpretation issue. And it is here that we find ambiguity mandating *Firestone* deference.")]. Whether the Plan complies with the actuarial equivalence requirement of ERISA, [DE 279 at 7212–13], is a question of law that does not require *Firestone* deference.  Further, a "court's review of a plan administrator's decision, even when *de novo*, is confined to the evidence in the administrative record."  *Daft*, 658 F.3d at 595 (citing *Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609, 618 (6th Cir. 1998) (Gilman, J., concurring)).

To the extent Plaintiffs' claims involving actuarial equivalence implicate whether the Plan is complying with ERISA, the Court reviews them *de novo*.  To the extent they implicate how Norton is construing the Plan,  the Court reviews them under *Firestone*'s arbitrary and capricious standard.

### 2.   Analysis

Plaintiffs argue they have three options from which to choose: statutory lump-sum, the contractual lump-sum, or the § 4.02(b)(6) lump-sum, whichever yields the largest number.  [DE 308].  All three of the lump-sums  go to the actuarial equivalence issue, although the third lump-sum addresses, in part, the ambiguity and Plan interpretation issue discussed above.[30]  The Sixth Circuit held that the issue for remand was whether the lump-sum under § 4.02(b)(6) is the "actuarial equivalent" of the basic form of benefit and whether Norton's actuarial assumptions are

---

[30] Plaintiffs clarify in their reply in support of their motion for summary judgment that they refer to what the Sixth Circuitcalled"the patent ambiguity—whether the (1-RF) was still applicable after the 2004 amendments to the early retirement provisions of Sections 4.05 and 5.01"  as "whether Norton provided Class members with their alternative 4.02(b)(6) '212' minimum lump-sum benefit."  [DE 324 at 9045].

valid, taken together. This includes all of Norton's actuarial conversions, such as the calculations from 4.03(a)(3). Thus, the issue is whether Norton's actuarial assumptions in applying the Plan, including the lump-sum under 4.02(b)(6), are valid, meaning that Norton's lump-sum under 4.02(b)(6) was actuarially equivalent of the basic form of benefit.

### 1)  Law on Actuarial Equivalence

To comply with ERISA, lump-sum payments such as the ones received by Plaintiffs in the present case must be the actuarial equivalent of the normal accrued pension benefit. *West v. AK Steel Corp.*, 484 F.3d 395, 400 (6th Cir. 2007).

> (3) For purposes of this section, **in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age**, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, **the employee's accrued benefit**, or the accrued benefits derived from contributions made by an employee, as the case may be, **shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).**

29 U.S.C. 1054(c)(1), (2)(B), (3) (emphasis added). "Accrued benefit" is "the individual's accrued benefit determined under the plan and except as provided in section 204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A). Thus, an accrued benefit determined as an amount other than "an annual benefit commencing at normal retirement age," must "be the actuarial equivalent of such benefit . . ." In other words, "(1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at retirement age; and (2) if the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump-sum distribution, instead of annuity) it must be" actuarially equivalent to the normal retirement age benefit. *Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000).

82

ERISA does not define "actuarial equivalence," and it does not provide for any specific formula, calculation, or actuarial assumptions.  *Belknap v. Partners Healthcare Sys., Inc*., 588 F. Supp. 3d 161, 175 (D. Mass. 2022), *appeal dismissed sub nom*., *Belknap v. Mass Gen. Brigham, Inc.*, No. 22-1188, 2022 WL 4333752 (1st Cir. Aug. 30, 2022).  ERISA requires that actuarial assumptions for determining benefits must be specified in the plan:

(25) Requirement that actuarial assumptions be specified.—

A defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, **such assumptions are specified in the plan in a way which precludes employer discretion.**

26 U.S.C. § 401(a)(25) (emphasis added).  Not only must actuarial assumptions be specified, but they must be done "in a way which precludes employer discretion." *Id*.[31]  Further, 26 C.F.R. §1.411(a)(13)–1(b)(3) addresses actuarial equivalence and requires the use of "reasonable actuarial assumptions" when calculating "benefits under a lump sum-based benefit formula."  *See* 26 C.F.R. § 1.411(a)(13)–1(a) ("Paragraph (b) of this section describes special rules for certain statutory hybrid plans that determine benefits under a lump sum-based benefit formula.").

The Plan defines "Accrued Benefit" in Section 2.01:

(a)    EFFECTIVE PRIOR TO JANUARY 1, 2004, the term "Accrued Benefit" as of any date of determination shall mean the greater of the amount in paragraph (1) or (2) as applicable, plus the amount in paragraph (3), if applicable:

(1)    The Member's Monthly Retirement Income earned to the  date  of determination under Section 4.03(a)(1), or

(2)    The greater of the amount in paragraph (A) or (B):

---

[31] Again, to the extent the Court is examining whether actuarial assumptions are valid, this is not an issue in which the Plan was exercising discretion. As ERISA requires, actuarial assumptions must be specified in a plan in  a way that precludes discretion. Thus, *Firestone*'s arbitrary and capricious standard  does not apply to the question of whether Norton's actuarial assumptions are valid.

83

(A)   The Member's projected Monthly Retirement Income at his Normal Retirement Date under Section 4.03(a)(2)(A) or (3)(A), as applicable, multiplied by a fraction, the numerator of which shall be the Member's Credited Service as of the date of determination and the denominator of which shall be the Credited Service the Member would have accumulated at his Normal Retirement Date had he continued to earn Credited Service at the same rate at which he earned it in the Plan Year preceding the date of calculation.

For purposes of this paragraph (2)A, the Member's projected Monthly Retirement Income shall be calculated on the basis of the following assumptions:

(i)   that the Member's Average Monthly Earning at date of determination would have been his Average Monthly Earnings at his Normal Retirement Date;

(ii)   that his Credited Service would have continued uninterrupted to his Normal Retirement Date at the same rate at which it accrued in the Plan Year preceding the date of calculation of the Accrued Benefit; and

(iii)   that the Member's Covered Compensation for the calendar year which contains the first day of the Plan Year in which the Accrued Benefit is being determined would remain unchanged to the Member's Normal Retirement Date.

(B)   The Member's Monthly Retirement Income under Section 4.03(a)(2)(B) or (3)(B).

(3)   The Member's Monthly Retirement Income earned to the date of determination under Section 4.03(a)(4).

. . .

(b)   EFFECTIVE JANUARY 1, 2004, THE TERM "ACCRUED BENEFIT" AS OF ANY DATE OF DETERMINATION SHALL MEAN THE MEMBER'S MONTHLY RETIREMENT INCOME EARNED TO THE DATE OF DETERMINATION UNDER SUBSECTION 4.03(B).

[DE 308-1, 1997 Restated Plan, at 8286; DE 307-12, 2004 amendments Combined with Plan, at 7887–89].  The definition of Accrued Benefit was changed as part of the 2004 amendments.  [*Id.*]  The changes are captured in red above.

As stated above, ERISA does not define "actuarial equivalence," which is a "term of art." *Stephens v. U.S. Airways Grp.*, 644 F.3d 437, 440 (D.C. Cir. 2011).  The D.C. Circuit has held, "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions."  *Id.*  Put differently, "[a]ctuarial equivalence prohibits a lump-sum payment that does not include the full value of the benefits a retiree would otherwise receive if he were to receive his pension in the form of an annuity."  *Id.*  (citing *Contilli v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 2009)).

The Plan defines "Actuarial Equivalent" in § 2.02:

> **The term "Actuarial Equivalent" shall mean a benefit of equivalent value**, as certified by the Actuary, and **computed on the basis of factors set forth in Section 4.02.** In the case of a benefit or form of benefit for which factors are not given in Section 4.02, the actuarial equivalent of such benefit or form of benefit shall be computed on the basis of the interest rate for 30-year Treasury securities for the second month prior to the beginning of the applicable Plan Year and the mortality table prescribed by the Secretary of Treasury.

[DE 308-1, 1997 Restated Plan, at 8286; DE 307-12, 2004 amendments Combined with Plan (emphasis added)]. In other words, all forms of payment under § 4.02 must be of equivalent value. [*Id.*; *see also* DE 307-17, Gagel Dep. at 8161, p. 151:12-23].  For the basic-form benefit under the Plan, the "factors in Section 4.02" refer to § 4.02(a), which sets forth the formula for computing the basic form:

> Basic Form: The basic form of Retirement Benefit (to which the formula indicated in Section 4.03 applies) shall be an increasing monthly income commencing on the Member's Disability, Early, Normal, or Late Retirement Date or on the date specified in Section 5.01 and continuing for sixty (60) months certain and for his lifetime thereafter. The monthly income shall be increased, on each January 1 following the date the Member's Monthly Retirement Income commences, by the Index determined for the Plan Year. If the Member's Monthly Retirement Income commences during the Plan Year immediately preceding a January 1, the benefit increase effective on that January 1 shall be equal to the applicable Index multiplied by the number of months in the preceding Plan Year during which the Member received Monthly Retirement Income, divided by twelve (12).

[DE 308-1, 1997 Restated Plan, § 4.02(a), at 8295; DE 307-12, 2004 amendments Combined with Plan, at 7889]. The basic form incorporates the applicable formula from § 4.03 and requires that the basic form "be an increasing monthly income . . . continuing for sixty . . . months certain and for his lifetime thereafter." [*Id.*]. The basic form requires the "monthly income shall be increased, on each January 1 following the date" it commences "by the Index determined by the Plan Year." [*Id.*].

For a lump-sum benefit under the Plan, the "factors in Section 4.02" refer to § 4.02(a) for purposes of the "Basic Form," and refer to § 4.02(b)(6) for purposes of a lump-sum:

> A lump sum payment payable at the Member's Disability, Early, Normal or Late Retirement Date or the date specified in Section 5.01, and **calculated by multiplying the increasing Monthly Retirement Income determined under the applicable Section by 212 and**, if the Monthly Retirement Income is due to Early Retirement or Disability Retirement, **dividing by one (1) minus the appropriate reduction factor** under Section 4.05(b)(6), Section 4.06(a)(5) or Section 5.01(c)(5), as applicable.

[DE 308-1, 1997 Restated Plan, § 4.02(b)(6), at 8299 (emphasis added); DE 307-12, 2004 amendments]. The lump-sum formula is calculated by "multiplying the increasing Monthly Retirement Income" (determined under the applicable section) by 212, and if due to Early Retirement, dividing by one minus the reduction factor under § 4.05(b)(5), "as applicable." [*Id.*]

Of the portions of the Plan cited directly above, only § 2.01 Accrued Benefit changed under the 2004 amendments.  Neither § 2.02 nor § 4.02(b)(6) were changed by the 2004 amendments. [*Id*.].  It is this formula, from § 4.02(b)(6), that must produce a lump-sum that is the actuarial equivalent of the basic-form benefit.  This formula must comply with both ERISA and  the Plan. 29 U.S.C. 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan . . .").  "In other words, the calculation in § 4.02(b)(6)—multiplying the § 4.03(b) MRI by 212 and then diving by one minus any applicable reduction factor—must produce a lump-sum that is actuarily equivalent to the increasing, sixty-month-certain lifetime annuity provided under the basic form rules."  [DE 279 at 7213 (citing *West*, 484 F.3d at 400)].

## 2)  Expert Reports and Parties' Arguments

Norton asserts that the formula in § 4.02(b)(6) results in a lump-sum that is the actuarial equivalent of the accrued benefit in the basic form as required by ERISA and the Plan terms. Specifically, Norton asserts that multiplying the increasing MRI by the 212 factor, and dividing by 1-RF, if applicable, ensures that the lump-sum is at least the actuarial equivalent of the accrued benefit in the basic form. [DE 307-1 at 7470].  Norton contends that this formula includes the sixty-month-certain feature in the calculation of the MRI input, which, according to Parks, is about 1.5% greater than the value of the equivalent benefit without the sixty-month-certain feature.  [DE 307-1 at 7471].  And Norton argues the Plan is not required to include the value of a subsidized early retirement benefit (i.e., "an early retirement benefit that is more generous that the actuarial equivalent of the accrued benefit at normal retirement age") in the value of any lump-sum option. [DE 307-1 at 7471-72].  Norton presents the report and rebuttal report of its expert, Parks.  [DE

87

307-6, DE 307-13].  Parks was also deposed, and his deposition transcript was provided to the Court.  [DE 307-20].[32]

Plaintiffs, on the other hand, argue the formula set forth in § 4.02(b)(6) is not actuarially equivalent to the accrued benefit because Norton: (1) inappropriately applied the early retirement reducers to the lump-sum calculation [DE 398 at 8245]; (2) failed to use § 2.01 Accrued Benefit in calculating a retiring member's actuarially equivalent lump-sum benefit [DE 308 at 8247]; (3) failed to include the value of the "post-2003 . . . cash balance formula accruals" [DE 308 at 8248]; and (4) failed to use the correct methodology—specifically, that it did not include the sixty-month-certain value and must be adjusted because it was based on a proxy factor. [DE 8250].  Plaintiffs present the expert opinions of Libman, who prepared a supplemental report and rebuttal report. [DE 318-1 at 8930; DE 307-19].  Libman was also deposed, and his deposition was provided to the Court.  [DE 307-15].

(1)  Whether Norton inappropriately applied the early retirement reducers to the lump-sum calculation [DE 398 at 8245]

As set forth above, Norton interprets the Plan to mean that the early retirement reducers apply to grandfathered frozen benefits after the 2004 amendments.  Plaintiffs argue that the reducers no longer applied after 2003, and thus early retirement was subsidized.  Because the Court has ruled that Norton was appropriately able to reduce the grandfathered benefits post-2003 under 4.05(b), this issue is likely moot.  Under Norton's interpretation of the Plan terms, Plaintiffs were not entitled to have their grandfathered benefit unreduced.

But there is a question as to whether applying those reducers impacted the requirement that the lump-sum be the actuarial equivalent of the accrued benefit/basic-form benefit.  Norton

---

[32] Parks was deposed in 2012 and 2019.  Only the 2019 deposition transcript was provided in full.  Plaintiffs provided excerpts of the 2012 deposition.

argues it does not because ERISA provides "a plan may have more than one optional form of benefit under which benefits may be paid. There is no requirement that each form of benefit be the actuarial equivalent of all other benefit forms." [DE 315 at 8450]. At the outset, Plaintiffs did not respond to the substantive law cited in Norton's summary judgment briefing on this issue.[33] Plaintiffs argue that Norton waived this issue, and that this Court's previous opinion stands. But that is incorrect. This Court's previous opinion on actuarial equivalence primarily concerned damages. The Sixth Circuit reversed that ruling on the merits—both as to actuarial equivalence and by necessity damages—so it is appropriate to consider Norton's arguments.

Early retirement subsidies are payments that provide an early retirement benefit greater than the actuarial equivalent of the normal retirement benefit. *Bellas v. CBS, Inc*., 221 F.3d 517, 525 (3rd Cir. 2000) (citing Dan M. McGill & Donald S. Grubbs Jr., FUNDAMENTALS OF PRIVATE PENSIONS, 131–35 (6th ed. 1989)). ERISA does not require "a retirement benefit plan to subsidize early retirement benefits in the form of both a lump-sum and an annuity. Rather, a plan may subsidize early retirement benefits only in an annuity form and separately calculate any lump-sum amount as an unsubsidized benefit." *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 481 (4th Cir. 2017). Thus, Norton is correct that ERISA does not require it.

But Plaintiffs argue that even if ERISA does not require it, the Plan's terms require it. [DE 316 at 8663]. Treasury Regulations establish that the text of the Plan determines whether the value of a subsidized early retirement benefit must be accounted for in any optional form. *See* 26 C.F.R. § 1.411(a)-11(a)(2) ("if a plan that provides a subsidized early retirement annuity benefit specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit, then the normal retirement annuity benefit is used to apply the

---

[33] Plaintiffs did respond in their Rule 56(c) objections, which was not the proper place to respond.

valuation requirements of this section and the resulting amount of the single sum distribution available at early retirement age"); 26 C.F.R. § 1.411(d)-4 Q&A-3(a)(2)(i) ("A plan may treat a participant as receiving his entire nonforfeitable accrued benefit under the plan if the participant receives his benefit in an optional form of benefit in an amount determined under the plan that is at least the actuarial equivalent of the employee's nonforfeitable accrued benefit *payable at normal retirement age under the plan*. This is true even though the participant could have elected to receive an optional form of benefit with a greater actuarial value than the value of the optional form received, such as an optional form including retirement-type subsidies . . .") (emphasis added). What "the Treasury Regulations make clear that while a plan may choose to subsidize early retirement benefits taken in both an annuity and lump sum form, it is not required to do so, and if the subsidized early retirement benefits apply only to the annuity form, then the normal annuity retirement benefit may be used to determine the lump sum amount." *Parry v. SBC Commc'ns, Inc.*, 375 F. Supp. 2d 31, 53 (D. Conn. 2005).

As set forth above, the Plan terms, deferring to Norton's interpretation, did not require an early retirement be unreduced for grandfathered benefits. The Plan does require that the lump-sum calculation reverse some of the reduction taken for early retirement and Norton has followed that calculation.*See*, *e.g.*, Khaliel's benefit..   Thus, Plaintiffs' argument on this issue is not persuasive.[34]  The value of the lump-sum for an early retiree based on a grandfathered benefit was

---

[34] Parks opined in his 2012 report that the "early retirement subsidy in the Norton Plan results from applying a formula to calculate a reduced early retirement benefit as contrasted to a reduction calculated using mortality tables." [DE 307-5, p. 17, ¶ 17].  Parks explains that "[t]his formula approach produces an advantage to a participant who elects a monthly income at early retirement . . ." [*Id*.].  Parks states that "[n]othing in ERISA requires . . . a plan that does contain a lump sum option that it include an early retirement subsidy." [*Id*.].  But Parks later changed his opinion, finding that the lump-sum calculation includes the early retirement subsidy.  [DE 308-1, Exh. C, Parks 2012 Dep., p. 113:1-22].

greater than the value would have been taking the benefit in the basic form, the calculation of which does not reverse one of the early retirement reducers.

(2) Norton failed to used Section 2.01 Accrued Benefit in calculating a retiring member's actuarially equivalent lump-sum benefit [DE 308 at 8247, 8249]

Plaintiffs argue ERISA requires the accrued benefit be the actuarial equivalent of the lump-sum, and that Norton did not use the accrued benefit to determine the lump-sum. Plaintiffs argue that lump-sum under 4.02(b)(6) is calculated based on the MRI from the "applicable section," which is 4.03, not the MRI rules used under the basic-form rules or the accrued benefit rules. [DE 308 at 8247]. Plaintiffs argue that the "actuarial equivalent lump sum benefit must be based on the Accrued Benefit and is calculated under § 5.01, § 2.01, and the normal form of benefit under 4.02(a), while the "Section 4.02(b)(6) alternative lump-sum" is not. [DE 308 at 8247]. Plaintiffs argue this lump-sum is tied to § 2.01 accrued benefit (specifically the "212 lump-sum," not the 4.02(b)(6) lump-sum).

Norton argues this is an attempt to get around application of the letterless paragraph, which converts a level benefit to an increasing benefit. Norton asserts that Plaintiffs want to use 2.01 Accrued Benefit to calculate the frozen grandfathered benefit because it does not have the letterless paragraph in § 4.03(a)(3)(A). [DE 315, Norton Reply at 8442-43]. And Norton says that Plaintiffs ignore the fact that the letterless paragraph is incorporated into § 2.01 Accrued Benefit, and thus is applied when calculating the accrued benefit. [DE 315, Norton Reply at 8444]. Even if § 2.01 did not incorporate the letterless paragraph, the basic-form benefit requires an "increasing monthly income." Therfore, even if § 2.01 calculates a level benefit, it must be converted to a smaller, increasing income to be actuarially equivalent. [DE 315 at 8444]. The Court is not persuaded by Plaintiffs' argument that Norton failed to calculate accrued benefits under § 2.01 for purposes of ensuring actuarial equivalence.

Plaintiffs also argue Norton misinterprets their argument about accrued benefit and that they are entitled to the greater of Khaliel's "protected accrued benefit" under § 2.01 "payable as a non-increasing annuity and sixty months certain annuity" or the plan formula in effect.  [DE 324 at 9056].  That is not correct.  At issue is whether the lump-sum is the actuarial equivalent of the basic-form benefit.  Norton's calculation of the lump-sum benefit must produce a benefit that is the actuarial equivalent of the basic-form benefit.

The Court agrees with Norton that the level benefit for Khaliel is $2,342.62, not $2,849.13. [DE 307-13, Parks Rebuttal Report at 7900].  Paragraph 29 of Parks' report speaks to this issue, which demonstrates through future projections for 20 years when the value of the increasing annuity reaches and then exceeds the value of the level annuity.  [DE 307-19, Libman Rebuttal Report at 8196, ¶ 33].  Libman argues "future projections are not relevant to calculating the actuarial equivalent lump sum benefit." [*Id.*].  But it is relevant because, in the instance of Khaliel, it demonstrates thatafter 12 years the increasing annuity exceeds the level annuity (reduced for early retirement), which shows the MRI input into the lump-sum calculation is the actuarial equivalent of the level benefit.  Parks multiplies the level benefit by "the IRS mandated annuity factor for such purposes (UP 1984 @3% with a 3 year setback)," which for Khaliel is 170.305. This results in a lump-sum of $398,960, which is the same lump-sum reached using the increasing annuity under 4.02(b)(6)'s formula.  [DE 307-6, ¶ 31].  This demonstrates that  the level nonincreasing annuity that is calculated before applying the letterless paragraph of § 4.03(a)(3)(A)is actuarially equivalent to the increasing benefit that results after applying the letterless paragraph.  This goes to Libman's approach of starting with a higher beginning annuity that is a level annuity. [DE 307-13, Parks. Rebuttal Report at 7900, ¶ 2].  Thus, to the extent there is a dispute regarding the calculations from converting the level annuity to the increasing annuity,

this calculation does not result in the ultimate lump-sum being less than it would have been if a level annuity had been used.

> (3) Whether Norton failed to include the value of the "post-2003 . . . cash balance formula accruals"

Plaintiffs argue that Norton's failure to include the value of the post-2003 cash-balance formula accruals in calculating the lump-sums resulted in a lump-sum that was not the actuarial equivalent of the basic-form benefit.  As set forth above, this argument was not pleaded, and Plaintiffs did not seek to amend.  This argument is resolved in favor of Norton insofar as it relates to retirees whose winning benefit was the grandfathered frozen benefit because the post-2003 cash-balance formula required the post-2003 accruals, but the grandfathered frozen benefit formula did not.

> (4) <u>Whether Norton's methodology ensures actuarial equivalence</u>

At issue is whether the lump-sum calculated under § 4.02(b)(6) provides the sixty-months-certain feature of the basic form of benefit in § 4.02(a) and whether the 212 factor ensures actuarial equivalence of the lump-sum to the benefit in its basic form.

> *i.    Sixty-months-certain feature*

Norton argues the lump-sum calculation accounts for the sixty-months-certain feature of the basic form of benefit. Specifically, Norton argues that in calculating the MRI, which in Khaliel's case is done under § 4.03(a)(3)(A), the sixty-months-certain feature is included. Plaintiffs, on the other hand, argue Norton's calculation under § 4.02(b)(6) does not include the value of the sixty-months-certain feature, and that the MRI calculation fails to adequately account for it.  This is one of the issues remanded, which is whether the lump-sum calculated under § 4.02(b)(6) includes the sixty-months-certain feature of the basic-form benefit. [DE 279 at 7213]. There seems to be no dispute that the sixty-months-certain feature is not calculated under §

4.02(b)(6).  Thus, the question is whether calculating the MRI, which is an input into the lump-sum formula, includes the value of the sixty-months-certain feature.

Plaintiffs' make three arguments about the above statement in relation to the sixty-months-certain benefit .  First, Plaintiffs do not dispute that the "212 factor includes a value for the sixty-months-certain certain benefit-the 1.015 adjustment. The Class's position was, and remains, that the contractually required actuarial equivalent lump-sum factor must also include the 1.015 adjustment."  [DE 316 at 8650].  Plaintiffs describe the sixty-months-certain feature as the "1.015 adjustment" in actuarial terms.  [DE 318-1, Libman 2019 Report at 8934, ¶ 17 "1.015 (to provide the value of the sixty (60) months certain benefit and convert to a single life annuity)"].  Plaintiffs make a distinction between the "212 factor" and the "contractually required actuarial equivalent lump-sum factor" and argues that the "212 factor" includes the 1.015 adjustment, but the "contractually required actuarial equivalent lump-sum factor" does not.  In support, Plaintiffs cite the Sixth Circuit's statement that "4.02(b)(6) does not appear to include the sixty-months-certain feature of the basic-form benefit."  [DE 316 at 8650].  Norton argues in response that the Sixth Circuit held § 4.02(b)(6) of the Plan does not require the lump-sum contain the sixty-months-certain feature.  That is true, but the Sixth Circuit also held that because the sixty-months-certain feature is part of the normal form of benefit, ERISA requires the lump-sum to account for it.

Norton argues that the lump-sum calculation does account for the sixty-months-certain feature.  Norton contends that Gagel's affidavit explains "the inclusion of the value of the 60-month certain benefit feature."  However, it is not clear in Gagel's affidavit where he is discussing the sixty-months-certain feature, if at all. [DE 52-2, Gagel Aff.].  True, Norton lists an amount of $1,988.21 as representing the "5-year certain and life function" in the lump-sum in its interrogatory response, and Gagel's deposition discusses calculating the sixty-months-certain feature.  [DE 344

94

citing DE 52-3].   Also Parks opines that the sixty-months-certain feature taken when he "calculate[s] the non-increasing annuity payable at Mr. Khaliel's Early Retirement Date . . . through a two-step calculation procedure [is] as follows: i. 2,849.13 x 170.305 ÷ 212 = 2,288.78." Parks opines that 170.305 "is the present value of $1 payable 60 months certain and life thereafter as a level annuity [non-increasing] for someone age 65" and that 212 "is an approximated present value $1 payable for 60 months certain and life thereafter as an increasing annuity."  [DE 307-6, Parks 2019 Supp. Report at 7541].  Parks opines that the 170.305 annuity factor includes the value of the sixty-months-certain benefit and that without it, the annuity factor would be 168.351.  [DE 307-13, Parks 2019 Supp. Report at 7903, ¶ 9].

Plaintiffs state that they have never disagreed that the 212 factor from the letterless paragraph includes the 1.015 adjustment but argue that the 1.015 adjustment must be made again as part of the 212 actuarial equivalent lump-sum factor in § 4.02(b)(6).  Plaintiffs assert that this is because both factors (170.305 and 212) used in the letterless paragraph conversion include the 1.015 factor, thus the sixty-months-certain feature in Parks' calculation is cancelled out, and "then by definition it has never been provided."  [DE 345].  Parks argues in response that Plaintiffs' expert is taking the 1.5% increase factor for the five-years-certain guarantee twice.  [DE 307-13, 2019 Parks Rebuttal Report at 7903].  Libman's report confirms that the 1.015 is applied two times in his calculation, first in paragraph 17 of his report, and then in paragraph 19 of his report.  [DE 318-1, Libman 2019 Report at 8934-35].

The letterless paragraph takes a level benefit and converts it to a smaller, increasing benefit. [DE 279 at 7209].  Parks testified that the 170.305 "is the present value of a five-year certain life annuity at age 62 and some months" for Khaliel.  [DE 316 at 8651].  Parks' report further demonstrates that the 212 that the MRI multiplies by 170.305 also represents "an approximated

present value $1 payable for 60 months certain and life thereafter as an increasing annuity." [DE 307-6, Parks 2019 Supp. Report at 7541, p. 13, ¶ 35(i)(3)]. Plaintiffs argue the calculation required by the letterless paragraph (under § 4.03(a)) cancels the sixty-months-certain value out. [*Id.*]. Plaintiffs demonstrate the cancelling out as follows:

$$\frac{\text{TRAC}_{\text{ Accrued Benefit}} \times \text{PBGC}_{\text{ 60 Months}}}{212_{\text{ 60 Month}}}$$

[DE 316 at 8651]. Thus, Plaintiffs assert the sixty-months-certain feature must be accounted for in the formula under § 4.02(b)(6). Otherwise, Plaintiffs argue, the sixty-months-certain feature of the basic-form benefit is not included in the lump-sum. [*Id.*]. Thus, Plaintiffs argue their expert applies the 1.015 factor again and they are not taking "a second bite at the apple," as Norton argues. [DE 316 at 8650].

Parks' rebuttal report does not adequately explain why it is correct for the sixty-month-certain feature to cancel out in the conversion of the level annuity to an increasing annuity. Parks' report does not include a separate value within the lump-sum that represents the sixty-month-certain feature only. Norton and Parks argue in response that Libman is "double loading for the 5-year certain and life benefit" and "double dipping on the 5-year certain multiplier factor." [DE 344 at 9319]. Norton further argues that Libman's calculation on the sixty-months-certain is not required by the text of the Plan. But that is not correct. The Plan, through its definition of "Actuarial Equivalence," requires that "all forms of payment are actuarially equivalent." [DE 308-1, 1997 Restated Plan, at 8286; DE 307-12, 2004 amendments Combined with Plan]; *see also* [DE 307-17, Gagel Dep. at 8161, p. 151:12-25, p. 152:1]. Thus, the Plan, in addition to ERISA, also requires the lump-sum be actuarially equivalent to the basic form and the basic form is for sixty-

months-certain. Again, the lump-sum calculation of the Plan's § 4.02(b)(6) itself does not require it as the Sixth Circuit said, but the other provisions of the Plan do. Plaintiffs are correct that Norton has not adequately accounted for the sixty-month-certain feature as required by ERISA in ensuring that the lump-sum is the actuarial equivalent of the benefit in its basic form. Plaintiffs demonstrate that Parks' report, in applying the letterless paragraph to the calculation of MRI, applies the sixty-months-certain feature in a way that cancels it out and therefore never accounts for it. Norton's application of the letterless paragraph results in cancelling out the value of the sixty-month-certain guarantee. Plaintiffs say the minimum value of the sixty-months-certain benefit is a 1.5% increase to the lump-sum benefit. Thus, "an upward adjustment of 1.5% is required in calculating the actuarial equivalent lump-sum." [DE 308 at 8254]. According to Libman, this ensures that the retiring member gets the value of the sixty-month-certain benefit. Because a reasonable fact finder could not find otherwise, the Court will grant summary judgment to Plaintiffs on this issue.

Not including the value of the sixty-months-certain feature is a violation of ERISA and the Plan. The Sixth Circuit held that "[a]bsent some indication that this cause of action depends on 'ERISA's statutory protections' rather than on the interpretation of the contract, the most analogous limitations period here would be that which Kentucky applies to contract claims." [DE 279 at 7217-18]. The Sixth Circuit reiterated that Plaintiffs' "actuarial-equivalence claims remain governed by the statutory limitations period" of five years because those claims are based upon a violation of ERISA's statutory protections, which requires a lump-sum be actuarially equivalent. [DE 279 at 7217-18]. While this claim is based on both a violation of ERISA and the Plan, it does not depend upon ERISA. Therefore, it is governed by the 15-year statute of limitations. [DE 279 at 7217–18(citing *Redmon v. Sud-Chemie Inc. Ret. Plan*, 547 F.3d 531, 537 (6th Cir. 2008))]. As for the scope of the class, the Sixth Circuit reversed and remanded this Court's previous ruling for

failure to "address[] the due-process issues raised by *Dukes* at all, much less . . . in light of the facts of this case." [DE 279 at 7221–22]. Further briefing will be required to determine whether a damages class may be certified and, if so, the scope of the class and amount of damages.

ii.   *Does the 212 factor from the § 4.02(b)(6) formula ensure actuarial equivalence to the basic form benefit?*

The 212 factor in § 4.02(b)(6)'s formula represents how many months a retiree is expected to live based on mortality tables. [DE 342, Hr'g Tr. at 9287-88, pp. 70 – 71]. Plaintiffs argue the 212 factor from § 4.02(b)(6)'s formula does not ensure the lump-sum is actuarially equivalent to the basic form of benefit. Under ERISA and the Plan, the lump-sum benefit must be the actuarial equivalent of the basic-form benefit. There are two formulas to consider on actuarial equivalence: the formula for calculating the MRI—which in Khaliel's case is found in § 4.03(a)(3)(A)—and the formula for converting the MRI from a monthly benefit to a lump-sum, which is found in § 4.02(b)(6).

Norton argues that the formula for calculating the MRI and the formula for converting the MRI to a lump-sum ensure actuarial equivalence to the basic-form benefit. But Plaintiffs say Parks calculated Khaliel's actuarial equivalent lump-sum factor to be 251.448, which is higher than the 212 proxy (§ 4.02(b)(6)), and that this factor is higher for people like Khaliel (retired at 62) who retire before 65. [DE 308 at 8250]. But that Parks' statement that Khaliel's actuarial factor was 251.448 is less persuasive, as it was made in response to this court's previous pre-appeal order for Norton to calculate damages using Plaintiffs' formula. That order is now vacated.

Plaintiffs argue the 212 factor set forth in the § 4.02(b)(6) formula must be adjusted to account for the member's actual age at the time of retirement and the current interest rate to ensure actuarial equivalence. [DE 308 at 8251, 8262]. Specifically, Libman opines that the discount interest rate and the index rate, as part of the actuarial factor, must be measured at the time of

retirement, and that tying them to the same determination date ensures they are applied consistently.  [DE 318-1, Libman 2019 Report at 8938-39].  Plaintiffs thus argue the 212 factor is a "proxy" that assumes a retiree is age 65 and a 0% interest rate, and "[w]hile it may have approximated the value of an increasing MRI at age 65, it was not actuarily appropriate . . . for earlier commencement dates."  [DE 318-1, Libman 2019 Report at 8941, ¶ 50].  Plaintiffs argue that Parks confirmed in his 2012 and 2019 deposition that the 212 factor from § 4.02(b)(6) is a proxy based on age 65 and a 0% interest rate, and that it would have to be adjusted to actual age and interest rate to be actuarially equivalent.  [DE 307-20, Parks 2019 Dep. at 9225-27, pp. 99–105].  Norton argues that "the conversion factor used by the Plan must simply be 'reasonable.'" [DE 344 at 9314 (citing 26 C.F.R. § 1.401(a)-11) (explaining in the context of qualified joint and survivor annuities, "[e]quivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants, if such determination does not result in discrimination in favor of employees who are officers, shareholders, or highly compensated")]; *see also* [DE 321 at 8995(citing *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 203–04 (2d Cir. 2007))].

Parks' testimony and the questions asked of him by Plaintiffs on the proxy, are unclear. Parks answered "correct" to the question "so the proxy is going to have to be adjusted to reflect the actual age and the effective interest rate at that time, for that immediate lump-sum payment, correct?"  [DE 307-20 at 8227, p. 105:5-9].  However, in the questions leading up to this answer, it appears there is confusion over whether counsel and Parks are discussing the 212 factor from the lump-sum conversion in 4.02(b)(6) or the 212 factor from the letterless paragraph that is applied to the MRI because the discussion involves "the 1.015 adjustment" and some of the factors

from the letterless paragraph, such as the 170.305, which are based on actual age, not age 65.  [DE 316 at 8651 (citing Ex. C Parks' 2012 Dep. at 172:19-24)].  The same goes for the limited excerpts the Court was provided from Parks' 2012 deposition.  [DE 308-1 at 8357-58].  The letterless paragraph in § 4.02(a)(3)(A) converts the MRI to a single sum based on interest rate and the 1984 Unisex Pension Mortality Table set back three years for age, before dividing by 212.  [DE 307-12 at 7892, § 4.03(a)(3)].  It is not clear that Parks agreed the 212 from the formula in § 4.02(b)(6) would have to be adjusted to ensure actuarial equivalence.  [DE 307-20, Parks 2019 Dep. at 8225-27, pp 97–105].  Instead, it appears more likely from testimony that the 212 from the letterless paragraph in § 4.03(a)(3) was being conflated with the 212 from § 4.02(b)(6), and Parks believed he was agreeing that the letterless paragraph's inputs had to be adjusted by age and interest rate, which is consistent with his expert opinions. [*Id.*].  Regardless, for the reasons below, the Court is convinced based on Parks' report that the lump-sum calculation in § 4.02(b)(6) adequately produces a lump-sum that is the actuarial equivalent of the basic form benefit.

Plaintiffs point out that Norton, in response to an Internal Revenue Service actuary, represented that the § 4.02(b)(6) lump-sum "implicitly contain the same interest rate and mortality table provisions [effective rate and UP 84]," thus recognizing that the 212 proxy must be adjusted to provide the actuarially equivalent benefit.  [DE 308-1 at 8264 (citing DE 308-1, Ex. L, Norton IRS Oct. 27, 2003 Letter at 8359–61].  But the interest rate and mortality table provisions referenced in the IRS letter are considered in the § 4.02(b)(6) formula by way of the increasing MRI which comes from § 4.03(a)(3) in Khaliel's case,[35] and is based on interest rate and the 1984 Unisex Pension Mortality Table set back three years for age before dividing by 212.  [DE 307-12

---

[35] The conversion of the annuity to an increasing annuity is also contained in the letterless paragraph of Section 4.03(a)(1) and (2).  These paragraphs that convert the annuity to an increasing annuity are incorporated by reference in Section 4.03(b) and Section 2.01.

at 7892, § 4.03(a)(3)].  In examining the language of the Plan, Norton is correct that Parks uses the same mortality table, interest rates, and COLA adjustments as Libman.  These are built into Parks' calculation of the increasing annuity that is used in the lump-sum formula.  [DE 315 at 8446, (citing DE 307-6, Parks 2019 Report at 7539, ¶¶ 31-32, 36)].  Libman opined in his rebuttal report that the 170.305 factor in the § 4.03(a)(3) calculation "is the actuarial factor at Mr. Khaliel's actual age at retirement, not age 65."  [DE 307-19, Libman Rebuttal Report at 8198, ¶ 40].

Also, both Norton's and Plaintiffs' experts agree that use of the 212 factor in § 4.02(b)(6) assumes a retirement age of 65 (notwithstanding that the increasing MRI was calculated based on actual age), and they also agree that applying the 1 minus applicable reduction factor in the second part of the formula in § 4.02(b)(6) results in "adjust[ing] for an early commencement date."  [DE 381-1, Libman Report at 8942, ¶ 51].[36]  Libman opines that the reversal in the 1-RF adjusts the age "for early commencement date" but reflects "the same 0% effective interest rate." [DE 381-1, Libman Report at 8942, ¶ 51].  Libman opines the best formula for determining effective rate is the Fisher Equation.  [DE 308 at 8253; DE 318-1 at 8939, ¶ 39].  But Parks opines that Libman's "effective rate method is just one possible method to calculate the present value of an increasing life annuity . . . it assumes constantly increasing monthly benefits" [DE 30-7-13 at 7909, ¶ 26; DE 307-20, Parks 2019 Dep. at 8235, p. 139 ("[t]here are ones that are more precise . . . [b]ut yes, it's an approach that's accepted.")].  And applying the 1-RF adjusts the factor from 212 to 237.313.  [*Id*.].  This is consistent with Parks' testimony that the 212 factor would have to be increased if a member retired before age 65, whether that was in reference to the 212 factor from the calculation

---

[36] Gagel's affidavit explained that "Section 4.02(b)(6) provides for a lump sum equal to the increasing annuity multiplied by 212 at age 65 (the Normal Retirement Date as defined by the Norton Plan)."  [DE 145-7, Gagel Aff. at 3145].  Gagel further explained that "[a]t early retirement age, Section 4.02(b)(6) provides for a lump sum equal to the increasing annuity multiplied by 212 and divided by (1-RF) where RF is the early retirement reduction factor in Section 4.05(b)(5)."

of MRI or the 212 factor in § 4.02(b)(6). [DE 308-1, Parks 2012 Dep. at 8358, p. 152]. Thus, the formula under § 4.02(b)(6), in addition to using an increasing MRI that has accounted for age and interest rate, does adjust for the age of an early retiree, increasing the factor. This is only for retirees who took early retirement post-2003 and whose frozen grandfathered benefit was the winning benefit, as no reduction was taken for early retirees taking the cash balance benefit, meaning the 1-RF would not apply. But for a member retiring before age 65 who took the cash balance formula, the MRI used in the lump-sum formula accounted for age and interest rate. And that MRI would not have been reduced for early retirement.

The 212 factor from § 4.02(b)(6) ensures actuarial equivalence to the basic form. [DE 307-13, Parks Rebuttal Report at 7900]. In the case of Khaliel, the 212 factor was increased to approximately 237 after reversing one of the reducers. This resulted in a lump-sum of approximately $398,960. If the lump-sum of $398,960 is divided by 237, which represents the 237 months that Parks was projected to live and collect the annuity, the result is $1,683, which is approximately the same amount as the "increasing monthly income" he would have been entitled to if he elected the basic-form benefit instead of the lump-sum. [DE307-6, ¶¶ 29–32, 36]. The parties' expert reports have been examined extensively on this question as to whether the lump-sum formula from § 4.02(b)(6) ensures actuarial equivalence of the basic-form benefit in § 4.02, as well as the law and the parties' arguments. Based on the record, a reasonable fact finder could only conclude the lump-sum formula from § 4.02(b)(6) results in a sum that is actuarially equivalent to the basic-form benefit, except for the sixty-month-certain feature discussed above. Summary judgment will be granted to Norton, except for the sixty-months-certain feature.

## IV.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that,

1. Norton's Motion for Summary Judgment [DE 307] is **GRANTED IN PART AND DENIED IN PART** as set forth above,

2. Plaintiffs' Motion for Summary Judgment [DE 308] is **GRANTED IN PART AND DENIED IN PART** as set forth above,

3. Norton's Motion to Exclude a Portion of Exhibit C of the 2019 Libman Report [DE 309] is **DENIED**, and

4. Plaintiffs' Rule 56(c)(2) Objections [DE 316] are **GRANTED IN PART AND DENIED IN PART** as set forth above;

5. The parties shall submit a joint report **within 30 days** of the entry of this order outlining their proposed schedule for briefing the following issues: (1) whether a damages class may be certified, including but not limited to considering the due process considerations set forth in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), (2) the scope of the potential damages class, and (3) how to calculate damages.  A status conference will be held on **Wednesday, May 15, 2024** at **10:30 a.m.** at the Gene Snyder U.S. Courthouse.

Rebecca Grady Jennings, District Judge
United States District Court

March 29, 2024

103